**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 17-CR-51 (BAH)** |
| | : | |
| **v.** | : | |
| | : | |
| **RAUL FLORES HERNANDEZ,** | : | |
| | : | |
| **also known as "El Tio,"** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits this Sentencing Memorandum in the case of

Defendant Raul Flores Hernandez (hereafter the "Defendant"), whose contested sentencing is

currently scheduled for September 6–8, 2023.  On March 8, 2023, the Defendant pleaded guilty

to conspiracy to distribute five kilograms or more of cocaine knowing and intending that such

substance would be unlawfully imported into the United States.  *See* Min. Entry 03/08/23.  In

pleading guilty absent a plea agreement, the Defendant submitted a barebones Statement of

Facts, *see* Dkt. No. 29.  The parties submitted a joint filing specifying the parties' position on the

applicable offense level.  S*ee* Dkt. No. 28.  The Defendant's position grossly understates the

extent of his involvement in the drug trafficking conspiracy and the scope and nature of that

conspiracy.

At the sentencing hearing, the Government will present evidence that the Defendant was

the leader of an influential Mexican drug trafficking organization ("DTO"), and, in that capacity,

the Defendant conspired to distribute thousands of kilograms of cocaine for importation into the

United States.  The evidence will further show that the Defendant and his DTO were closely

aligned with leaders of the most prolific and violent cartels of their time, including the Sinaloa

1

Cartel, the Beltran Leyva Organization, the Milenio Cartel, and the Cartel de Jalisco Nueva

Generacion ("CJNG").  The Defendant was able to navigate these alliances, shifting over time,

for more than three decades to benefit from their patronage, powerful protection, and sources of

supply.

There are no mitigating circumstances in this case to justify a variance below the

Guidelines range.  *See* 18 U.S.C. § 3553(b)(1).  Accordingly, the Court should impose the

Guideline sentence—life imprisonment—to reflect the nature, circumstances, and seriousness of

the Defendant's unlawful conduct.

I.     Background

a.   Procedural History

On March 8, 2017, the Defendant was charged in a one-count Indictment with conspiracy

to distribute five kilograms or more of a mixture or substance containing a detectable amount of

cocaine, a Schedule II controlled substance, knowing and intending that such substance would be

unlawfully imported into the United States, in violation of in violation of 21 U.S.C. §§ 959(a),

960, 963, and 18 U.S.C. § 2.  Dkt. No. 1.  The Defendant was arrested in Zapopan, Jalisco,

Mexico, by Mexican authorities on July 20, 2017, pursuant to a provisional arrest warrant.  He

was detained in Mexico while he contested extradition to the United States in Mexican courts.

On January 4, 2018, a Grand Jury sitting in the Southern District of California returned a

Fourth Superseding Indictment charging the Defendant and numerous co-defendants with

conspiracy to distribute five kilograms or more of cocaine, knowing and intending that such

substance would be unlawfully imported into the United States, in violation of 21 U.S.C.

§§ 959(a), 960(a)(3), 960(b)(2)(B)(ii), and 963 (Count One); and conspiracy to distribute five

kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count Five).  *See*

*United States v. Flores Hernandez*, Case No. 16-CR-01996-WQH (S.D. Cal.). On August 17,

2018, a separate Grand Jury sitting in the Southern District of California returned a Superseding

Indictment charging the Defendant and several co-defendants with conspiracy to distribute five

kilograms or more of cocaine and 500 grams or more of methamphetamine, knowing and

intending that such substances would be unlawfully imported into the United States, in violation

of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(2)(B)(ii), and 963 (Count One); conspiracy to

distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, in

violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count Two); and conspiracy to launder the

proceeds of Counts One and Two, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and

(h). *See United States v. Flores Hernandez*, Case No. 17-CR-0680-JAH (S.D. Cal.). These

indictments arise out of two separate Title III investigations conducted by the U.S. Attorney's

Office for the Southern District of California, the Drug Enforcement Administration ("DEA"),

and Homeland Security Investigations ("HSI").

The Defendant remained detained pending lengthy extradition proceedings until his

extradition to this District on February 5, 2021. The Government of Mexico authorized the

extradition of the Defendant to this District for the purposes of prosecution in the above-

captioned case only.[1]

On March 8, 2023, the Defendant pleaded guilty to Count One of the Indictment in the

above-captioned case. *See* Min. Entry 03/08/23. The Defendant admitted in the Statement of

---

[1] Accordingly, due to the doctrine of the rule of specialty, the Defendant did not and
cannot plead guilty to the two pending indictments in the Southern District of California, and
those indictments will be dismissed following the sentencing hearing. Because the scope and
conduct underlying the Southern District of California indictments overlap at least in part with
the indictment in the above-captioned case to which the Defendant has pleaded guilty, the U.S.
Attorney's Office for the Southern District of California will join the Narcotic and Dangerous
Drug Section for the purposes of sentencing in this matter.

Facts and on the record at the change of plea hearing that from approximately 2007, he "was an intermediary, who made introductions that facilitated international drug trafficking."  Dkt. No 39 ¶ 2.  The Defendant further admitted "invest[ing] in several loads of cocaine from Bolivia and Peru to Mexico."  *Id*.  The Defendant minimized the quantity of cocaine he conspired to traffic, alleging he was only responsible for "more than 150 kilograms but not more than 450 kilograms."  *Id*.  The evidence presented at the evidentiary hearing, and summarized in part herein, will demonstrate that, for more than three decades, the Defendant was in fact responsible for coordinating and investing in the transport of tens of thousands of kilograms of cocaine from Colombia, Bolivia, Peru, and elsewhere to Mexico, where he and his associates arranged for the transportation of the cocaine into and across the United States, and for the laundering of millions of dollars of drug proceeds from the United States to Mexico and Colombia.  The evidence further will demonstrate that the Defendant was the leader of a DTO based in Guadalajara, Mexico, bribed Mexican and other officials to facilitate the receipt of the cocaine in Mexico, and used non-commercial aircraft to transport the cocaine.

       b.  <u>Anticipated Testimony</u>

At the sentencing hearing, the Government will present and enter evidence from multiple cooperating witnesses, a recorded in-person meeting with the Defendant, and other documentary evidence.  The government anticipates that the evidence presented and entered during the evidentiary hearing will establish the following.

In the 1980s, the Defendant was operating a sophisticated network of commercial trucking to support his business importing clothing, electronics, and other goods from the United States into Mexico without paying taxes and duties (commonly called *fayuca*).  As the Defendant admitted, he was commonly referred to as "El Tio."  PSR at 3.

In approximately 1983, a contact of the Defendant who was a Colombian cocaine broker (hereinafter, "Broker 1") introduced the Defendant to Joaquin Guzman Loera, also known as "El Chapo" ("El Chapo"). At that time, Broker 1 was supplying cocaine to El Chapo and other traffickers allied with the Sinaloa Cartel, including Arturo and Hector Beltran Leyva of the Beltran Leyva Organization ("BLO"). El Chapo and the others were then transporting cocaine from Colombia to Mexico via aircraft for onward transportation through Mexico and into the United States. Broker 1 introduced El Chapo to the Defendant, because the Defendant had a network of commercial trucking in Mexico and the United States because of his *fayuca* business that could transport the cocaine and drug proceeds between those two countries. The Defendant began to do just that, transporting the cocaine through Mexico to the U.S. border, where El Chapo crossed the cocaine using tunnels, and then continuing to transport the cocaine throughout the United States and to return to Mexico with the drug proceeds.

Later in the 1980s, the Defendant began investing in shipments of cocaine with El Chapo and the BLO. He also became very close to El Chapo, at times acting as his liaison with other traffickers. The Defendant, El Chapo, Broker 1, and others moved thousands of kilograms of cocaine in this manner. In the early 2000s, Broker 1 began to coordinate the transport of cocaine from Colombia to Mexico on commercial vessels instead of aircraft.

The Defendant's DTO also operated independently of other cartels and DTOs. Throughout the 2000s and into the 2010s, the Defendant and his DTO arranged for the transportation of multi-ton shipments of cocaine from Colombia and Bolivia to Mexico. Once the cocaine was in Mexico, the Defendant and his associates arranged for its transport from the coast of Mexico to the United States. The Defendant received millions of dollars of drug proceeds in Mexico in the form of U.S. currency. The Defendant used his connection to high-

ranking police and military officials to facilitate the receipt of cocaine in Mexico and its transport through Mexico and into the United States.

Additionally, contrary to the Defendant's limited self-reporting relating to his employment and asset history, *see* PSR ¶¶ 53, 57 (claiming that he is supported only by his illegal import/export business and has no bank accounts or other assets), the witnesses will describe the Defendant as a wealthy man who owned a network of entertainment and tourism venues, including night clubs and restaurants and at least three professional football (soccer) clubs. The Defendant purchased his businesses at least in part with drug proceeds and used those entities to launder his drug proceeds.

In total, the evidence at the hearing will establish that, as a leader of his DTO, the Defendant invested in multi-ton and multi-hundred kilogram quantities of cocaine and arranged for the transportation, distribution, and sale of tons of cocaine for importation to the United States, used extraordinary methods to conceal those shipments, paid bribes to facilitate his cocaine-trafficking activities, used non-commercial aircraft to transport cocaine, and laundered the substantial profits he reaped as a result through his network of companies and via professional money launderers.

   II.   Objections to the Presentence Investigation Report

On June 2, 2023, the U.S. Probation Office issued a Presentence Investigation Report ("PSR") for the Defendant. Relying on the Defendant's sparse Statement of Facts and without yet having the opportunity to hear witness testimony at the evidentiary hearing, the U.S. Probation Office concluded in the PSR that the Defendant's overall Guideline imprisonment range is 168 to 210 months. PSR ¶ 59 (Level 35, Criminal History I). The U.S. Probation Office determined that the Defendant's Base Offense Level is 38. *Id.* ¶ 16. However, the U.S.

Probation Office failed to apply a two-level enhancement for use of an aircraft to import a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(3)(B), a two-level enhancement for bribing, or attempting to bribe, a law enforcement officer to facilitate the commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(11), or a four-level enhancement for the Defendant's role as an organizer or leader in the criminal activity, pursuant to U.S.S.G. § 3B1.1(a).[2]

The Government agrees that the Base Offense Level is 38, pursuant to U.S.S.G. § 2D1.1(a)(2) and (c)(1), as the evidence at the sentencing hearing will show that the Defendant personally coordinated and invested in shipments totaling well over 450 kilograms of cocaine during his participation in the conspiracy.  The Government further asserts that the evidence presented at the hearing will establish that the following additional enhancements apply: a two-level enhancement for use of an aircraft to import a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(3)(B); a two-level enhancement for bribing, or attempting to bribe, a law enforcement officer to facilitate the commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(11); and a four-level enhancement for the Defendant's role as an organizer or leader in the criminal activity, pursuant to U.S.S.G. § 3B1.1(a).  Thus, the adjusted offense level is 46, and with a three-point reduction for acceptance of responsibility, the total offense level is 43. With a total offense level of 43 and a Criminal History Category of I, the applicable Guideline range is life imprisonment.

      a.   <u>Organizer-Leader</u>

---

[2] These enhancements were included in the draft Presentence Investigation Report.  Dkt. No. 34 ¶¶ 17-18, 20.  As a result, the government filed no objection to the U.S. Probation Office's Guidelines calculation, but did provide some minor factual corrections by letter on May 25, 2023.

The Court should apply a four-level increase pursuant to U.S.S.G. § 3B1.1(a) because the Defendant was an organizer and leader of a criminal activity that involved five or more participants and was extensive.  The anticipated evidence at the sentencing hearing will establish that the Defendant was a leader of a drug trafficking organization with significant reach. Application Note four to U.S.S.G. § 3B1.1 identifies the following factors the Court should consider in distinguishing leadership from mere management: exercise of decision-making authority, nature of participation, recruitment of accomplices, claimed right to a larger share of the fruits of the crime, degree of participation in planning or organizing the offense, nature and scope of illegal activity, and the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1, cmt. n.4.  Witness testimony will show that the Defendant was the leader of the Flores DTO, had final decision-making authority in the DTO, personally organized cocaine shipments across continents, recruited and employed more than five subordinates to send and receive the cocaine, and profited from cocaine investments.  Accordingly, a four-level increase for leadership applies.

      b.  <u>Use of an Aircraft to Import a Controlled Use</u>

The Court should also apply a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(3) because the Defendant used an aircraft other than a regularly scheduled commercial air carrier to import a controlled substance.  At the sentencing hearing, witnesses will testify that the Defendant used aircraft to transport cocaine that was imported into the United States.  For instance, the Defendant invested in cocaine shipments with other organizations that were using non-commercial aircraft to import cocaine into the United States.  Consequently, a two-level enhancement for use of an aircraft applies.

      c.  <u>Bribing, or Attempting to Bribe a Law Enforcement Officer to Facilitate the Commission of the Offense</u>

The Court should apply a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(11) because the Defendant bribed or attempted to bribe a law enforcement officer to facilitate the Defendant's drug trafficking activities.

At the sentencing hearing, witnesses will testify that the Defendant bribed government officials, including law enforcement officers to further his drug trafficking activities.  For example, the Defendant, through an intermediary, paid a high-level official in the Procuraduría General de la República ("PGR") who controlled the ports of Manzanillo and Veracruz.  Thus, a two-level increase for bribing or attempting to bribe a law enforcement officer to facilitate the Defendant's drug trafficking activities is warranted.

   III.   Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

The Sentencing Guidelines are advisory, not mandatory.  *United States v. Booker*, 543 U.S. 220, 258–60 (2005).  However, the Supreme Court held in *Booker* that sentencing courts must consider the Guidelines in formulating an appropriate sentence.  *Id.*  In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district court] must make an individualized assessment based on the facts presented." *Id.* at 49–50 (citation and footnote omitted).

9

In determining the appropriate sentence, the statute directs courts to consider the nature

and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C.

§ 3553(a)(1).  Further, courts are also directed to "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect
> for the law, and  to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant;
> and
>
> (D)   to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines

range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines

supports the premise that district courts must begin their analysis with the Guidelines and

remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.   The

relevance of the Guidelines throughout the sentencing process stems in part from the fact that,

while advisory, "the sentencing statutes envision both the sentencing judge and the

Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551

U.S.  338, 348 (2007), and the Guidelines are "the product of careful study based on extensive

empirical evidence derived from the review of thousands of individual sentencing decisions,"

*Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.  To the extent a sentencing court varies

from  the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the

justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at

50.

> a.  Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense

The Defendant committed a serious crime against the United States, having been

convicted of conspiring to distribute large quantities of cocaine for importation into this country.

Although the Defendant has only admitted to a drug quantity less than 450 kilograms, the

evidence at sentencing will show that the Defendant conspired to distribute thousands of

kilograms of cocaine.  The Defendant's drug-trafficking network spanned at least three

continents and transported cocaine by air, land, and sea.  The staggering quantity of cocaine that

the Defendant distributed, by itself, would make the Defendant's offense serious.

As the Court is well aware, cocaine is a dangerous and destructive substance.  From 2019

to 2021, cocaine-involved deaths in the United States rose nearly 54 percent to 24,486 deaths.

*See* National Institute on Drug Abuse, *Drug Overdose Death Rates* (Feb. 9, 2023),

https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.  Cocaine abuse has

devastated communities in the United States, Mexico, Colombia, and elsewhere, ruining lives,

splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on

society at large.  It is also a highly destabilizing and corruptive force in countries throughout the

region that do not have strong enough law enforcement institutions to combat it, such as Mexico,

further adding to the destructive nature of the crime.  As the Government witnesses will testify,

battles for control of territory for the purpose of distributing cocaine and other controlled

substances resulted in the loss of many lives, including innocent victims.  The social cost of

cocaine distribution is massive.  The Defendant's unlawful conduct played a significant role in

perpetuating drug abuse and addiction in the United States and its corrosive effects on communities in multiple countries.

Ultimately, the Defendant's goal was to make as much money as possible by distributing drugs. The Defendant acted without concern for the individuals suffering from addiction or the associated harms of drug abuse. Accordingly, the Court should impose a life sentence to reflect the nature and seriousness of the crime he committed.

b.  History and Characteristics of the Defendant

The Defendant's history and characteristics warrant a sentence of life in prison, as the Defendant has repeatedly shown disregard for the law.

The Defendant often partnered with some of the most violent cartels to move massive quantities of cocaine. The Defendant—motived by greed—continuously aligned his DTO with these cartels, thereby condoning their violent acts for personal gain.

The Defendant's inability to take responsibility for his conduct is further reflected in the minimalist statement of facts submitted at his Rule 11 hearing. As the testimony at the sentencing hearing will demonstrate, his proffered statement of facts falls well short of his conduct. A life sentence is therefore appropriate.

c.  Adequate Deterrence

Given the adverse impact that drug trafficking has on society and the serious detrimental effects of cocaine in communities in the United States and abroad, it is important that the Court impose a sentence that deters others from undermining the rule of law. Importation of controlled substances from South and Central America and Mexico into the United States still occurs in large quantities. In 2022, the DEA seized approximately 201,395 kilograms of cocaine, accounting for only a portion of the cocaine imported into the United States. *See* DEA, *Drug*

*Enforcement Administration Announces the Seizure of Over 379 million Deadly Doses of*

*Fentanyl in 2022* (Dec. 20, 2022), https://www.dea.gov/press-releases/2022/12/20/drug-

enforcement-administration-announces-seizure-over-379-million-deadly.  A life sentence

provides critical general deterrence to other DTO leaders, demonstrating that participation in

narcotics importation into the United States will result in substantial prison sentences.

        d.   Protect the Public from Further Crimes of the Defendant

Prior to his arrest, the Defendant led a DTO that operated independently yet maintained

significant ties to cartels for many years.  Upon serving his sentence, the Defendant could

conceivably return to the same criminal conduct.  As the testimony at the sentencing hearing will

show, the Defendant's extensive drug-trafficking network operated in many countries, including

the United States and Mexico.

        e.   Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among
            Similarly Situated Defendants

Section 3553(a)(6) articulates "the need to avoid *unwarranted sentence* disparities among

defendants with similar records who have been found guilty of *similar conduct*."  18 U.S.C.

§ 3553(a)(6) (emphasis added).  When determining whether a sentence creates an unwarranted

disparity, the Court should consider a defendant's acceptance of responsibility, the nature and

extent of a defendant's participation in the criminal activity, a defendant's criminal history and

whether and to what extent a defendant cooperated.  *See, e.g.*, *United States v. Mejia*, 597 F. 3d

1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by

co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's

"harsher" sentence was not unwarranted).  A defendant is only entitled to "a weighing of the

section 3553(a) factors that are relevant to his case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).[3]

As set forth above, the Defendant engaged in drug trafficking activities for decades and conspired to distribute ton quantities of cocaine into the United States. In arriving at its sentencing recommendation, the Government has evaluated the Defendant's role within the conspiracy and the length and extent of his criminal conduct. The Government's recommendation of a Guideline sentence of life is consistent with sentences received by defendants engaged in similar conduct and holding similar positions within international DTOs.

In *United States v. Eliu and Waldemar Lorenzana-Cordon*, brothers and co-defendants Eliu and Waldemar Lorenzana were leaders of a Guatemala-based DTO and conspired for 13 years to distribute thousands of kilograms of cocaine from cartels in Colombia to Mexican buyers for importation into the United States. Dkt. No. 1002 at 44 & Dkt. No. 1018 at 30–31, Case. No. 03-cr-00331-CKK (D.D.C.). Following a jury trial, both brothers were convicted of conspiracy to import five kilograms or more of cocaine into the United States and conspiracy to manufacture and distribute five kilograms or more of cocaine intending and knowing cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 952, 959, 960, 963, and 18 U.S.C. § 2. Dkt. Nos. 998 & 1010, Case. No. 03-cr-00331-CKK (D.D.C.). Both brothers had a base offense level of 38, and a total offense level of 46 with enhancements for

---

[3] Section 3553(a)(6) does not require that the sentencing judge engage in a case-by-case comparison. This sentencing provision is aimed at national disparities; and courts have held that "the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18–19 (1st Cir. 2006); *see also United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Gallegos,* 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall,* 977 F.2d 861, 863–64 & n.4 (4th Cir. 1992); *United States v. LaSalle,* 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Joyner,* 924 F.2d 454, 460–61 (2d Cir. 1991).

possession of a firearm, use of a non-commercial aircraft, and being a leader or organizer of the criminal activity. Dkt. No. 1002 at 7–8 & Dkt. No. 1018 at 6, Case. No. 03-cr-00331-CKK (D.D.C.). Eliu and Waldemar Lorenzana-Cordon did not have any prior U.S. convictions or enhancements for use of violence. *See id.* Given the seriousness of the drug trafficking offense, the court sentenced both brothers to life imprisonment. Dkt. No. 1002 at 50–51 & Dkt. No. 1018 at 34–35, Case. No. 03-cr-00331-CKK (D.D.C.).

In *United States v. Alfredo Beltran Leyva*, for example, the defendant received a life sentence after pleading guilty without a plea agreement and following a contested sentencing hearing. 916 F.3d 14, 20–21 (D.C. Cir. 2019). Like the Defendant, Beltran Leyva and his two brothers ran the Beltran Leyva Organization, a Mexico-based DTO closely allied with the Sinaloa Cartel until after Beltran Leyva's arrest in 2008, from the early 2000s to the 2010s. *Id.* at 19. Like the Defendant, the Beltran Leyva "DTO's cocaine business purchased cocaine from Colombian manufacturers through brokers and then shipped the drugs via land, air, or water for sale throughout Mexico; the cartel also imported some of that cocaine to the United States . . . ." *Id.* As here, Beltran Leyva's base offense level was 38, based upon the quantity of drugs involved. *Id.* at 20. The court found that five enhancements applied, including a four-level enhancement because the defendant was an organizer or leader and two-level enhancements each for possession of a dangerous weapon, violence, bribing a law enforcement official, and being a leader or organizer directly involved in the importation of a controlled substance. *Id.* at 20–21. Beltran Leyva's total offense level prior to any acceptance of responsibility was 50, and similar to the Defendant, Beltran Leyva had a criminal history score of zero, resulting in a criminal

history category I.[4]  *Id.* at 21.  After considering the factors in 18 U.S.C. § 3553, the court found

no basis for a downward departure and imposed a life sentence.  *Id.*

In *United States v. Sergio Mejia Duarte*, the defendant was sentenced to life

imprisonment following a conviction at trial of conspiracy to distribute five kilograms or more of

cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960,

and 963.  Dkt. No. 87, Case No. 15-CR-20540 (S.D.F.L.).  At trial, the Government presented

evidence that the Defendant operated in Honduras and Guatemala as the leader of a large-scale

narcotics transportation organization spanning from Colombia to Mexico and the United States.

Dkt. No. 71 at 2, Case No. 15-CR-20540 (S.D.F.L.).  The defendant had a base offense level of

38 based on drug quantity; a total offense level of 50 after enhancements for leadership,

possession of a dangerous weapon, violence, obstruction, and use of a non-commercial aircraft;

and a criminal history category of I.  *Id.* at 3–4; Dkt. No. 92 at 15, Case No. 15-CR-20540

(S.D.F.L.).  The court found a life sentence appropriate for such conduct.

In *United States v. Gerardo Gonzalez Valencia*, the defendant was sentenced to life

imprisonment following the defendant's guilty plea to conspiracy to distribute five kilograms or

more of cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§

959(a), 960, and 963, and a contested sentencing hearing.  Dkt. No. 184 at 2, Case No. 16-cr-

065-BAH (D.D.C.).  At sentencing, the government's evidence established that the defendant

was a leader of a drug trafficking organization, "Los Cuinis," that imported thousands of

kilograms of cocaine to the United States from Colombia, Guatemala and Mexico.  The Court

found that the defendant's base offense level was 38.  Sentencing Tr. at 25, Jul. 21, 2023, *United*

---

[4] Prior to sentencing, Beltran Leyva unsuccessfully attempted to withdraw his guilty plea. *Id.* at 21.  The court ultimately held the defendant did not qualify for a downward adjustment for acceptance of responsibility.  *Id.*

*States v. Gerardo Gonzalez Valencia*, No. 16-cr-065-BAH (D.D.C.).  Further, the court applied

enhancements for leadership, possession of a dangerous weapon, violence, and use of a semi-

submersible vessel, resulting in a total offense level of 46.  *Id.* at 32.  Gonzalez Valencia's

criminal history category was III due to a prior drug conviction in the United States and

committing a new offense while on escape status.  *Id.* at 10.  The Court issued a life sentence as

just punishment for his crimes.

The applicable Guideline sentence of life is therefore appropriate for the Defendant and

would not cause an unwarranted sentencing disparity with similarly situated defendants.

IV.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court

impose a Guideline range sentence of life imprisonment which is reasonable, appropriate, and

matches the severity of the crime committed by the Defendant.  A life sentence is sufficient, but

not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for

the law, deter the Defendant and others from committing similar serious crimes and protect the

public.

<div style="margin-left: 40%;">

Respectfully Submitted,
MARLON COBAR
Acting Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:     */s/ Melanie L. Alsworth*
        Melanie L. Alsworth
        Acting Assistant Deputy Chief
        Kirk Handrich
        Jonathan Hornok
        Trial Attorneys
        Narcotic and Dangerous Drug Section

</div>

Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the Defendant, this 23rd day of August, 2023.

By:     /s/  *Melanie L. Alsworth*
        Melanie L. Alsworth
        Acting Assistant Deputy Chief
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice