UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 17-CR-51 (BAH) |
| v. | : | |
| RAUL FLORES HERNANDEZ, | : | |
| also known as "El Tio," | : | |
| Defendant. | : | |

### GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States, for the reasons described below and in its initial sentencing memo, respectfully requests that this Court sentence Raul Flores Hernandez (the "defendant") to life in prison and order that he forfeit $680 million in drug proceeds.

On March 8, 2023, Mr. Flores pleaded guilty to conspiracy to distribute five kilograms or more of cocaine knowing and intending that such substance would be unlawfully imported into the United States. Min. Entry Aug. 8, 2023. When pleading guilty absent a plea agreement, Mr. Flores submitted Statement of Facts of his own design. Dkt. No. 29. The parties also submitted a joint filing specifying their differing positions on the applicable offense level. Dkt. No. 28.[1] At the sentencing hearing that began on September 6, 2023, and was continued on September 7 and 18, the government presented evidence that Mr. Flores was the leader of a Mexican drug

---

[1] At the plea hearing, the Court reviewed this statement, including the government's likely position that Mr. Flores should be sentenced to life in prison. Mar. 8 Tr. at 20–21.

1

trafficking organization (DTO) and that he conspired to send tens of thousands of kilograms of cocaine into the United States. There are no mitigating circumstances in this case to justify a variance below the Guidelines range. *See* 18 U.S.C. § 3553(b)(1). Accordingly, the Court should impose the Guideline sentence—life imprisonment—to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

## I. Previous Objections to the PSR

The June 2, 2023, Presentence Investigation Report ("PSR") calculated the defendant's Base Offense Level as 38 and did not include any enhancements or reductions apart from Acceptance of Responsibility. Dkt. No. 41 ¶¶ 16–25. On August 23, 2023, the United States objected to the PSR, arguing for the application of three guideline enhancements: the enhancement for organizers and leaders provided by U.S.S.G. § 3B1.1(a), the enhancement for using an aircraft to import a controlled substance provided by U.S.S.G. § 2D1.1(b)(3), and the enhancement for bribing or attempting to bribe a law enforcement officer to facilitate drug trafficking provided by U.S.S.G. § 2D1.1(b)(11). Dkt. No. 55 at 7–9. On August 30, 2023, Mr. Flores objected to the PSR, arguing that he is responsible for no more than 450 kilograms of cocaine. Dkt. No. 60 at 2.

The evidence presented at the sentencing hearing establishes that (A) Mr. Flores is responsible for more than 450 kilograms of cocaine; (B) Mr. Flores was an organizer and leader of an organization with five or more individuals; (C) Mr. Flores

2

used an aircraft to import cocaine into the United States; and (D) Mr. Flores bribed or attempted to bribe a law enforcement officer to facilitate drug trafficking.

*A. Mr. Flores is responsible for more than 450 kilograms of cocaine.*

To begin, the evidence established that Mr. Flores is responsible for trafficking more than 450 kilograms of cocaine. Mr. Flores was introduced to cocaine trafficking "through El Chapo and by Hector Beltran." Sept. 6 Tr. at 45. By 2003, Mr. Flores was partnering with others to smuggle cocaine into Mexico in oil tanks. *Id.* at 54, 61. Mr. Flores and his partners would smuggle "[a]bout 1,000 kilos" of cocaine in "each side" of each oil tank. *Id.* at 59. Mr. Flores's attorney summarized the testimony this way: "approximately 2,000 kilos of cocaine every week for more than two years. . . [—]56 loads in total." *Id.* at 106–07. "Out of each load," "[h]alf of the load was for El Tio"— Mr. Flores. *Id.* at 62. And "[a]ll [the cocaine] that was delivered to El Tio" was going "[t]o the United States." *Id.*

Years later, in 2010, one of Mr. Flores's drug loads was seized at the Port of Manzanillo, Mexico. Sept. 7 Tr. at 26–27. That load contained "450 kilos of cocaine and 50 kilos of ephedrine." *Id.* at 27. The leader of the Milenio Cartel was "attempting to get out Mr. Flores's [load] from the port." *Id.* at 26. But after another drug load was stolen, the leader of the Milenio Cartel directed "the Navy" to "seize it because [he] preferred that it be seized instead of having the [C]artel Jalisco New Generation also rob that one." *Id.* The leader of the Milenio Cartel was able to order the seizure because he was "paying off the port commander and the commander—what's it called?—the one who does the investigations" to "keep [him] updated." *Id.* at 27–28.

3

Based on the evidence presented during the hearing, Mr. Flores is responsible for at least 112,450 kilograms of cocaine, 56,450 kilograms of which belonged to him personally. Accordingly, Mr. Flores's base offense level should be 38 pursuant to U.S.S.G. § 2D1.1(a)(5).

### B. Mr. Flores was an organizer and leader of an organization with five or more individuals.

Section 3B1.1(a) of the guidelines provides a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The evidence established that Mr. Flores "worked independently but [was] protected by the" "Sinaloa Cartel." Sept. 7 Tr. at 18. In about 2003, "[a]bout 20 people" were "working in the defendant's cocaine trafficking organization." Sept. 6 Tr. at 62, 70. "About five" of these "were bodyguards." *Id.* at 70. The list of "people who work[ed] for him who would receive his portion of the cocaine" included "Chani," "Cachoro," and "Licenciado," none of whom were Mr. Flores's family. *Id.* at 65–66. Later, "Santiaguito," who also went by "Enriquito," transported money for Mr. Flores. *Id.* at 79. In the "early 2000s," a man with the "last name" "Alfaro" was working for Mr. Flores and was "trying to get a bigger position" within "Mr. Flores-Hernandez's organization." Sept. 18 Tr. at 20–24. Mr. Alfaro is "the actual governor for Jalisco right now."[2] Finally, the Mr. Flores's son, who was also a DEA target, Sept. 7 Tr. at

---

[2] The current governor of the State of Jalisco in Mexico is Enrique Alfaro. *Jalisco governor eyes presidential run: "I'm more than prepared to be candidate,"* Mexico News Daily (Dec. 8, 2021), https://mexiconewsdaily.com/news/jalisco-governor-prepared-to-be-candidate/; *Enrique Alfaro Ramirez*, Wikipedia,

111, was involved in a drug "shipment from Guadalajara to Indianapolis," Sept. 18 at 63. In short, Mr. Flores was an organizer and leader of a criminal activity that involved five or more people. Accordingly, the four-level enhancement provided by section 3B1.1(a) applies.

### C. Mr. Flores used an aircraft to import cocaine into the United States.

Section 2D1.1(b)(3) provides a two-level enhancement "[i]f the defendant unlawfully imported . . . a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import . . . the controlled substance." U.S.S.G. § 2D1.1(b)(3). The evidence established that Mr. Flores used planes in his operation. For example—during a recorded conversation—Mr. Flores bragged about how someone "was going to be selling him [a] plane." Sept. 7 Tr. at 53. The person facilitating the transaction "needed to change the paperwork to change the name." *Id.* During the conversation, Mr. Flores used coded language to conceal what he was talking about: using the word *car* when referring to a plane and using a vague plane model number "C90," which is "King Air." *Id.* at 52–53. Finally, Mr. Flores was having the conversation with another high-level drug trafficker, who understood that "Mr. Flores supposedly had planes and was going help [him] get planes." *Id.* at 33. Accordingly, the two-level enhancement provided by section 2D1.1(b)(3) applies.

---

https://en.wikipedia.org/wiki/Enrique_Alfaro_Ram%C3%ADrez (last visited Nov. 3, 2023); *Gobernador Institucional del Estado de Jalisco*, Jalisco Gobirno del Estado, https://www.jalisco.gob.mx/gobierno/gobernador (last visited Nov. 3, 2023).

> *D. Mr. Flores bribed or attempted to bribe a law enforcement*
> *officer to facilitate drug trafficking.*

Section 2D1.1(b)(11) provides a two-level enhancement "[i]f the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense." U.S.S.G. § 2D1.1(b)(11). The evidence established Mr. Flores used intermediaries to pay bribes to law enforcement officers. For example, "Licenciado" "was a partner with El Tio" and "was the person who would pay everybody at the ports." Sept. 6 Tr. at 67. Specifically, Licenciado "was the person who would pay everyone government related." *Id.* at 68. Similarly, Mr. Flores hired a money launderer who "would pay the commander of the airport" "$50,000" "[e]very week." *Id.* at 98–99. The money launderer paid the airport commander to "provide . . . security and . . . support so everything would work out fine." *Id.* at 100. The airport commander oversaw the "[f]ederal police" at the "Benito Juarez Airport." *Id.* at 100–01. When the airport commander received "photographs of the passenger or passengers" who were smuggling money, "he would set aside a gate for [the money smugglers] to go through, . . . a security filter for [the money smugglers] to use to be able . . . to bring the suitcases [of money] in" to the airport. *Id.* at 101. Accordingly, the two-level enhancement provided by section 2D1.1(b)(11) applies.

## II. NEW OBJECTIONS TO THE PSR

During the sentencing hearing, Mr. Flores engaged in conduct that must be considered in his guideline calculations and ultimate sentence: (A) Mr. Flores

6

obstructed justice during the sentencing hearing; and (B) Mr. Flores failed to accept responsibility.

### A. Mr. Flores obstructed justice during the sentencing hearing.

Section 3C1.1 provides a two-level enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1. The application notes to that section provides "a non-exhaustive list of examples of the types of conduct to which this adjustment applies," including the following: "(A) threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . , directly or indirectly, or attempting to do so;" and "(C) producing . . . a false . . . document or record during [a] . . . judicial proceeding." U.S.S.G. § 3C1.1 appl. note 4.

In this case, Mr. Flores engaged in both. To begin, Mr. Flores attempted to intimidate the first witness called to testify against him. Specifically, when that witness "came into the courtroom and saw the defendant," he saw Mr. Flores "look at [him]," "st[i]ck out his tongue and touch[] the end of it with his pointer finger." Sept. 6 Tr. at 69. The witness took Mr. Flores's motion to mean that he should "[w]atch out with [his] tongue." *Id.* And when asked whether he "[had] any fear . . . testifying against this particular defendant," the witness replied, "Yes. Of course," "[b]ecause, when he saw me, he" "stuck out his tongue and touched the end of it with his pointer finger." *Id.* Then—without prompting—the witness said, "You can see it in the cameras." *Id.* After the hearing, the Court disclosed the relevant camera footage to

7

the parties, which showed Mr. Flores motioning exactly as described immediately after the witness took the stand:



This was not the only attempted witness intimidation. Mr. Flores's "friend," who was the "best man at his wedding," "tried to convince [another witness] . . . not to come and testify." Sept. 18 Tr. at 28–29. Simply put, Mr. Flores directly and indirectly attempted to intimidate witnesses.

Next, Mr. Flores produced binders full of false documents during the sentencing hearing. Specifically, Mr. Flores presented what his counsel claimed was "7500 pages" of "receipts of Mr. Flores purchasing . . . electronics" "that he smuggled into Mexico," *id.* at 106–07,[4] including "watches . . . and then later large quantities of

---

[3] This screen capture is from 1:22 from the video file provided by the Court, which had the following file name: 09062023102000_09062023121518_10_F.asf.

[4] Counsel for Mr. Flores did not disclose the receipts to the government before September 18, explaining "I just received [them] over the weekend, myself." Sept. 18 Tr. at 106. When asked to confirm that the defense witness "brought you, over the weekend, boxes of receipts," counsel for Mr. Flores replied, "Yes, Your Honor." *Id.* at 107. But in her August 30 sentencing memo, counsel for Mr. Flores said that she had

televisions and other electronics," Dkt. No. 60 at 6. Then the witness Mr. Flores called to authenticate the receipts described them as "invoices of business that [Mr. Flores] did with the company in Laredo, Texas." Sept. 18 Tr. at 110. For example, the witness claimed that one receipt was "an invoice for purchase made." *Id.* at 111. But when the Court pressed him, stating, "But we don't know what actually was being purchased"; the witness admitted, "No, I don't know." *Id.* at 112. The Court correctly expressed "puzzlement of how anybody could audit or compare any invoices based on the minimal information reflected on this single document out of these three volumes which doesn't even tell us what was being bought," concluding "I don't know how this doesn't prove money laundering of some kind." *Id.* at 112–13. Simply put, Mr. Flores produced false documents at this sentencing hearing.

In sum, Mr. Flores obstructed justice by intimidating witnesses and by producing false documents. Accordingly, the two-level enhancement provided by section 3C1.1 applies.

### B. Mr. Flores failed to accept responsibility.

Finally, section 3E1.1 provides a two- or three-level reduction for acceptance of responsibility "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). But "[a] defendant who enters a guilty plea[—let alone one who pleads guilty without a plea agreement—]is not entitled to an adjustment under this section as a matter of right." *Id.* appl. note 3. In order to receive

---

"been provided boxes and boxes of receipts from the business located in Laredo, Texas." Dkt. No. 60 at 6 n.3.

the reduction, a defendant must "not falsely deny[] any additional relevant conduct." *Id.* Put another way, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.* appl. note 1(A). Likewise, "[c]onduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." *Id.* appl. note 4.

In this case, Mr. Flores falsely denied and frivolously contested his relevant conduct. Instead of simply admitting the necessary elements and then waiting to see if the government could carry its burden of proof at sentencing, Mr. Flores falsely denied and frivolously contested his relevant conduct by advancing a false narrative with false evidence. To begin, in his statement of facts he claimed that the "total amount of cocaine" for which he was responsible was "not more than 450 kilograms." Dkt. 29 at 2. At his plea hearing, Mr. Flores—personally and under oath—affirmed that claim to the Court. Mar. 8 Tr. at 12. Then in his sentencing memo, Mr. Flores repeated that claim, Dkt. No. 60 at 2, and then asserted that before his arrest and release in 2015, "Mr. Flores invested in three cocaine loads of thirty kilograms each," *id.* at 7.

As described above, the evidence in this case established that, before 2015, Mr. Flores was responsible for at least fifty-six loads, each of which contained more than 450 kilograms of cocaine. *Supra* I.A. Importantly, there was no evidence at the sentencing hearing—presented by Mr. Flores or the government—from which this

10

Court could conclude that there is any truthful or factual basis for Mr. Flores's claim of being involved in only three thirty-kilogram loads. Simply put, Mr. Flores went beyond "remain[ing] silent" and putting the government to its burden of proof—which is his right—to advancing a specific narrative detached from any rational interpretation of the facts. *United States v. Saani*, 650 F.3d 761, 769 (D.C. Cir. 2011). By doing so, he has failed to accept responsibility. *Id.*

In addition, the D.C. Circuit has held that "[i]n almost all cases, a defendant . . . who receives an obstruction of justice enhancement under § 3C1.1, is not eligible for a downward adjustment for acceptance of responsibility." *United States v. Gaviria*, 116 F.3d 1498, 1521 (D.C. Cir. 1997). In this case, Mr. Flores's obstructive conduct is part and parcel with his failure to accept responsibility. First, Mr. Flores's choice to put the government to its burden of proof created the opportunity for his obstructive conduct—drawing out cooperators for him to intimidate.[5] Second, by falsely denying—under oath—the drug quantity for which he is responsible, Mr. Flores advanced a specific, false narrative, including with boxes of false documents which he presented as exculpatory proof. Accordingly, Mr. Flores is not eligible for an acceptance of responsibility reduction because he obstructed justice.

---

[5] By drawing out cooperators who were previously unknown to Mr. Flores, he also created an opportunity for retribution. To be clear, there is no evidence that Mr. Flores has retaliated against the cooperators who testified against him. But his intimidation of these witnesses demonstrates why the risk of reprisal cannot be ignored.

III. M<small>R</small>. F<small>LORES</small> <small>SHOULD BE SENTENCED TO LIFE IN PRISON</small>.

As properly calculated, Mr. Flores's Total Offense Level is 48, which consists of the following:

- a 38 Base Offense Level because the quantity of cocaine was more than 450 kilograms of cocaine;
- plus a 4-level enhancement because Mr. Flores was an organizer and leader of an organization with five or more individuals;
- plus a 2-level enhancement because Mr. Flores used an aircraft to import cocaine into the United States;
- plus a 2-level enhancement because Mr. Flores bribed or attempted to bribe a law enforcement officer to facilitate drug trafficking;
- plus a 2-level enhancement because Mr. Flores obstructed justice during the sentence hearing.

With a Criminal History Category of I and a Total Offense Level of 48, Mr. Flores's guideline range is life in prison.[6] And because of the massive quantities of cocaine and aggravating conduct for which Mr. Flores is responsible, this is not a case in which this Court could state—without abusing its discretion when considering the 18 U.S.C. § 3553(a) factors—the specific reasons why Mr. Flores's conduct was less harmful or egregious than the typical case represented by a Total Offense Level five

---

[6] Indeed, Mr. Flores's guideline range would be life in prison even if the Court granted him a three-level reduction for acceptance of responsibility *and* declined to apply one of the three two-level enhancements discussed above.

levels less than the one he earned. 18 U.S.C. § 3553(c)(2); *cf. United States v. Parks*, 995 F.3d 241, 248 (D.C. Cir. 2021).

IV. MR. FLORES SHOULD FORFEIT $680 MILLION.

Finally, the United States previously sought, Dkt. No. 62, and the Court granted, a preliminary order of forfeiture in the amount of $280 million, Dkt. No. 66. In that motion, the government requested leave to amend the requested amount based on the evidence presented at the sentencing hearing. Dkt. No. 62. at 1. The evidence presented established that Mr. Flores personally obtained at least $680 million in drug proceeds. The Court should therefore order him to forfeit that amount.

As described in more detail in the government's forfeiture motion, the law requires the Court to forfeit a reasonable estimate—as determined by the preponderance of the evidence—of the gross proceeds attributable to the defendant's activities. *Id.* § III. In this case, the evidence highlighted three time periods of Mr. Flores's drug activity: before 2000, from about 2003 to 2005, and from about 2007 to 2008. To begin, Mr. Flores presented "receipts [that] amounted to over $100 million"—or "even more than that." Sept. 18 Tr. at 156. A review of sixteen books of receipts revealed that they cover the period from 1985 through 1993.[7] That review also showed that many of the receipts have the same puzzling lack of detail as the receipts reviewed at the hearing. *See id.* at 112–13. For example, a receipt dated 14-

---

[7] The government's review revealed one receipt dated 18-Aug-1999. But that receipt was tucked between receipts dated in 1989 and 1993. There were no other receipts from 1994 or after. The 1999 date appears to be a typo. At a minimum, it is an outlier.

Nov-1985 purported to show that Mr. Flores paid Jet Racing $34,765.62, but the receipt failed to provide any detail regarding the item or items purchased and the quantity purchased. Other receipts, totaling over $350,000, simply stated "wire transfer." On other receipts, critical information—including who made the purchase, what was purchased, how much was purchased, and the price of each item—was blacked out or whited out. Finally, four receipts appeared to document payments to "Agentes Aduanales," meaning Customs Agents. As the Court observed, these receipts appear to "prove money laundering of some kind" worth "over $100 million." *Id.* at 113, 156.

Next, as described above, in about 2003 and 2004, Mr. Flores personally received 56 loads containing 1000 kilograms each—for a total of 56,000 kilograms of cocaine—all of which was destined for the United States. *Supra* § I.A. Using the minimum value of cocaine in the United States from 2000 to 2010—$10,000 per kilogram, Sept. 7 Tr. at 108—Mr. Flores is personally responsible for $560 million in drug proceeds from 2003 through 2004. This is a conservative total. For example, 56,000 kilograms is much less than the total 104,000 kilograms—"2,000 kilos of cocaine every week for more than two years," Sept. 6, Tr. at 106–07—that Mr. Flores and his partners received, reflecting only the amount of cocaine that Mr. Flores personally received. Similarly, it does not include the "about" "50 million" dollars "the defendant" "sent back to Columbia" "[d]uring 2003 to 2004," avoiding any risk of double counting. *Id.* at 73. And it uses the minimum value of cocaine in the United States during that time, instead of the maximum value: $26,000 per kilogram. *Id.* at

108. Put another way, instead of attempting to hold Mr. Flores responsible for the maximum value supported by the evidence—$2.7 billion of cocaine imported into the United States—this conservative estimate holds Mr. Flores responsible for only $560 million in 2003 and 2004.

Finally, between 2007 and 2008, Mr. Flores laundered "[a]bout 20 million" "United States dollars." *Id.* at 81. Specifically, Mr. Flores—through "Enriquito"—delivered "currency" "[o]ver ten times," which Mr. Flores had "deliver[ed] . . . to a contact in Colombia." *Id.* at 80–81.

In total, during four distinct time periods, Mr. Flores personally obtained at least $680 million in drug proceeds.[8] Using this conservative, reasonable estimate, the Court should order Mr. Flores to forfeit $680 million in United States currency pursuant to 21 U.S.C. §§ 853 and 970.

V. Conclusion

For the reasons set forth above, and those set out in its sentencing memorandum, the United States respectfully requests that this Court impose a Guideline sentence of life imprisonment, which is reasonable, appropriate, and matches the severity of the crime committed by Mr. Flores. A life sentence is necessary to hold Mr. Flores accountable for his crimes, to promote respect for the law, to deter Mr. Flores and others from committing similar serious crimes, and to

---

[8] This amount does not include the value of any seized cocaine. *See United States v. Young*, 330 F. Supp 3d 424, 434–37 (D.D.C. 2018). For example, the evidence established that in 2010 Mr. Flores had "450 kilos of cocaine and 50 kilos of ephedrine" seized at the Port of Manzanillo, Mexico. Sept. 7 Tr. at 26–27. This seizure was excluded from the forfeiture calculation.

15

protect the public. Additionally, the government respectfully requests that this Court order Mr. Flores so forfeit $680 million in United States currency, which represents a very conservative estimate of the drug proceeds he personally obtained by trafficking tens of thousands of kilograms of cocaine to the United State over the span of four decades.

        Respectfully Submitted,

        MARLON COBAR
        Chief
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice

By:   */s/ Jonathan R. Hornok*
        Jonathan R. Hornok
        Kirk Handrich
        Trial Attorneys
        Melanie L. Alsworth
        Acting Assistant Deputy Chief
        Narcotic and Dangerous Drug Section
        Criminal Division, U.S. Department of Justice
        Washington, D.C. 20530
        Telephone: (202) 514-0917

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant, this 15th day of November 2023.

By:   /s/ *Jonathan R. Hornok*
Jonathan R. Hornok
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice