UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| v. | : |
| | :     1:17 CR 51 (BAH) |
| RAUL FLORES HERNANDEZ | : |
| Defendant. | : |

**DEFENDANT'S POST-HEARING**
**MEMORANDUM IN AID OF SENTENCING**

**INTRODUCTION**

On September 6, 7, and 18, 2023, this Court presided over a evidentiary hearing for the purpose of determining whether the Government could satisfy its burden of proving that defendant Raul Flores-Hernandez was subject to sentencing enhancements for: (1) an amount of cocaine in excess of four hundred and fifty (450) kilograms; (2) leadership; and (3) bribing a law enforcement officer. The Government presented the testimony of three "cooperating" witnesses: Mario Pinedo Alvarez Correa; Elpidio Mojarro Ramirez; and Jack Sinuhe Almaguer Rodriguez, as well as the testimony of Drug Enforcement Administration (DEA) Special Agent Kevin Novick. The defense presented the testimony of Mexican attorney Jorge Murillo. The pending determination for this Court is whether it should find any of the Government witnesses' testimony credible in deciding what sentencing enhancements apply.

For all of the principled reasons explained in this memorandum, the defense believes that this Court should determine that the Government's witness testimony was not sufficient to establish that any of the enhancements apply. The cooperator testimony was by any objective standard, an amalgam of outright falsehoods and fabulist exaggerations, almost entirely unsupported by any independent corroboration. Moreover, the Government's witnesses were in

1

every sense beholden to the Government for their freedom (both current and future) and continued ability to live in the United States. Rather, this Court should conclude that Mr. Flores-Hernandez is responsible for conspiring to import between one hundred and fifty (150) and four hundred and fifty (450) kilograms of cocaine into the United States and that no other sentencing adjustments apply. Thus, for all of the reasons previously set forth in the defense sentencing memorandum, this Court should sentence him to a term of imprisonment of no more than ten years.

## LEGAL STANDARD

**1. This Court Should Apply The Clear and Convincing Evidence Standard Of Proof**

In contested sentencing hearings, the Government generally needs to prove sentencing enhancements by "a preponderance of the evidence." See, e.g., United States v. Mohammed, No. CR 06-357 (CKK), 2022 WL 2802353, at *4 (D.D.C. July 18, 2022). Accord United States v. Carter, 591 F.3d 656, 659 (D.C. Cir. 2010)("[w]hen seeking a sentence enhancement, the government must prove a prior conviction by a preponderance of the evidence"). The Supreme Court has noted, however, "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." United States v. Watts, 519 U.S. 148, 156 (1997). The D.C. Circuit has likewise noted that courts in other jurisdictions have held the Government to the higher evidentiary standard of clear and convincing evidence in extreme cases, although the Court of Appeals did not identify where the cut-off for such enhancement would lie. See United States v. Long, 328 F.3d 655, 671 (D.C. Cir. 2003).

In this case, the Probation Office calculated the defendant's Adjusted sentencing

guideline as Level 35, which corresponds to 168-210 months.[1] See DE 41. The Report was finalized and published on the Court's docket on June 2, 2023, before the new amendment to U.S.S.G. Section 4C1.1 was even proposed. Thus, under the current version of the guidelines, the defendant's final offense level would be 33, which corresponds to a presumptive sentence of 135-138 months. The defense believes that the appropriate drug quantity is between 150-450 kilograms of cocaine, which results in a two-level decrease, or a guideline of 108-135 months. [2]

In contrast, the Government contends that as a result of the appropriate upward adjustments, the defendant's guideline (which includes a two-level enhancement for obstruction) is Level 48 – or in other words – five levels above mandatory life. This constitutes a difference of fifteen levels, which exponentially increases to the presumptive sentence from approximately nine (9) years, to mandatory life in jail. In common parlance, this would appear to be an "extreme" case that justifies imposing a higher burden of proof on the Government.

This use of the heightened clear and convincing standard also appears to be particularly apt in this case because of the Government's principal reliance on the use of cooperating witnesses to prove the alleged enhancements. In this jurisdiction, the standard jury instruction advises that as a general matter, the testimony of accomplices should be viewed "with caution." See D.C. Criminal Jury Instruction 2.205. That caution is further justified in this case, where DEA Special Agent Kevin Novick candidly agreed during cross-examination that: (1) drug traffickers lie to each other "all of the time;" and (2) that confidential informants often have

---

[1] The Probation report concluded that the defendant was responsible for more than 450 kilograms of cocaine (Level 38), that no other sentencing enhancements apply and that the defendant was entitled to a three level downward adjustment for acceptance of responsibility.

[2] In addition, the defendant met with the prosecutors and agents assigned to this case in approximately May of 2022 for two days. The Government was not satisfied with the defendant's version of events because it did not coincide with their own. Depending on this Court's resolution of the contested sentencing factors, the defense reserves its right to argue that Mr. Flores Hernandez is safety valve eligible, with its concomitant two-level guideline reduction and abrogation of the ten-year mandatory minimum in drug offenses for quantities above five kilograms.

"credibility" problems, which is why the DEA tries to "corroborate" their information. Tr. 07/23/23 at pp.140-141. These admissions suggest that the field of play in this case was never "neutral," but that it always tilted in the Government's favor – because the cooperating witnesses were "inclined," by experience, necessity, and desperation, to exaggerate and/or invent their testimony against defendant Raul Flores Hernandez. As described in greater length herein, that is exactly what happened.

## ANALYSIS OF THE EVIDENCE

1. **Factors For Evaluating The Credibility Of The Cooperator Testimony**

The defense believes that there are certain objective criteria that can be applied when the evaluating the credibility of the Government's witnesses. They would include: (1) the manner in which the witness testified; (2) the degree of detail in their version of events; (3) whether the testimony was based upon personal knowledge or hearsay; (4) the probability of improbability of their testimony; (5) their acceptable of responsibility for their own conduct; (6) demeanor on cross-examination; (7) any motive to testify falsely; (8) the potential reward for dishonesty: and (9) the existence or lack of existence of independent corroborating evidence. With this non-exhaustive list of factors, the defense turns to a review of the Government's witnesses and evidence presented during the sentencing hearing.

## THE GOVERNMENT'S EVIDENCE

1. *Mario Pinedo Alvarez Correa*

Mario Pinedo Alvarez Correa stands apart in the annals of cooperators in terms of a debt to American law enforcement. He admitted that he was involved in a conspiracy to import more than two metric tons (2,000 kilograms) of cocaine hidden in tanks filled with gasoline into the United States during the two-year time frame between 2003 until 2004 (Tr. 09/06/23 at p. 39)

4

**and** that he laundered at least six hundred and fifty million dollars in drug proceeds. Tr. at p. 77.[3]

For that extraordinary criminal conduct, he did was never prosecuted and indeed, never spent a single moment in jail. Tr. at pp 77-78.

Mr. Alvarez Correa's sense of entitlement about the lack of punishment was stratospheric. The following segment from his cross-examination is emblematic of his attitude:

Q. Many, many other Colombians have been extradited to the United States and faced very long periods of incarcerations in jail, haven't they?
A. Yes.
Q. And many of American -- many other Mexican drug traffickers have also been extradited to the United States and received very significant periods of jail sentences, correct?
A. Yes.
Q. But not you?
A. No, because I have -- no, because I have cooperated with Justice. I have helped in catching drug traffickers. I have helped with seizures.
Q. And you think that for that reason you are entitled to a pass on ever going to jail?
A. That's correct.

Tr. at p. 78.

More importantly, this witness' testimony was replete with generalities, but short on details. Alvarez Correa testified that defendant Raul Flores Hernandez allegedly had twenty people working for him, including five bodyguards, but could not identify a single one of them by name, except "Licenciado," (which the witness explained meant college graduate) and he admitted that he didn't know Licenciado's true name either. Tr. at pp. 37-39. Likewise, on direct examination, the witness was asked about meeting with the defendant during the time frame of 2003-04. He testified without any detail first, that "I saw him several times." Tr. at p. 30. Then later during direct examination, he provided equally vague details. Alvarez Correa testified that he "attended meetings" with the defendant where "we would talk about drugs," but no other

---

[3] The entirety of Mr. Alvarez Correa's testimony took place on September 7, 2023 and thus, all subsequent transcript references are limited to the page number of the referenced testimony.

5

details - such as who was present, where the meetings took place, how many times he met, how the meetings were organized – were provided. Tr. at p. 71.

This lack of specificity ought to weigh heavily against giving any credence to Alvarez Correa's testimony about drug trafficking with Mr. Flores-Hernandez, including the amount of cocaine that should be attributed to the defendant and whether he was a "leader" under the federal sentencing guidelines. The lack of details dovetails with the credibility problem identified by the Court concerning the excessive "leading" during the direct examination of the witness. As the Court advised Government counsel:

> The leading questions undermine the credibility of your witness, just so you know. So every time Mr. Feitel raises a leading objection he is actually helping you, which is why some defense lawyers just sit and let you undermine the credibility of your own witness because you are planting every word in his mouth.

Tr. at p. 28.

In a similar way, Alvarez Correa was evasive about his own participation in the drug trafficking conspiracy, taking every opportunity to minimize his own involvement and going so far as to initially deny during cross-examination that he knew where the cocaine was destined:

Q. Well, were you ever present when cocaine was tested for its purity?
A. Well, yes, but I don't remember when. **That is the truth**, I don't remember.
Q. Because it would be inconsistent with never having seen anyone test the cocaine with knowing what the markings were that were impressed on the cocaine, correct?
A. Well, the thing is, those are not impressions. All the kilos had marks. Outside the kilo there were marks. All of them had marks, but I don't remember the mark. I don't remember. **That is the truth**, sir.

Tr. at p. 86 (emphasis added).

**Q. And the cocaine that your brother sold to people in Mexico, what do you think happened to it?**
**A. I don't know.**
Q. Do you remember during an interview you had with U.S. law enforcement agents you told them that almost all of the cocaine in Mexico comes to the United States, whether people want to admit it or not?
A. Yes.

Q. So when I asked you the question where did the cocaine that your brother sold go to, you know full well that the answer was the United States, don't you?
A. Yes.

Tr. at pp. 75-76 (emphasis added).

The witness' repeated use of the self-vouching expression "that is the truth," when asked about the markings on the cocaine is of course a sure sign that Alvarez Correa was dissembling. Moreover, he clearly was outright lying when he first said that he didn't know what happened to the cocaine. These falsehoods are not at all surprising, since the witness was perfectly comfortable using numerous "false" passports to travel in and out of Mexico, but then could not recall destroying them, until confronted during cross-examination. Tr. at pp. 79 – 81. Alvarez Correa of course had the "chutzpah" to dress up as a religious Jewish person when using his false passports because he thought it would insulate him from scrutiny. Tr. at p. 81. He also entered the United States illegally by sea; and although he could not initially recall how much it cost to charter a ten-person boat, he then remembered that it was between ten and twenty thousand dollars, which not surprisingly, he testified that his in-laws paid. Tr. at p. 102-03. There was not a single piece of independent corroborating evidence for Alvarez Correa's testimony; not a phone call, a photograph, a text message. Tr. at p. 109.

As further evidence of motive to fabricate, the witness agreed that he owed "an enormous debt of gratitude for the DEA and FBI agents" who worked on his case. Tr. at p. 78. That included obtaining an "S" visa, which currently allows him to live freely in the United States. Tr. at p. 101. And when Alvarez Correa suffered from mental health crisis, he did not call 911, but rather had his wife contact his FBI handlers. Tr. at pp. 105-06.  Finally, notwithstanding his self-professed aversion to violence - "I don't like to participate in assassinations or killings" (Tr. at p. 51), Alvarez Correa would have been content to have the bodyguard he bribed during his

kidnapping "kill all the ones" who kidnapped him (Tr. at p. 105) and he then was "gifted" an automatic pistol while living in Mexico (Tr. at p. 82).

Notwithstanding the quantity and quality of this impeachment, the Government also seeks to rely upon Alvarez Correa's testimony to establish the enhancement for "bribery" <u>See</u> Gov Supp. Sentencing Memorandum DE 80 at p.6. The first time the prosecution attempted to elicit testimony about bribes through the use of leading questions, the witness exculpated defendant Flores Hernandez:

Q. Who are the people that he [Licenciado] was arranging or getting to work?
A. Licenciado was the person who would pay everybody at the ports and wherever they would be working.
Q. Would this be including -- **did you ever see him pay uniform police**?
MR. FEITEL: Your Honor, objection. Leading.
MR. HANDRICH: Okay. I will --
THE COURT: Sustained.
BY MR. HANDRICH:
Q. Sir, describe what kind of officials or people at the port that you saw him work with or interact with.
A. I knew that he was the person who would pay everyone government related. **But I did not see -- would not see or didn't ever see any police officer.**

Tr. at pp. 35-36 (emphasis added).

Finally, during its second attempt, the prosecution was able to obtain the barest modicum of testimony as to the issue of bribes:

Q. No. I am asking specifically about the airport commander. Who were his employees who worked under him?
A. It would be everybody working under him, the officers that were working for him; law enforcement for the airport.
Q. Can you just explain to the judge what type of law enforcement that the Benito Juarez Airport had?
A. Federal police.

Tr. at p. 68.

The prosecution did not ask a single follow up question as to the issue of alleged bribery,

including the underlying basis for the conclusion - undoubtedly because the witness had nothing further to add and asking additional questions was only going to create additional fodder for cross-examination.

Against this background, the Court should give Alvarez Correa's testimony the weight to which it is entitled, which is to say, none at all. His motives stop and start at his own self-interest. His hypocritical protestations to the contrary ("Sir, I was already very tired of that lifestyle" and "I wanted to stop the suffering") should be as further evidence of his dishonesty. In the end, Alvarez-Correa became a cooperator not because of some virtuous decision, but because he had no other options left.

BY MR. FEITEL:

Q. If you had not lost all the money and the DEA hadn't been trying to arrest you, you would still be working as a drug trafficker or money laundering up until today, wouldn't you?
A. No. Yes. I mean no.

Tr. at p.88. [4]

### 2. *Elpidio Mojarro Ramirez*

The Government also relied upon the testimony of Elpidio Mojarro Ramirez, the former leader of the *Milenio* Cartel. This witness' testimony was filled with half-truths, exaggerations, if not outright falsehoods, and since the conclusion of the sentencing hearing the defense has obtained information that renders his credibility – and all of this testimony – essentially worthless.

---

[4] Finally, this Court should reject Alvarez Correa's assertion that when the defendant "stuck out his tongue and touched it with his pointer finger," it was a threat for him to be silent. Tr. at p. 37. Undersigned defense counsel represent that they have seen Mr. Flores Hernandez make this gesture many times outside of the context of the contested sentencing hearing. It seems to be an involuntary movement that in no way can be fairly construed as a threat. It is more likely that Alvarez Correa misconstrued the gesture out of his own feelings of guilt for his false testimony, than the defendant chose to make a clandestine threat in front of a courtroom of spectators.

As an initial matter, Mojarro Ramirez repeatedly minimized his criminal leadership role in the *Milenio* Cartel, by describing himself as merely an "accountant."

Q. Okay. Would you refer to yourself as an accountant for the cartel?
A. Yes. Because I was in charge of delivering the merchandise, receiving the money, and given payment.

Tr. at pp. 11-12.

Mojarro Ramirez then characterized himself as the accidental leader of the cartel, as though the title was thrust upon him by accolade. He testified first on direct examination, "then, in May 2010, Juan Carlos Nava Valencia is arrested, and that's when I am left in charge of the cartel." Tr. at p. 25. Then later during cross-examination, he repeated the ludicrous idea that he was anointed cartel leader because of his accounting skills.

Q. When Oscar Nava Valencia and Juan Carlos Nava Valencia were incarcerated and the Milenio Cartel did not have a head, you fought in a brutal battle to be the head of the Milenio Cartel; didn't you?
A. I was the leader of the Milenio Cartel. I did not fight to become so.
Q. So they just let you become the head because you were the accountant?
A. Because the group in which Molca was put me there

Tr. at p. 99.

Mojarro Ramirez was, in fact, a sophisticated, lifelong drug trafficker. He was convicted in federal district court in the Southern District of Texas in 1987 for the distribution of more than ten pounds of cocaine and was sentenced to ninety-seven months in jail. After he was designated to a Federal Prison Camp (not a "field") in North Dakota, he planned and executed an escape with the help of his brother-in-law. Tr. at pp. 61, 64, 66. His remarkable explanation for the criminal escape was that "I left because I was going to be deported either way." Tr. at p. 62. When this Court assesses Mojarro Ramirez's credibility, it should keep in mind that the witness was unable to even accept responsibility for his own prior criminal conduct.

Mojarro Ramirez returned to Mexico, having learned nothing from his conviction and incarceration. He obtained not one, but two sets of false identification documents, undoubtedly to facilitate his new drug trafficking activities.

Q. Did you have any fake ID with the name Augustine Reyes Garza?
A. Yes. Of course, I had all the paperwork; passport, and everything.
. . . . . . .. .
Q. Did you travel with that false passport?
A. It wasn't. It was a legal passport; I got it legally.
Q. Okay. So you got --
A. Yes, I used it for travel.

Q. Did you also have false identification under the name Jose Rivera Pichardo?
A. That's correct.

Tr. at pp.68-70. Mojarro Ramirez testified without a moment's hesitation that he had bribed someone to obtain the false documents ("of course") as though it were the most common thing in the world. Tr. at p. 70.

After his return to Mexico, Mojarro Ramirez ultimately came to the realization that his days as a drug trafficker were numbered and that if he was capture again, he would be facing "significant jail time." Tr. at p. 91. And so Mojarro Ramirez began to plan for his future. He managed to become a DEA informant and to further his potential cooperation with the United States, organized a meeting with the defendant, despite being specifically told not to go. Tr. at pp. 39-40. Only a portion of the meeting, however, was recorded. Tr. at p. 84. During direct examination, the witness claimed that the meeting was held to discuss drug trafficking activities and pointed to certain isolated words in the transcript as being code for drugs. For example, in the transcript there is a reference to "F," which the witness claimed meant ephedrine, but which could just as easily have meant "efectivo," the Spanish word for money. Tr. at p.95.

11

In the final analysis, the meaning of the transcript requires this Court to credit Mojarro Ramirez's testimony – and that is a bridge too far. First, he had every possible motive to curry favor with the Government by exaggerating his interaction with the defendant. Mojarro Ramirez had pled guilty to a second prosecution for drug trafficking conspiracy charge (the case remains under seal), with its accompanying twenty (20) year mandatory minimum and a sentencing guideline Level 41, which corresponds to a sentence of twenty-seven to thirty-three years. Tr. at p. 74; Defense Exhibits 4, 5, and 6. The witness was fully aware that his only path to a reduced sentence was with cooperation. Tr. at pp. 74-75. But Mojarro Ramirez's criminal propensity – or perhaps his desperation – led him to subvert justice in this case.

As the Court knows from prior pleadings, after the conclusion of the evidentiary hearing, the defense received audio tapes of the witness' recorded calls from the Alexandria Detention Center. Transcripts of four conversations were previously filed under seal on the docket of this case, with the relevant portions highlighted for the Court's convenience. Those transcripts reveal a concerted effort by Mojarro Ramirez to obtain information from third persons with the intent to use that information at the sentencing hearing in this case.

The highlighted portions of one transcript, for example, contains passages where a female speaker identified as "J," reads to Mojarro Ramirez information that came from periodicals about Raul Flores' family and their properties, along with accusations against him for money laundering, and even the date of Mr. Flores' arrest. See Transcript Exhibit 1, at p. 3. In another recorded conversation with "J," Mojarro Ramirez asks her bluntly "*Let's see, my love, what did you investigate for me*?" The two then discuss the terms of Flores Hernandez's guilty plea and the charges against him. See Transcript Exhibit 2, at pp. 2-3. In a final conversation with "J," Mojarro Ramirez asks her "*what do find*?" She responds by providing him with information

12

concerning chemical seizures in Mexico. "*Look, it says here, that seizure was on August 4, 2010. There were 20 tons of chemicals used to manufacture that. And Ah…Port of Manzanillo.* See Transcript Exhibit 3 at pp. 1-2.

Finally, in a recorded conversation with (what was then) an unidentified male, Mojarro Ramirez asks "*hey, do you know how I met Flores. What I do not recall well is if it was for collecting money he met this…Valderrama met Flores right*? See Transcript Exhibit4 at p.4.

These were not innocent discussions between an inmate and friends or family. Rather, the recorded conversations constitute clear and undisputable evidence that Mojarro Ramirez attempted to obstruct the sentencing proceeding in this case by "fishing" for evidence to be used against Raul Flores Hernandez. The defense has still not received Mojarro Ramirez's recorded conversations from the District of Columbia Central Treatment Facility and so the full scope of this "conspiracy" is not yet known. In the final analysis, legitimate doubt and suspicion should permeate every word uttered by Mojarra Ramirez and this Court should make the principled decision to reject his testimony and declare it void *ab inicio*. [5]

### 3. DEA Special Agent Kevin Novick

The Government attempted to use Special Agent Novick in an effort to prove a connection between a series of intercepted blackberry messenger communications allegedly involving defendant Flores Hernandez and the seizure of seventy-nine and one-half kilograms of cocaine on November 9, 2016. Tr. 09/07/23 at p. 129. Even assuming *arguendo*, that the messages that were intercepted from the blackberry phone using the all-too-common nickname "Tio," (uncle in English) came from Raul Flores Hernandez, there was insufficient evidence to

---

[5] Undersigned counsel believe that Mojarro Ramirez received a sentence of time served on or about September 11, 2023. The Bureau of Prisons website notes that he is no longer in custody.

connect the messages to the seizure. [6]

Special Agent Novick interpreted the intercepted communications as discussing a load of either fifty (50) or seventy (70) kilograms of cocaine. The actual amount of the seizure was almost eighty (80) kilograms. Moreover, Special Agent Novick concluded that the means of hiding the cocaine was as follows:

> I believe they're describing what would be called a parasitic device. It's something that attaches to the outer hull of a vessel, usually a larger shipping vessel and below the water line. And it's used to conceal contraband, in this case cocaine, so that it can avoid being detected by customs, because if it was in a container or placed with legitimate cargo there's a possibility it would be inspected by customs upon arriving at its port of call. By having it unloaded underneath the water while the vessel is docked at the pier, it can be done in secret, and then taken off in secret as well without law enforcement knowing.

Tr. at 121. The cocaine seized by the DEA, however, was found in two duffle bags. Moreover, the DEA did not even undertake the effort to look underneath the vessel:

Q. When the ship pulled into port, did someone look under the ship to see if there was some kind of portable device, you know, hidden underneath it?
A. Not that I am aware of. Not that I saw in any reports.

Tr. at p. 139.

Given the difference in both quantity of drugs and in *modus operandi* between the intercepted communications and the actual drug seizure, along with the DEA's failure to conduct a meaningful follow up investigation, the connection is too meager for this Court to fairly attribute the cocaine to the defendant.

    4.   ***Jack Sinuhe Almaguer-Ramirez***

Jack Sinuhe Almaguer-Ramirez was the Government's fourth and final witness. He was not fully honest about a number of issues that bear adversely on his credibility, including (but not limited to: (1) his immigration benefits; and (2) the amount of money received from U.S. law

---

[6] Special Agent Novick acknowledged that notations on the transcribed blackberry intercepts stated that the putative targets were using each other's telephones. Tr. at pp. 133-134.

enforcement for his work as a cooperator. Moreover, to minimize his own criminal conduct, he portrayed a Mexican criminal fraud case against him as merely a property dispute. Almaguer did not accept responsibility for anything, studiously minimizing his own criminal role and exaggerating the role of the defendant and others.

Almaguer testified during direct examination that Raul Flores was involved in moving cocaine hidden in both cattle trailers and tankers filled with gasoline. When questioned on cross-examination, however, Almaguer, testified that he did not actually have any first-person knowledge about these matters, but only learned about these matters as the result of allegedly overhearing unspecified conversations between his stepfather and defendant Flores.

Q. You didn't see cocaine being loaded?
A. No.
Q. Okay. Did you say that cocaine was loaded onto trailers with cattle?
A. No. **I didn't see that**.
Q. You didn't see it. Okay. But you just know about it from general knowledge of how cocaine is transported?
A. No. No. **I listened to them talking about that.**
Q. Okay. So when you said there was a special treatment and a seal, it's not from your own knowledge, it's just from what you heard people talking about, correct?
A. Not "people." Not general people. Specifically, I spoke about my stepfather and Mr. Raul.

Tr. 09/18/23 at p. 79 (emphasis added).

Moreover, when challenged on cross-examination, Almageur admitted that it wasn't until May 2023 that he first mentioned to law enforcement these cattle trucks being used to smuggle cocaine into the United States. When asked why he didn't mention this seemingly critical earlier, Almaguer responded, "I don't remember." Tr. at p. 79-80.

Almaguer also testified on direct examination about the defendant's alleged money laundering operation, which moved large amounts of cash. Again, when questioned during cross-examination, he reverted to the defense of "mere presence," explaining that he didn't have a role, was never paid for anything that he did. Tr. 9/18/23 at p. 68. As Mr. Almaguer explained that he

15

was really like the convenience owner's son, who helped out at the family grocery on the weekends:

A. No. It all depends upon the bill, 20s, 50s or 100s, but no. No. As I told you, **I was there but I wasn't working actually there.**
Q. What were you doing there then? You said you went to help your dad.
A. Yes. I was there. I was there.
Q. You were just there?
A. Yes.
Q. Okay. You testified that your dad had an employee that was absent so you were there to fill in for that employee, weren't you?
A. Yeah.
Q. So did that employee -- if he were there he was just going to be there?
A. No. It's different **because I was the boss son so nobody is going to obligate me to do something. So I was just there.**

Tr. at p. 82-83.

Almaguer was bounteous with the generalities during his direct testimony, but short on details. In response to the government's question as to how the defendant may have moved money from one location to another using soccer players, Almaguer responded:

Q. Are you aware of whether Mr. Flores used that --
A. **Everybody was -- is doing that kind of method.**
Q. Do you know if Mr. Flores used soccer teams in a similar way?
A. I mean, I am not—I am not aware of that. I am not sure. **But probably yes because it's well-known** that you send a player to a team and you sell that player for $10 million, but it's not; that player is only 2 million and the other 8 million will be clear, right?
Q. Directly from Mr. Flores's mouth did he ever tell you how much cocaine he was moving into the United States?
A. No.

Tr. at. p. 40

When questioned more specifically during cross-examination, how defendant Flores laundered money using soccer players, Almaguer responded, "I didn't say that today. I said it's well known that that is the way that many people is [sic] laundering money in Mexico and South America." Tr. at p. 85.

16

This court should not credit testimony based upon the generality that everyone knows that's how it's done. Likewise, Almaguer's testimony should not be credited because he could not bring himself to tell the truth about easily verifiable matters, such as his Mexican fraud case, where he fraudulently transferred title of property to a female acquaintance.

Q. And so you thought you would put the property in her name so that it would look like she has assets, correct?
A. Yes.
Q. So you were helping a friend commit visa fraud, correct? A. Yes.
Q. Is the friend that you were trying to help out the young lady who was listed in here, Alejandra Elizabeth?
A. Yes.
Q. So when the actual owners of the property complained, you were arrested, correct?
A. Yes.
Q. And your mom had to pay off the actual owners of the property so they wouldn't go after you, correct?

. . . . . .
Q. And so your mom paid him off so he wouldn't prosecute you?
A. Yes.
Q. So when you were arrested in Guadalajara for this crime, it wasn't just a property dispute, it was a case -- a criminal case of fraud, correct?
A. Yes.

Tr. at pp. 77-78.

This witness was also untruthful about the amount of money that he was paid as an informant and the immigration benefits he received. On August 23, 2023, the Government provided the defense a *Giglio* which advised that: (1) Almaguer-Ramirez was paid a total of $98,600 by the DEA and (2) in March 2023, at the government's request, Almaguer-Ramirez's daughter was paroled into the United States while she awaited the results of her deferred action request.

During his testimony and in direct response to repeated questions from the Court, he testified that he had been paid only between $10,000 to $30,000 since 2018.

17

THE COURT: Well, when you say thousands and thousands of dollars, is that more than $30,000 or less than $30,000?
THE WITNESS: No. **Less than $30,000.**
THE COURT: Is it more than $10,000 or less than $10,000?
THE WITNESS: **More than 10,000.**
THE COURT: And that has been over how many years?
THE WITNESS: Since 2018 probably.

Tr. at p. 54.

When questioned about his daughter and her status, he replied:

Q. And you recently had a daughter that was also paroled [sic] in the United States, correct?
A. No.
Q. You didn't have a daughter who was paroled into the United States in March 2023 who is now waiting the results of her deferred action?
A. No. No. My daughter is studying in Mexico. She is studying there. She is in college. She is not here.

Tr. at p. 71.

All of this testimony was false; worse, the Government's own *Giglio* disclosures proves its falsity. The difference between being paid $30,000.00 versus $98,000.00 is not an inadvertent accounting error – it is perjurious. Almaguer had every motive to curry favor with the United States government in order to maintain his legal status (and that of his immediate family) in this country because absent their protection, all of them will be returned to Mexico against their will.

Finally, and inexplicably, Almaguer was never prosecuted in the United States, never spent a day in jail, and never had to take any responsibility for his own criminal conduct.

## THE DEFENSE CASE

### *Attorney Jorge Arturo Santos Murillo*

The defense presented the testimony of Mexican attorney Jorge Arturo Santos Murillo, who is both a long time friend of the defendant and the attorney who represented him during his acquittal on, *inter alia*, money laundering charges in Mexico. The bulk of Attorney Murillo's testimony involved explaining to the Court that the defendant had been involved in the

importation of contraband black marked electronics (known as *fayuca* in Spanish) beginning in the 1980s. In support of this claim, the defense presented approximately twenty-six ledger books containing receipts for Raul Flores' purchase of the electronics in Texas.

In its supplemental sentencing memorandum, the Government summarily dismisses the ledgers as "false documents." Remarkably, the prosecutors did not represent to the Court that investigated the contents of the ledgers in any way; that they attempted to locate the source of the electronics, spoke with Wolf Hoffman (the vendor) or took any affirmative acts to test the credibility of the ledgers. To be sure, the ledgers contain general receipts, but undersigned counsel personally spoke with Mr. Hoffman, who claimed that this was his standard business practice. In the absence of nothing more than speculation, this Court should treat the receipts as business records. Moreover, there is no principled basis for the Government's argument that the use of the invoices constitutes obstruction of justice in these proceedings.

## CONCLUSION

For all of these reasons, this Court should conclude that the Government did not satisfy its burden of proof with respect to the contested sentencing adjustments. Accordingly, upon consideration of the totality of circumstances in this case, the defendant should be sentenced to no more than ten-years of incarceration.

Respectfully submitted,

/s/ *Sandi S. Rhee*

_____
Sandi S. Rhee
228 S Washington Street
Suite 300
Alexandria, Virginia 22314
(202) 285-8366
DC Bar 502417
SandiRheeLaw@Gmail.com

*Robert Feitel*
_____
Robert Feitel
1300 Pennsylvania Avenue, N.W.
190-515
Washington, D.C. 20004
DC Bar 366673
(202) 255-6637
RF@RFeitelLaw.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Supplemental Sentencing Memorandum was filed with this Court on ECF and served on Government counsel, this 4th day of December, 2023.

*Sandi S. Rhee*
_____
Sandi S. Rhee

20