```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 17-051
vs.                                )
                                   )
RAUL FLORES-HERNANDEZ,             )  January 12, 2024
                                   )  11:56 a.m.
              Defendant.           )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>**:**


FOR THE UNITED STATES:

                        JONATHAN R. HORNOK
                        MELANIE ALSWORTH
                        DOJ-CRM
                        145 N Street NE
                        Washington, DC 20530
                        (202) 514-0917
                        Email: jonathan.hornok@usdoj.gov
                        Email: melanie.alsworth2@usdoj.gov

                        KYLE MARTIN
                        DOJ-USAO
                        Criminal Division
                        880 Front Street
                        San Diego, CA 92101-8807
                        (619) 546-8874
                        Email: kyle.martin@usdoj.gov


FOR THE DEFENDANT:
                        SANDI RHEE
                        228 S Washington St.
                        Suite 300
                        Alexandria, VA 22314
                        (571) 800-6900
                        Email:  sandirheelaw@gmail.com

                   ***(Appearances Continued)***

**APPEARANCES** (Continued):


FOR THE DEFENDANT:

                          ROBERT FEITEL
                          1300 Pennsylvania Avenue NW
                          Washington, DC 20008
                          (202) 255-6637
                          Email: rf@rfeitellaw.com



ALSO PRESENT:       SHERRY BAKER, U.S. Probation

                    KYLE MORI, Special Agent
                    JAMES CHUPIK, Special Agent

                    KARIMA AZZOUZ, Spanish Language Interpreter
                    MANUELA CRISP, Spanish Language Interpreter



Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


            Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.

1                      **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Your Honor, this is

3     Criminal Case 17-051, United States of America versus Raul

4     Flores-Hernandez.  And also, for the record, Your Honor,

5     Interpreters Karima Azzouz and Manuela Crisp have been sworn

6     for this matter.

7              Would the parties please come forward to the

8     lectern and identify yourselves for the record.  We'll start

9     with government counsel first this morning.

10             MR. HORNOK:  Good morning, Your Honor.

11    My name is Jonathan Hornok, I am here on behalf of the

12    United States of America.  With me at counsel table, we have

13    Melanie Alsworth, Kyle Mori, James Chupik, and Kyle Martin.

14    Mr. Chupik and Mr. Mori are both agents with the DEA.

15    Ms. Alsworth is from our office at NDDS.  Mr. Martin is an

16    AUSA out of the Southern District of California.

17             THE COURT:  All right.  Thank you.

18             MS. RHEE:  Good morning, Your Honor.

19    Sandy Rhee for Mr. Raul Flores-Hernandez, and with me at

20    counsel table is Mr. Robert Feitel.

21             THE COURT:  Good morning.

22             All right.  So we're here this morning for the

23    sentencing -- go ahead.

24             PROBATION OFFICER:  Good morning, Your Honor.

25    Probation Officer Sherry Baker on behalf of the U.S.

1    Probation Office.

2         THE COURT:   Good morning, Ms. Baker.

3         All right.   We are here this morning for the

4    sentencing of the defendant, Mr. Raul Flores-Hernandez, who

5    entered a plea of guilty without a plea agreement on

6    March 8, 2023, to the one-count indictment that charges him

7    with conspiracy to distribute 5 kilograms or more of cocaine

8    for importation into the United States of America in

9    violation of 21 U.S.C. Sections 959(a), 960, and 963.

10        Let me just review all of the materials that I

11   have looked at in connection with the sentencing this

12   morning, starting with the presentence investigation report

13   and sentencing recommendation from the probation office

14   docketed at ECFs 41 and 42.

15        I have also reviewed the government's sentencing

16   memorandum submitted in advance of and then the supplemental

17   memoranda submitted after the evidentiary sentencing hearing

18   that was held in this case on September 6, 7, and 18th of

19   2023, all of which are docketed at 55, 80, and 86.

20        I have received the defendant's sentencing

21   memorandum submitted in advance of the evidentiary hearing

22   plus supplemental memorandum submitted after docketed at

23   ECFs 60 and 85.   The defense has also submitted various

24   supplemental exhibits after the hearing docketed at ECF 73.

25        Of course, I have also looked at and presided over

1    and heard all of the evidence submitted at the evidentiary

2    hearing which included the testimony of several -- four

3    government witness and one defense witness, including

4    Mario Pinedo Alvarez Correa, Elpidio Mojarro Ramirez, DEA

5    Special Agent Kevin Novick, Jack Sinuhe Almaguer-Ramirez,

6    and the defense witness Jorge Murillo.

7              Does the government have all of that material?

8              MR. HORNOK:  Yes, Your Honor.

9              THE COURT:  Thank you.

10             Ms. Rhee, do you have all of that material?

11             MS. RHEE:  Yes, Your Honor.

12             THE COURT:  All right.  So Mr. Flores-Hernandez,

13   please stand right where you are.

14             Let me just explain to you how this sentencing

15   hearing will proceed this morning.  The sentencing hearing

16   will proceed in four different steps.  At the first step, I

17   will determine whether the government or you have any

18   objections to the factual or other portions of the

19   presentence investigation report and then resolve those

20   objections.

21             At the second step, I will determine how the

22   advisory guidelines apply in your case and what the advisory

23   sentencing range is based on your criminal history and all

24   of the specific offense characteristics and other factors

25   under the guidelines manual that apply in your case and that

1    is much disputed in this case, so that is going to take some

2    lengthy period of time.

3              And then the third step, I will hear from the

4    government, then I will hear from your counsel, and then I

5    will hear directly from you if you wish to be heard about

6    sentencing in the case.

7              And at the last step, I will explain the sentence

8    I am about to impose and impose sentence.

9              Do you have any questions about how this hearing

10   will proceed this morning?

11             THE DEFENDANT:  No.

12             THE COURT:  All right.  You may be seated.

13             MS. RHEE:  I'm sorry, Your Honor.

14             THE COURT:  Yes, Ms. Rhee.

15             MS. RHEE:  I forgot to mention that many people in

16   this audience are members of Mr. Flores's family, if you

17   were wondering why there were so many people in for the

18   sentencing.  I understand that three of his family members

19   would like to address the Court very briefly.

20             THE COURT:  Have they already submitted letters

21   because you submitted many, many, many letters?

22             MS. RHEE:  There are so many letters.  I didn't

23   know who was coming.  I don't know -- I didn't know who was

24   going to speak.  I believe they have already submitted

25   letters, but --

1          THE COURT:  Okay.  You will have to pull those

2    letters out and tell me where -- which letters they are so

3    that I can just look at their letters.

4          Do I need to hear from them directly as opposed to

5    just reviewing their letters?

6          MS. RHEE:  Just very briefly, Your Honor.  They

7    traveled here from Mexico, California, Atlanta, and

8    Chicago -- Las Vegas also.  And they informed me that some

9    of their family members could not get visas to get into the

10   United States quickly enough so that's why there are not

11   more of their family here to show their support and love for

12   Mr. Flores.

13         THE COURT:  All right.

14         Okay.  So this defendant has agreed to certain

15   facts in support of his plea, which was incorporated into

16   the presentence investigation report.  And the government

17   presented evidence in support of a number of different

18   adjustments during the hearing.  So I do intend to hear

19   arguments about how the guidelines apply in this case and

20   resolve the disputes about how the guidelines apply in this

21   case during the first and second steps of the hearing so

22   they're sort of going to be combined in this case.

23         Starting with the government.

24         Does the government have any objections to any of

25   the factual statements, putting aside the guideline

1    determinations?  Any of the factual statements set out in

2    the presentence report?

3              MR. HORNOK:  No, Your Honor.

4              THE COURT:  Although you would want to supplement

5    those facts with the facts you presented at the evidentiary

6    hearing?

7              MR. HORNOK:  That's correct, Your Honor.

8              THE COURT:  Okay.

9              Ms. Rhee, have you and your client read and

10   discussed the presentence investigation report?

11             MS. RHEE:  Yes.  We have, Your Honor.

12             THE COURT:  And setting aside any objections to

13   the guideline calculation, does the defendant have any

14   objections to any of the factual statements set out in the

15   PSR?

16             MS. RHEE:  No, Your Honor.

17             THE COURT:  All right.

18             Mr. Flores-Hernandez, just stand right where you

19   are.

20             Are you fully satisfied with your attorneys in

21   this case?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you feel that you have had enough

24   time to talk to your attorneys about the presentence

25   investigation report and the other documents submitted in

1      connection with your sentencing here today?

2                  THE DEFENDANT:  Yes.

3                  THE COURT:  Thank you.  You may be seated.

4                  All right.  Hearing no objection by either side to

5      the factual portions of the presentence report, I will

6      accept those as my findings of fact at sentencing as

7      supplemented by the defendant's admitted facts at the time

8      of his plea and the evidence presented at the evidentiary

9      sentencing hearing on September 6, 7, and 18.

10                 Now we're at the step where we have the most

11     disputes in the case about how the guidelines apply in this

12     case.

13                 I am going to start with the criminal history

14     because I think the parties -- that's one aspect of how the

15     guidelines apply that the parties both agree on.  I think

16     they agree with the probation office's determination that

17     this defendant has a criminal history score of zero and a

18     corresponding Criminal History Category of I; is that

19     correct?

20                 MR. HORNOK:  That is correct, Your Honor.

21                 THE COURT:  And from the defense?

22                 MS. RHEE:  That's correct, Your Honor.

23                 THE COURT:  Okay.  Now turning to how the

24     calculation of the total offense level under the guidelines

25     apply in this case, by my count the parties have seven

1    disputes as to how the guidelines apply here.  So I am going

2    to go through those to make sure I haven't missed any.

3             The parties dispute the quantity of cocaine for

4    which the defendant was accountable and, therefore, the

5    applicable base offense level under the guideline 2D1.1;

6    two, whether the defendant used an aircraft to import drugs

7    warranting a two-point increase to the base offense level

8    under the guideline SOC, or specific offense characteristic,

9    at Section 2D1.1(b)(3)(B); three, whether the defendant

10   bribed or attempted to bribe a law enforcement officer

11   warranting a two-point increase to the base offense level

12   pursuant to the SOC at 2D1.1(b)(11); four, whether the

13   defendant was an organizer or leader of criminal activity

14   that involved five or more participants or was otherwise

15   extensive, warranting a four-point increase for his role

16   under the guideline at Section 3B1.1(a); five, whether the

17   defendant obstructed justice, warranting a two-point

18   increase to the base offense level under the guideline at

19   Section 2C1.1; six, whether the defendant accepted

20   responsibility, warranting a two-point decrease to the base

21   offense level pursuant to the guideline at Section 3E1.1;

22   and seven, whether the defendant is entitled to a two-level

23   decrease to the base offense level as a zero-point offender

24   under the guideline at Section 4C1.1.

25             Am I missing anything from the government or are

1    you not raising one of the objections I attributed to the

2    parties?

3              MR. HORNOK:  That list sounds right to me, Your

4    Honor.  In addition to that, I think there was possible

5    reference to a safety valve in some of the defendant's

6    pleadings.

7              THE COURT:  I will deal with that.

8              MR. HORNOK:  I think that's --

9              THE COURT:  That doesn't deal necessarily with the

10   guideline determination.

11             MR. HORNOK:  Well, it could because there is the

12   reduction in 2D1.1.  So if for some reason we find ourselves

13   in a world where it applies, that 2D -- that two-point

14   reduction would apply.

15             THE COURT:  All right.  I intend to address the

16   safety valve argument.

17             Ms. Rhee.

18             MS. RHEE:  Your Honor, that's correct.

19             Those are the seven points of dispute between the

20   parties and we do want to address the safety valve

21   eligibility issue when Your Honor gets to it.

22             THE COURT:  When I get to that.

23             I think the best way to deal with this is, I could

24   deal with each of the issues separately; and I will hear

25   each of the parties on each issue, unless you'd prefer and

1   have already prepared a presentation that addresses all of

2   your disputes all at one presentation.

3        Do the parties have a preference, one by one or

4   altogether?

5        MR. HORNOK:  I would prefer one by one.

6        MS. RHEE:  We would also, Your Honor.

7        THE COURT:  Okay.  One by one it is.

8        Okay.  So let's start with -- I think there was

9   also a little bit of a dispute about -- well, let's just

10  start then with the quantity of cocaine, dispute number one.

11       I will hear from the government on quantity.

12       MR. HORNOK:  Thank you, Your Honor.

13       So Your Honor heard the testimony in the hearings.

14  Mr. Flores is responsible for at least 112,450 kilograms of

15  cocaine within a conspiracy; that was the testimony that we

16  heard.  Specifically, 56,450 kilograms of that cocaine

17  belonged personally to him under -- according to that

18  testimony.

19       Some of the highlights of that testimony were

20  that, by 2003, he was partners and smuggling, quote, about a

21  thousand kilograms of cocaine into each side of the oil

22  tank; we heard about that.  Mr. Feitel summarized that

23  evidence for us as approximately 2000 kilos of cocaine every

24  week for more than two years; 56 loads in total.  And then

25  out of each load, half of the load was for "el Tio," or the

1   defendant; and that all of the cocaine delivered to the

2   defendant was going to the United States.

3          Then we heard additional testimony about that --

4   about a load in 2010 -- this was one of Mr. Flores's drug

5   loads.  It was seized at the port of Manzanillo on orders of

6   the leader of the Milenio cartel; and that load consisted of

7   450 kilos of cocaine and 50 kilos of ephedrine.  We have got

8   a litany of different pieces of evidence there.  But what

9   that all amounts to is an amount much, much, much greater

10  than 450 kilograms of cocaine.

11         I would also point out, Your Honor, that in the

12  defendant's statement of facts, the range of cocaine that he

13  identified as being responsible for was not more than 450

14  kilograms of cocaine.  The guidelines apply a Level 38 if

15  there are 450 kilograms or more.  And so there is, in fact,

16  an overlap between what the guideline range is and the range

17  that he stipulated to in his facts.

18         THE COURT:  So by my review of the briefing, the

19  government agrees with the PSR recommendation that a base

20  offense level of 38 applies under 2D1.1, and the defendant

21  is arguing for a base offense level of 36; that, basically,

22  boils down to a two-offense level difference.

23         MR. HORNOK:  That's it.

24         THE COURT:  Okay.  Thank you.

25         Ms. Rhee.

```
 1              MS. RHEE:  We objected to the Level 38 and the

 2     quantity of the cocaine even before in the presentence

 3     investigation report --

 4              THE COURT:  But you agree that this is a debate

 5     over two offense levels, between 36 and 38?

 6              MS. RHEE:  That's correct, Your Honor.

 7              THE COURT:  Just to cut through this, because I

 8     have other cases pending and waiting, as I understand your

 9     briefing, Ms. Rhee, you think that the testimony that

10     supports over 450 kilograms of cocaine being attributable to

11     this defendant is based on testimony that you believe should

12     not be deemed credible?

13              MS. RHEE:  Exactly, Your Honor.

14              THE COURT:  And that's basically your --

15              MS. RHEE:  That's basically our argument, Your

16     Honor.

17              THE COURT:  All right.  Do you want to add

18     anything to the very fulsome briefing that I have already

19     received on this?

20              MS. RHEE:  Just very briefly, Your Honor.

21              When the government just argued that Mr. Feitel

22     had mentioned that he -- the quantity of cocaine, Mr. Feitel

23     was merely summarizing the witness's testimony; he was not

24     accepting that that was what Mr. Raul Flores had moved.

25              THE COURT:  I understand that.
```

1          Okay.  I am just going to -- since I view the base

2     offense level dispute all combined with the, sort of,

3     overarching challenge by the defense to the credibility of

4     the witnesses, I am going to talk first about the legal

5     standard that applies because I think the defense was

6     suggesting that a different standard of review or standard

7     of review for the evidence applied then is the legal

8     standard; I am going to address that first.  And then I am

9     going to address generally the criticism of all of the

10    government's witnesses before, then, turning to resolve

11    dispute number one on the drug quantity.

12          So as to the legal standard that applies, the

13    government carries the burden to demonstrate by a fair

14    preponderance of the evidence that an enhancement to the

15    guidelines is warranted.  See *U.S. v. Leyva*, 916 F.3d 14,

16    jump cite 24, D.C. Circuit 2019; and that a forfeiture

17    amount is appropriate.  See ID at page 29.  The law on the

18    applicable legal standard is very well settled.  See the

19    guideline at Section 6A1.3, comment saying that a

20    preponderance of the evidence standard is appropriate to

21    resolve factual disputes.  See the D.C. Circuit's case from

22    2009 in *U.S. v. Blalock*, saying that to determine whether

23    the increase was warranted, the district court properly

24    applied the preponderance of the evidence standard.  See

25    *U.S. v. Watts*, 519 U.S. 148 from 1997, Supreme Court.  See

1   *In re Sealed Case*, D.C. Circuit case from 2001, 246 F.3d

2   696, jump cite 698.  See the D.C. Circuit case from 1992,

3   *U.S. v. Boney*, stating:  It is well established that due

4   process is satisfied as long as facts necessary for

5   sentencing are proved by a preponderance of the evidence.

6          So notwithstanding this long, well-settled

7   standard regarding the applicability of the preponderance

8   standard for fact-finding at a sentencing hearing, the

9   defendant urges that I apply a different standard.

10          Defendant recognizes that the preponderance of

11   evidence standard generally applies but argues that a clear

12   and convincing -- a higher standard -- should apply here.

13   This argument fails to persuade.

14          The two cases the defendant cites in support of

15   this argument, *U.S. v. Watts,* a Supreme Court case from 1997

16   and *U.S. v. Long*, a D.C. Circuit case from 2003, both

17   recognize that in some circuits in extreme circumstances

18   relevant conduct that would dramatically increase the

19   sentence must be based on clear and convincing evidence; see

20   *Watts,* 519 U.S. at 156.

21          The D.C. Circuit is not one of those circuits.

22   See *Long*, 328 F.3d at 661 stating:  This Court for its part

23   has noted the split among the circuits on this issue but has

24   declined to require more than the preponderance standard at

25   sentencing.  Also see *U.S. v. Mohammed*, 2023 Westlaw,

1    8853035, at *4, a D.C. Circuit case from December 22, 2023,

2    explaining that:  Even assuming that defendant's case was

3    extraordinary, the District Court did not err by relying on

4    conduct proving by a preponderance of the evidence in light

5    of *U.S. v. Booker*, 543 U.S. 220, 2005.

6         The defendant's concerns about the government's

7    reliance on cooperating witnesses to prove each of the

8    alleged enhancements is noted, and their testimony of these

9    cooperating witnesses will and has been scrutinized and

10   carefully evaluated.  In resolving factual disputes at

11   sentencing, the guidelines permit a district court to

12   consider relevant information without regard to its

13   admissibility under the rules of evidence applicable at

14   trial provided the information has sufficient indicia of

15   reliability to support its probable accuracy.  See *Leyva*,

16   916 F.3d at 24.

17        A district court's decision to rely upon hearsay

18   is necessarily a judgment about the credibility of both the

19   witness and the declarant and, relatedly, a district court's

20   credibility determinations at sentencing are within the

21   Court's discretion and are given strong deference on appeal.

22        So at the outset, given this overarching challenge

23   to whether any of the government's cooperating witnesses

24   should be believed, I want to address the credibility of the

25   witnesses since, as I said, this underlies each of the

1    defendant's arguments, and with the general thrust being

2    that none of the testimony from any of the cooperating

3    witnesses who testified at the sentencing hearing should be

4    believed.

5          Let me just say, for its part, the government

6    simply ignores the attack on each of the government

7    witnesses' credibility and makes no mention of credibility,

8    which is not helpful to the Court.  I say that for future

9    cases that DOJ's Narcotics and Dangerous Drugs Section may

10   bring before this Court.

11         Let me just say that I did find that each of the

12   cooperating witnesses presented by the government at the

13   hearing to be credible.  And those witnesses include:  Mario

14   Pinedo Alvarez Correa, I am going to call him Mr. Pinedo;

15   Elpidio Mojarro Ramirez, who I am going to call Mr. Ramirez;

16   and Jack Sinuhe Almaguer-Ramirez, who I am going to call

17   Mr. Sinuhe.

18         Regarding these three cooperating witnesses, they

19   each largely owned up to each of their own individual very

20   extensive criminal conduct and those of people who are their

21   own accomplices in narcotics cocaine trafficking on an

22   extraordinary scale including violence for which they were

23   responsible; sometimes, I think for each of them, at great

24   personal risk to themselves and their families.

25         Nowhere in the record is there any suggestion that

1    any of these cooperating witnesses was lying about knowing

2    this defendant who is critical of their credibility but

3    never denies knowing who each of them are.

4         I will address the credibility of each of the

5    individual cooperators starting with Mr. Pinedo, who

6    described his father and brother's drug trafficking

7    activity, how he helped them directly beginning in 2003 due

8    to himself having a lot of debt.

9         He also testified that both his father and brother

10   trafficked drugs with this defendant and other very

11   notorious drug lords, including El Chapo, Miguel Angel,

12   Hector Beltrán, and that they were all involved in smuggling

13   drugs in trucks.

14        The defendant contends that Pinedo's testimony was

15   replete with generalities but short on details.  I found

16   this a gross mischaracterization of Mr. Pinedo's testimony.

17   I found that Mr. Pinedo recounted in great painstaking

18   detail in some events including how, when working for his

19   father and brother from 2003 to 2004, he helped package

20   cocaine in oil tanks containing about 2000 kilograms of

21   cocaine each.  He described how he personally had been

22   inside one of those tanks; he helped clean those tanks.  He

23   said the tanks would arrive every one to two weeks, and he

24   saw about 53 to 56 tanks arrive over a two-year period.

25        He testified based on his conversations with his

1    brother, who was deeply -- more involved than Pinedo was

2    himself in the drug trafficking operation, that half of each

3    tank or about 1000 kilograms would go to this defendant,

4    totalling approximately 53,000 to 56,000 kilograms over the

5    two years.

6           Pinedo testified that he himself helped transport

7    $50 million in proceeds using human carriers who would carry

8    about over $2 million each in vacuum-packed bags on Copa

9    Airlines airplanes back to Colombia; this was $50 million in

10   proceeds that he was carrying, I think, for the defendant.

11          He described how he had a fight with his brother

12   over money for the sale of cocaine and left his family's

13   narcotics operation in 2004.  He started his own criminal

14   money laundering operation for the Sinaloa cartel.  He ran

15   his own money laundering operation until his 2010

16   kidnapping.  He testified about his own criminal activity in

17   laundering vast amounts of money, including using human

18   couriers carrying cash in vacuum-packed bags in suitcases,

19   and so on.  He talked about how he paid off security

20   personnel at the Benito Juarez Airport in Mexico City and

21   moved millions and millions of dollars back to South America

22   to purchase cocaine.

23          He described his traumatic 2010 kidnapping

24   committed by La Barbie, otherwise known as Edgar Valdez

25   Villarreal.  He also provided the details of his cooperation

1   with the DEA starting in 2012; his deactivation as a source

2   in 2014 because of his illegal entry into the United States

3   with his family; his eventual reactivation in 2015; and he

4   testified about meeting with his brother and/or his father

5   with the defendant a number of times including at the

6   defendant's own home.  And this was also a telling detail;

7   Pinedo's description of the defendant's home was

8   corroborated by Jack Sinuhe and Jorge Arturo Santos Murillo.

9   Pinedo described the defendant's home as having a soccer

10  field, a domed roof, and a big dining room; very similarly

11  to Sinuhe and Murillo.

12          So it is certainly correct that Pinedo has

13  benefited from his cooperation.  He engaged in conduct that

14  can be charged -- so he could be charged with drug

15  trafficking, money laundering, fraud; he was never charged.

16  And he admits that despite his decades being involved in

17  international criminal activity on an incredible scale, he

18  believes he is entitled to a pass on going to jail due to

19  his cooperation.

20          Well, I mean, this was a surprise, that he never

21  faced any charges.  But at the same time, you know, we're

22  not privy and the government didn't detail for us why he was

23  never charged; and perhaps they didn't have the evidence

24  against him until he put forth his own evidence.  But,

25  whatever, that's on the government, it's not necessarily on

1   Mr. Pinedo.  His details about his own involvement with drug

2   trafficking and his interactions with this defendant and his

3   revelations of the drug trafficking activities by his own

4   family members -- some of which involved the defendant, some

5   of which did not -- all lend credibility to what he said

6   about this defendant.

7           With respect to Elpidio Mojarro Ramirez, who

8   described his drug trafficking dealings with the defendant

9   as the former accountant and a leader, at least for a period

10  of time, of the Milenio cartel.  I have seen Mr. Ramirez

11  before; he has testified before me in connection with

12  another sentencing hearing; I found him credible in that

13  case as well as this one.

14          He described in detail his role in the Milenio

15  cartel, starting in the early 2000s, when he was in charge

16  of transferring cocaine in trucks with secret compartments

17  from Honduras to Guatemala to Mexico City.  He was then

18  appointed to the role of accountant.

19          Now, I understand that the defendant argues that

20  this underplays his role in the cartel, and that that

21  minimization of his role in the cartel undermines his

22  credibility.  I think it's actually more of a quibble over

23  terminology or title since Ramirez fully acknowledged his

24  outsized role as a leader in the Milenio cartel.  He was

25  involved in overseeing the cartel's marijuana and cocaine;

1      he kept track of his investors; he determined the pricing of

2      the drugs; he maintained written accounts of the cartel's

3      balances; he coordinated payments to and from the cartel; he

4      made arrangements for bribing security personnel at the

5      seaports.  He reported directly to Oscar Nava Valencia, "El

6      Lobo."  So it seemed like he was pretty extensive in his

7      descriptions of his role, owning up to what he did for the

8      cartel; not all of which had anything to do with this

9      defendant.

10             He admitted that he became a leader of the Milenio

11     cartel, by my count, it seemed like about 16 months, a

12     little over a year, during a period when both El Lobo and

13     Juan Carlos were arrested in 2010 until Juan Carlos was

14     released in June 2011.

15             As to this defendant, he said he generally became

16     aware of the defendant as a member or affiliate of the

17     Sinaloa cartel, and they ran in the same social circles.

18     Since, I guess, the Milenio and Sinaloa cartels were the

19     only -- by his testimony -- two cartels operating in

20     Guadalajara for at least a period of time, he viewed the

21     defendant as working somewhat independently but protected by

22     the Sinaloa cartel.  So that when the defendant made one of

23     his independent deals, El Chapo would take a percentage for

24     the Sinaloa cartel.

25             Ramirez testified he didn't work with the

1    defendant although he knew about him and his drug

2    trafficking associates, but he didn't work with them until

3    2009 when this defendant made a deal with El Lobo to help

4    with test runs, which he called "priors," when wood flooring

5    shipments without drugs would be sent to a company to make

6    the company look like an active legitimate company.

7         Again, to the extent that the defense argues that

8    Ramirez's testimony shouldn't be believed because it was so

9    general, I, again, found that some of his recounting of

10   events was quite detailed, including this one, of the

11   defendant's involvement, because of this deal with the test

12   runs with this wood flooring company.  When the test runs

13   were run successfully, they decided to move forward with

14   shipping cocaine and ephedrine from Bolivia through Chile in

15   the wood flooring shipments.  Two shipments were organized:

16   One for a 1,000-kilogram container, which was not for this

17   defendant but for someone else; and one 500-kilogram

18   shipment including 450 kilograms of cocaine and 50 kilograms

19   of ephedrine was in a container for the defendant.

20        Ramirez described in detail how the test runs and

21   shipments were organized.  The ultimate fate of the

22   containers coming through the Port of Manzanillo over which

23   the CJNG, another Mexican cartel, had control, or, at a

24   minimum, some influence.  And during the period when Ramirez

25   was the leader of the Milenio cartel, he personally had

1    knowledge of what happened to the defendant's shipment of

2    450 kilograms of cocaine.  According to Ramirez, he said the

3    person organizing the loads from Bolivia, whose nickname

4    named was Chivito, was kidnapped by the CJNG, they got

5    information about the cocaine shipments.  And when the

6    container arrived in the port, the 1,000-kilogram cocaine

7    merchandise was stolen by the CJNG.  Ramirez didn't want the

8    CJNG to steal the second shipment, 450 kilograms of cocaine

9    that belonged to the defendant, so he alerted Navy officials

10   in Manzanillo to be on the lookout for the second shipment.

11   And the Navy -- the bribed Navy officials told Ramirez the

12   container had been moved to a wrong location which led

13   Ramirez to believe the CJNG was going to steal the cocaine

14   from that shipment, too, so he directed the Navy to seize

15   the 500-kilogram container with the cocaine from the

16   defendant because Ramirez testified that he preferred that

17   to having that load stolen by the CJNG.  So this was highly

18   detailed and quite credible testimony.

19        Ramirez also testified that he reached out to the

20   defendant in 2017 because he needed a plane and was told the

21   defendant had access to them.  And he explains that he met

22   with the defendant over a period of, like, five different

23   times, and he recorded one such meeting on January 9, 2017,

24   using his phone.  So there is no question that Ramirez and

25   defendant were quite familiar with each other and that they

1    did have this discussion in January 2017 when planes were

2    discussed.

3         Now, the defendant argues that Ramirez's jail

4    calls received by the defendant from the Alexandria

5    Detention Center undermine his credibility by revealing a

6    concerted effort by Ramirez to obtain information from third

7    persons with the intent to use that information at the

8    sentencing hearing in this case and thus destroy his

9    credibility.  Four transcripts of calls with Ramirez have

10   been submitted to the Court for review.

11        One of those calls with Ramirez's attorney

12   prompted a round of litigation with the government's motion

13   to strike use of that call which this Court denied and,

14   surprisingly again, the government's briefing

15   post-evidentiary hearing in response to the government's

16   briefing doesn't mention these calls at all.  It doesn't try

17   to defend or address, as I said before, the credibility of

18   the witnesses or what these calls mean.

19        In any event, the calls were obtained from the

20   jail and revealed that Ramirez was interested in the

21   defendant and affirmatively sought out information about the

22   defendant in the defendant's case.  The defendant's

23   characterization, to my mind, is a little bit extreme in

24   that this was information he was soliciting to make up stuff

25   during his testimony; I think that was the import of what

1    the defendant's objection is based on these phone calls.

2           From my review of the calls, it shows that Ramirez

3    is speaking to other individuals about what they heard on

4    the news and asked him to remind him what he had previously

5    told him.  The defendant offers no reason why these calls

6    reveal a concerted effort to obtain such information for use

7    at the sentencing hearing and does not even identify, for

8    example, any information shared with Ramirez in any such

9    jail calls that were later presented to this Court at a

10   sentencing hearing.

11          There is a plethora of reasons why Ramirez was

12   interested in the defendant in this case; he could have been

13   concerned about the defendant's potential cooperation with

14   the government if the defendant had any information on

15   Ramirez; he could have generally been interested in how his

16   associates were fairing in U.S. courts; he could have been

17   looking for information to refresh his recollection about

18   dates.

19          In the phone call with the person identified as

20   his "lawyer," Ramirez asked for his recollection to be

21   refreshed about the circumstances where he met the

22   defendant.  Absent more, the transcripts of these calls are

23   insufficient to discredit Ramirez's testimony.  That being

24   said, Ramirez certainly has a checkered criminal history,

25   including a 1975 conviction for his illegal presence in the

1   U.S., a 1988 conviction for drug trafficking, and a recent

2   conviction of conspiracy to distribute cocaine for

3   importation on board an airport registered in the U.S.  He

4   has admitted to bribing people to get false identification

5   and traveling using false passports.

6            Most of this criminal history was revealed in

7   cross-examination.  And Ramirez had trouble -- failed to

8   accept any responsibility for his own conduct.  What was

9   most striking to me is he repeatedly described his escape

10  from a U.S. minimum security prison as fleeing from a field

11  without seemingly appreciating the illegality of escaping

12  from a prison.  But in any event, his testimony doesn't

13  stand alone in providing testimony about the scale of this

14  defendant's drug trafficking activity during the period of

15  the 2000s through 2010.  And even if I totally discounted

16  all of Ramirez's testimony -- and I would have appreciated

17  all of the material brought out on cross-examination by the

18  defense to have been brought out on direct to sort of

19  understand all of his prior convictions, and so on.  But in

20  any event, even if I totally discounted Ramirez's testimony,

21  the testimony of Pinedo would have supported -- would

22  support the base offense level here.

23           With respect to Jack Sinuhe, he testified that he

24  met the defendant in 1997 through Sinuhe's own stepfather,

25  Oscar Lopez Sanchez, who was selling cocaine in small

1    quantities.  And by "small quantities" it has to be defined

2    in a case where people are involved with kilogram quantities

3    of cocaine.  And by "small quantities," I think Mr. Sinuhe

4    described that his father dealt with quantities under 10

5    kilograms, which is certainly not gram amounts.

6           In any event, his stepfather wanted the

7    defendant's help in expanding, in growing his cocaine

8    business and is very close to -- I think there are very

9    close connections between Sinuhe's family and the

10   defendant's family.

11          The defendant again contends that Sinuhe's

12   testimony was short on details and very general.  And to be

13   sure, Sinuhe did speak in generalities on a number of

14   things.  But as to his testimony about the defendant, the

15   defendant contends that his testimony about the defendant's

16   other businesses including a concert hall, a casino, and

17   soccer team as an example of his lack of credibility.  But,

18   I mean, other than mentioning that that was his

19   understanding of the businesses that this defendant owned,

20   he never testified about the use of these businesses to

21   launder money, and I mean through sort of general

22   statements, but it was based on his understanding; so I

23   don't think that that is particularly probative of his

24   credibility.

25          The defendant emphasizes that Sinuhe significantly

1     downplayed the payments he received from the government,

2     testifying he received less than $30,000 when he had, in

3     fact, received just under $100,000.  It was a surprise that

4     Sinuhe was not better prepared by the government to testify

5     more fully, completely, and in detail about the benefits he

6     has received from the government.  But this downplaying of

7     benefits from the government when he did admit that he did

8     receive these benefits from the government in terms of visa

9     and cash payments, although they were imprecise, doesn't

10    undermine his overall credibility.

11           He again described, like the other ones --

12    described his own criminal activity both with and without

13    the defendant; he implicated his own family members.  He was

14    able to recount, in painstaking detail, meetings he attended

15    with his stepfather and the defendant where they discussed

16    their drug trafficking primarily using these two methods of

17    hidden compartments in trailers that sent cows and bulls to

18    the U.S. once a month, and fuel tanks filled with cocaine.

19    He described meeting with the defendant, I guess, in

20    Guadalajara.  He also described a trip to Mexico City in

21    2011 to 2012 to help his stepfather collect 14 to

22    $17 million in cocaine proceeds from a warehouse for the

23    defendant.  He described the warehouse in detail and other

24    matters related to that incident.

25           He explained how difficult it was to testify about

1    somebody he grew up with.  He also described receiving a

2    text message from his stepfather that he interpreted to be

3    his stepfather trying to convince Sinuhe not to testify

4    against the defendant.

5          Generally, these are all three cooperating

6    witnesses deeply incriminating themselves as to their own

7    extensive many-year, huge amounts of narcotics trafficking

8    activity on an incredible scale; and they do also, for that

9    reason, tend to corroborate some of the information

10   specifically about this defendant.

11         With respect to this first dispute about drug

12   quantity, the guideline at 2D1.1 applies to Count 1 charging

13   the defendant with conspiracy to distribute 5 kilograms or

14   more of cocaine for importation into the U.S.  The

15   presentence report recommends a base offense level of 38

16   based on the defendant's accountability for more than 450

17   kilograms of cocaine under the guideline at 2D1.1(a)(5) and

18   (c)(1).  The government agrees with the PSR recommendation.

19   The defendant argues he is only accountable for 150 to 450

20   kilograms of cocaine that would result in a base offense

21   level of 36 under the guideline at 2D1.1(c)(2).

22         Upon review of the evidence, the defendant's

23   objection is overruled.  With respect to the 150 to 450

24   kilograms of cocaine that he admits to, he doesn't actually

25   provide any specific evidence other than his admission in

1   support of the plea or offers any principal way for the

2   Court to draw a line that the defendant is accountable for

3   under 450 kilograms but not over 450 kilograms based on the

4   hearing testimony, relying, as I said, on discrediting the

5   government's witnesses.  To be clear, he would have to

6   discredit all of the government witnesses to successfully

7   maintain this position.

8          I also note that his sentencing memo submitted

9   prior to the evidentiary hearing stated that he invested in

10  three cocaine loads of 30 kilograms each which -- I am a

11  mere lawyer rather than a mathematician, but even I can do

12  that math -- that only amounts to 90 kilograms of cocaine

13  for which he was responsible.  And 90 kilograms of cocaine

14  is far less than even what he admitted to as part of his

15  statement of facts in support of his plea where he accepted

16  responsibility for more than 150 kilograms but not more than

17  450 kilograms.  He didn't pursue this argument about the 90

18  kilograms of cocaine at the evidentiary hearing or in a

19  supplemental sentencing memo that he only admits to 90

20  kilograms, but he provides no basis even for that.

21         I do have a clear basis from the three government

22  witnesses; particularly, Pinedo who testified about how --

23  each tanker in the drug trafficking operation with his

24  brother and his father and the defendant had 1,000 to 2,000

25  kilograms of cocaine; and half of each load would go to the

1    defendant; with about 53 to 56 tankers from 2003 to 2005.

2    And a conservative estimate suggests that the defendant was

3    accountable for at least 26,500 kilograms of cocaine based

4    on 500 kilograms per tanker belonging to the defendant and

5    53 tanks from 2002 to 2005.  If each tanker were assumed to

6    contain 1,000 kilograms of cocaine for the defendant and 56

7    tanks arrived between 2003 to 2005, he would be accountable

8    for even more, up to 56,000 kilograms of cocaine.  But I

9    don't even have to -- I don't have to go beyond the

10   conservative estimate based on Pinedo's testimony alone to

11   find that a base offense level of 38 applies.

12           This testimony is only further corroborated by

13   Ramirez who talked about the incident between 2009 and 2010

14   where El Lobo partnered with the defendant to import 450

15   kilograms of cocaine and 50 kilograms of ephedrine that

16   Ramirez said he employed the Navy, the Mexican Navy, to

17   seize so that CJNG, another cartel, would not seize it or

18   steal it, as he believed the CJNG had seized an immediately

19   prior shipment, which would only add to the amount of

20   kilograms of cocaine.  And I did find Ramirez's testimony

21   about that 450 kilograms to be quite credible.  And Pinedo's

22   testimony about the amount of cocaine is also further

23   corroborated by Sinuhe, who testified about hiding 100

24   kilograms of cocaine per hidden compartment in the floor of

25   the trailers used to send cows and bulls to the

1    United States about once a month for a period of time and

2    also, I guess, he said about four to five years; and also,

3    even more cocaine in fuel tanks, similarly to the method

4    used by Pinedo.

5            All of this testimony, without counting up

6    precisely what the kilogram quantities were, firmly support

7    a base offense level of 38 under the guideline at Section

8    2D1.1(c)(2) because the defendant is accountable for more

9    than 450 kilograms of cocaine.

10           Now let's turn to dispute number two, use of the

11   aircraft.

12           Okay.  I will hear from the government.

13           MR. HORNOK:  Thank you, Your Honor.

14           Just briefly.  The aircraft evidence is primarily

15   that recorded conversation.  In that conversation, the

16   defendant talked about somebody that was going to sell him a

17   plane.  He used a specific model number of the airplane that

18   was going to be purchased.  He spoke about that airplane in

19   a way that suggested its use was not just to, like, fly to

20   soccer games or something like that; it was actually

21   confused coded language to suggest its use in the actual

22   importation of cocaine.  Furthermore, the person who was

23   having that conversation with him, his impression and kind

24   of the basis -- the reason he had that conversation with the

25   defendant was because he understood that Mr. Flores had

1    planes and was using them for cocaine trafficking.

2              THE COURT:  Okay.

3              Mr. Feitel.

4              MR. FEITEL:  Good afternoon, Your Honor.

5              I want to address this issue as a legal matter.  I

6    understand Your Honor has accepted the testimony of Elpidio

7    Mojarro Ramirez.  But even if you accept it as true, I don't

8    believe it satisfies the legal requirement of the

9    enhancement contained in 2d1.1(b)(3)(A).

10             That enhancement provides that there is a

11   two-level upward adjustment when an aircraft other than a

12   regularly scheduled commercial air carrier was used to

13   import or export the controlled substance.  So as an initial

14   matter, I want to preserve our challenge to this contrary

15   case law in this jurisdiction from Judge Kotelly.

16             It seems to me that a plain reading of the

17   enhancement requires that the plane had been used directly

18   in the importation of cocaine, and that it doesn't say that

19   it was used in a conspiracy to commit the offense.  So that

20   is one argument.  The other --

21             THE COURT:  So what you are saying is you actually

22   need a lot more than just a conversation between the

23   defendant and another person about how much planes cost,

24   whether you can get a plane, whether you can fly it; you

25   need direct evidence that this defendant was using that

1    plane to actually transport a shipment of cocaine?

2          MR. FEITEL:  That's correct, Your Honor.

3          I will say that I read the government's

4    memorandum.  And what they say about it is that they

5    conclude that Mr. Flores supposedly had planes and was going

6    to help him get planes, that's what Mr. Ramirez concluded.

7    I think that -- we may disagree about the import of his

8    testimony; but if Your Honor accepts it even as being true,

9    I don't think it satisfies the requirement of this

10    particular enhancement.  It seemed more like a bragging

11    issue or talk between people.

12          THE COURT:  You don't have to say anymore, I agree

13    with you.  I am going to deal with this particular -- unless

14    you really want to make a record, but you don't have to.

15          MR. FEITEL:  No, I don't -- I may end up changing

16    Your Honor's mind if you let me speak.  I'll sit down.

17          THE COURT:  Exactly.  Good call, Mr. Feitel.

18          The guideline at Section 2D1.1(b)(3)(A) provides a

19    two-level enhancement, quote:  If the defendant unlawfully

20    imported or exported a controlled substance in which, A, an

21    aircraft other than a regularly scheduled commercial air

22    carrier was used to import or export the controlled

23    substance in pertinent part.

24          The PSR does not apply this adjustment, and the

25    defendant agrees with the presentence investigation report

1     recommendation not to apply this two-level offense level

2     SOC.  Upon review of the evidence, the government's

3     objection to not including this two-level enhancement for

4     use of a plane is overruled.  The government has not proven

5     by a preponderance of the evidence that the defendant used a

6     plane to import or export cocaine.  The only witness who

7     testified about this enhancement was Ramirez, Mojarro

8     Ramirez, whose testimony about this defendant's use of a

9     plane for narco trafficking is insufficient.

10          Mr. Ramirez testified that, credibly, about his

11    own use of planes and his own trafficking operation.  And he

12    admitted, for example, that, in 2015, a plane chartered by

13    Ramirez to transport 1500 kilograms of drugs from Venezuela

14    to Honduras was shot down.  He also testified that he was

15    told the defendant had access to planes.

16          The government relies on a recorded phone call

17    between Ramirez and defendant to argue that the evidence

18    established that Mr. Flores used planes in his operations.

19    But having reviewed the transcript of that call, it simply

20    is not as persuasive as the government argues.

21          That recorded call, on January 9, 2017, between

22    Ramirez and the defendant reveals, from what I could

23    understand of it, that the defendant was thinking about

24    purchasing a plane.  There was no transfer or purchase,

25    paperwork that had been yet completed.  And he may have

1    understood in theory that drugs can be transferred by the

2    plane, but that does not, to my mind, meet the explicit

3    language of this specific offense characteristic at

4    2D1.1(b)(3)(A) that the defendant did unlawfully import or

5    export cocaine using an airplane.

6            At most, the evidence suggests that the defendant

7    understood that planes could be used to smuggle drugs and

8    that the defendant, if he wanted to, could buy a plane.

9    This is insufficient to establish that he, in fact,

10   unlawfully imported or exported a controlled substance using

11   an aircraft other than a regularly scheduled commercial air

12   carrier, so no two-level increase will be applied, as the

13   government requests, under 2D1.1(b)(3)(A) for use of an

14   aircraft to unlawfully import a controlled substance.

15           Okay.  We're now down to dispute number three,

16   bribery of a law enforcement officer.

17           I will hear from the government.

18           MR. HORNOK:  Thank you, Your Honor.

19           With respect to the bribery of a law enforcement

20   officer, we have got a couple of different instances where

21   we heard testimony about how this occurs, and it occurs kind

22   of regularly within the context of the drug trafficking

23   business.  And we also specifically heard about those who

24   were involved with Mr. Flores, bribing law enforcement

25   officers on the defendant's behalf or for his benefit.

 1          Specifically, we heard about an individual named

 2     Licenciado; he was a partner of the defendant.  And he was

 3     the person within their partnership who was responsible for

 4     paying everybody at the ports.  This was with respect to the

 5     oil tanker testimony.  So there was a group of individuals

 6     who were partnering to bring those oil tankers in; and the

 7     defendant was one of those partners, and another of those

 8     partners was the responsible party for going and paying

 9     those bribes on behalf of that partnership.

10          In addition to that, we heard testimony about

11     Mr. Flores's money launderers and the bribes that they were

12     paying to the commander of the airport in order to get the

13     loads of cash through the airport down to Colombia.  In both

14     of these instances, Mr. Flores is not directly the one who

15     is handing the cash to the law enforcement officers, but he

16     is the one who is certainly benefiting from that, and he is

17     obtaining those services.  So he is obtaining the services

18     of a money launderer who is, in turn, actually the one who

19     is handing the cash over to the law enforcement officer in

20     order to launder the defendant's money.

21          In addition to that, I would point out -- in

22     reading back through, particularly, the forfeiture

23     discussion regarding the receipts actually that came from

24     the defendants.  Some of those receipts actually identify --

25     Your Honor will recall, most of them identify absolutely

1  nothing with respect to details; it's just some kind of a

2  number.  But some of those receipts actually did identify or

3  have some things written on them.  There were a couple of

4  them that listed -- I am not going to butcher the Spanish,

5  but it's customs agent -- the Spanish word is for customs

6  agent.  So it is, essentially, a receipt; and the

7  description is customs agent.  Another of those receipts

8  lists custom agent and tips.  And so both of those things

9  that were provided by the defendant suggest and kind of

10  corroborate the idea that he was participating in and was

11  himself --

12          THE COURT:  Yes.  But the problem with those

13  receipts, that evidence is -- you think that he was making

14  receipts of bribes to customs agents for cocaine shipments?

15  I mean, it has to be -- it has to facilitate the commission

16  of the offense of cocaine trafficking and importation into

17  the United States.  So, I mean, I don't even know what to

18  make of those receipts that were dumped on the Court during

19  the evidentiary hearing.

20          As I said at the time, it clearly could strongly

21  suggest some nefarious criminal activity given the nature of

22  those receipts, but I am not sure I can rely on them to find

23  that a two-level increase under 2D1.1(b)(11) applies.

24          MR. HORNOK:  I don't think you should rely

25  exclusively on them by any means because of the issues that

1    you have identified.  But what those receipts -- those are

2    receipts from 1988 and 1989, and just kind of the general

3    theory that the defense has offered, which is that he was

4    involved in this smuggling business -- what they demonstrate

5    is the defendant's understanding of how to smuggle things

6    and how bribing customs agents, for example, and giving them

7    tips is part of that smuggling business.

8              So then when we look -- fast forward to years

9    later where the defendant has risen enough in the

10   organization that he is not the one who is actually putting

11   his hands on the drugs, he is not the one who is actually

12   handing bags of cash to an airport commander -- this is not

13   happening without his knowledge.  This is happening at his

14   direction and for his benefit, but he has gotten high enough

15   up in the organization that he can kind of keep his hands

16   clean.

17             THE COURT:  Well, this Licenciado, this evidence

18   that -- Pinedo said that Licenciado --

19             Ms. Rhee, how would you pronounce that name?

20             MS. RHEE:  We can ask the interpreters, but it's

21   Licenciado.  It is someone that is --

22             THE COURT:  Licenciado, thank you, Mr. Rhee.

23             This testimony about Licenciado being a partner of

24   this defendant and -- meaning that, you know, it sounds as

25   if he certainly wasn't an employee.  He wasn't paying the

1    bribes at a specific direction of this defendant.  And

2    partners -- when somebody is a partner as opposed to an

3    employee or a worker, you can't attribute everything that

4    that person knows to the defendant.

5           Why should I believe that if Licenciado was a

6    partner that this defendant had any knowledge of what the

7    partner was doing to facilitate shipments?

8           MR. HORNOK:  I think you have precisely identified

9    the appropriate standard here.  This is not a:  You are

10   responsible for the acts of your co-conspirator because --

11   given the language of that enhancement.  It needs to be an

12   act that the defendant did personally or that he obtained or

13   that he -- the language is aided, abetted, counseled,

14   commanded, induced, procured, or willfully caused.  So I do

15   think that that is the evidence that needs to be there.

16          I have presented the evidence as it was presented

17   by those witnesses.  I think you can make the reasonable

18   inference given, specifically, the history in the 1980s

19   where we have got the evidence of bribery and then the

20   testimony that you have to make that conclusion that needs

21   to be made under the guidelines.  If I had better evidence,

22   I would be offering it to you.

23          THE COURT:  Got it.

24          MR. FEITEL:  Good afternoon, again, Your Honor.

25          I have a case that Your Honor talked about; I

1    promise to be brief.  I do agree with the government's

2    concession and Your Honor's concern that this needs to be a

3    personal matter.  You have to do it yourself, because the

4    enhancement at 2D1.1(b)(11) says if the defendant bribed --

5    or attempted to bribe a law enforcement officer.

6          Your Honor may remember that there was a lot of

7    problems that the government had, in the first instance,

8    trying to get out from the witness who it was that was

9    bribed at the airport.  It sort of seemed no one had

10   mentioned to him what they were looking for before he got on

11   the witness stand or he had forgotten -- in my view, he had

12   forgotten what he made up; but I will leave that alone.

13         There is a case from the Southern District of

14   New York called *United States versus Lobo*, it appears at

15   2017 Westlaw 2838187 -- this is my latenight review.

16         THE COURT:  You said the Southern District of

17   New York?

18         MR. FEITEL:  Yes, ma'am.  Judge Schofield.

19         The defendant, Mr. Lobo, was the son of the former

20   President of Honduras.  He was charged in a drug conspiracy

21   with bribing the law enforcement officers through the use of

22   some associates.  And the court concluded that the

23   enhancement requires proof that the "Defendant," quote --

24   himself personally -- "bribed or attempted to bribe" the law

25   enforcement officials.  In the *Lobo* case, the defendant was

1    present at a meeting where other people bribed a law

2    enforcement officer, $100,000 to each.  And the court

3    concluded that even actual knowledge that the bribes are to

4    be paid doesn't satisfy the government's burden of proof.

5             I don't want to belabor the point.  Again, I would

6    like to win when I am ahead; brevity being the soul of wit,

7    as they say.  I will sit down.

8             THE COURT:  And you are ahead here.

9             All right.  The guideline at Section 2D1.1(b)(11)

10   provides that: If the defendant bribed or attempted to bribe

11   a law enforcement officer to facilitate the commission of

12   the offense, increase by two levels.  The PSR doesn't

13   mention this adjustment.  The defendant agrees with the PSR

14   recommendation not to apply this two-offense level specific

15   offense characteristic, and the government believes it

16   should be added.

17            According to the government, the defendant used

18   intermediaries including Licenciado and a money launderer to

19   pay bribes to law enforcement officers.  I don't believe

20   this record is sufficiently clear for the government to have

21   established this support for this SOC by the necessary

22   preponderance of the evidence.

23            Pinedo was the person who testified that

24   Licenciado -- I am sorry, Ms. Rhee, I am going to slaughter

25   that name again -- a government official -- that Licenciado,

1    who was a government official at an airport, bribed -- a

2    government official bribed court officials.  He admitted

3    that he never saw Licenciado bribe anyone.  He didn't know

4    how much Licenciado got paid, if at all; he didn't know

5    whether the defendant directed Licensiado's payments.  He

6    only knew that Licenciado was the person who would pay

7    everyone government related, and he understood that

8    Licenciado was the defendant's partner; never suggested that

9    Licenciado was the defendant's employee, his worker, took

10   direction from the defendant.  That is just simply not

11   sufficient to support this two-level increase.

12          Citing pages 98 through 101 of the September 6,

13   2023, evidentiary hearing transcript that the government

14   also argues that Mr. Flores hired a money launderer who

15   would pay the commander of the airport $50,000 each week.

16   At the outset, the government cited transcript pages 98

17   through 100, excerpts from the defendant's cross of Pinedo,

18   when he was asking about the money the government paid him

19   in exchange for cooperation are irrelevant to the bribery

20   enhancement.  The government's citation to those transcript

21   pages was a waste of time.

22          But to the extent that Pinedo testified about

23   paying the commander of the airport $50,000 every week, it

24   appears to me from the testimony that Pinedo did that to aid

25   his own money laundering.  And so this, again, doesn't help

1   support this two-level enhancement for bribery against this

2   defendant.  So the government's objection is overruled and

3   the two-offense level increase for bribery under

4   2D1.1(b)(11) will not be applied.

5          All right.  We are at dispute number four, the

6   defendant's role as a leader of his own DTO.

7          Okay.  I will hear from the government.

8          MR. HORNOK:  Thank you, Your Honor.

9          Your Honor, all three of the witnesses described

10  the way that the defendant was engaged in drug trafficking.

11  What is clear is that although he was associated with the

12  Sinaloa cartel and other cartels, he was really operating

13  independently.  As we get a view into the way that his

14  operation ran, it is clear that it included five or more

15  people; the defendant, plus at least four other people.

16         We have got specific testimony about there were

17  about 20 people working for him in 2003.  We have another

18  instance of testimony talking about five people were

19  bodyguards.  And then we have -- I believe it is -- six

20  people where we have specific names of people who have been

21  identified.  We have identified that in our briefing.

22         Bottom line, there were at least five people

23  involved in the defendant's organization; and the defendant

24  was, in fact, the organizer or leader.  He was kind of the

25  top-level person.  He wasn't working for somebody who was

1    further up the food chain; although he was, certainly,

2    associated with bigger drug traffickers.

3              THE COURT:  Okay.  And you would not include

4    Sinuhe in that -- any of -- in those five people?  Any of

5    the cooperators were not included in the five because he

6    wasn't -- by their own admission, this defendant wasn't

7    their leader?

8              MR. HORNOK:  That's correct.

9              So, for example, in the oil tanker scenario where

10   we have kind of this description of a partnership and it's a

11   little bit unclear, for example, as to whether Licenciado

12   was working for the defendant; that guy is not included in

13   the six.  It's the: How many people showed up working for

14   the defendant to receive the defendant's cocaine?  Those are

15   the people included.  Specifically, the names were Chani;

16   Cachoro; a different Licenciado who was delivering money

17   later, I believe; Santiaguito, who also went by Enrico; and

18   then there was a description of a man with the last name

19   Alfaro, who the witness described as the current governor of

20   Jalisco, Mexico.  And we have provided information -- public

21   record information to corroborate that statement.  In

22   addition to that, there is Mr. Flores's son who was also

23   identified as a specific individual within that kind of

24   general 20 individuals or more.

25             THE COURT:  Ms. Rhee.

1          MS. RHEE:  Good afternoon, Your Honor.

2          I let Mr. Feitel pick his issues, and he let me

3     have this one, Your Honor.

4          The only other thing that we would argue is that

5     we disagree with the Court's assessment of the credibility

6     of the witnesses.  And we would just argue that there is no

7     corroboration of any -- with any factual evidence or --

8     excuse me -- any physical evidence, no emails, no text

9     messages, and Mr. Flores just has no idea who these people

10    are that were identified by the witnesses.  Other than that,

11    we would rest on the evidence.  Thank you.

12         THE COURT:  All right.  Thank you.

13         Okay.  The guideline at Section 3B1.1(a) provides,

14    quote:  If the defendant was an organizer or leader of a

15    criminal activity that involved five or more participants or

16    was otherwise extensive, increase by four levels.

17         The PSR, presentence investigation report, does

18    not apply this leadership role adjustment, and the defendant

19    agrees with probation's recommendation not to apply the

20    4-level role adjustment under Section 3B1.1(a) of the

21    guidelines.

22         The government argues that the evidence

23    established that Mr. Flores worked independently but was

24    protected by the Sinaloa cartel; and that about 20 people,

25    including five bodyguards, were working in the defendant's

1   cocaine trafficking organization.

2          For a defendant to be a manager or supervisor, he

3   must exercise some control over others.  See *U.S. v.*

4   *Bikundi,* 926 F.3d 761, jump cite 801, D.C. Circuit from

5   2019.

6          The D.C. Circuit understands the concept of

7   control or authority implicit in the notion of management or

8   supervision to connote some sort of hierarchical

9   relationship in the sense that an employer is hierarchically

10  superior to his employee.  See *U.S. v. Johnson*, 64 F.4th

11  1348, jump cite 1352, D.C. Circuit from 2023 quoting

12  *U.S. v. Quigley*, a D.C. Circuit case from 2004.

13         The government specifically names as individuals

14  supervised by the defendant, the five bodyguards, plus

15  Chani, Cachoro, Licenciado, Enriquito, and Alfaro.  And

16  specifically, Pinedo testified about 20 people who he

17  identified or believed worked for the defendant and named

18  specifically Licenciado, Enriquito, Chani, and Cachoro.

19  None of the other witnesses corroborated this defendant's

20  association with these persons.

21         Sinuhe testified that the defendant had numerous

22  workers but was unable to name any except Alfaro, who he

23  defined as the defendant's errand boy; Chicklin, one of the

24  defendant's workers; and -- which are different names,

25  potentially different participants supervised by the

1    defendant than those named by Pinedo.

2         To my mind, this is not particularly surprising

3    since the defendant's involvement in narcotics trafficking

4    occurred over a lengthy period, with deals with multiple

5    high-level drug dealers for hundreds of kilograms of cocaine

6    shipped to the U.S. using various means from shipping

7    containers to trucks.  Not only did the witnesses identify

8    by name more than four workers -- five workers supervised by

9    the defendant; his narcotics trafficking qualifies as an

10   otherwise extensive illegal operation to meet the criteria

11   of this role adjustment.  So I do find that the government

12   has proved by a preponderance of the evidence and just

13   common sense, given the nature of what this defendant has

14   admitted about his own conduct, the amount of cocaine

15   involved that this was an activity that involved five or

16   more participants or was otherwise extensive.

17        Accordingly, the four offense levels under the

18   guideline at 3B1.1 will be applied.  This finding makes this

19   defendant ineligible for his request for safety valve relief

20   under 18 U.S.C. Section 3553(f).  That statute, the

21   statute -- that statute expressly provides, in pertinent

22   part, that relief from an applicable mandatory minimum is

23   available if the defendant was not an organizer, leader,

24   manager or supervisor of others in the offense as determined

25   under the sentencing guidelines.  So that finding about his

 1    role adjustment also resolves the dispute between the

 2    parties about application of the safety valve relief.

 3              All right.  Now let's turn to the fifth dispute,

 4    obstruction of justice.

 5              I will hear from the government.

 6          MR. HORNOK:  The Court mentioned the safety valve;

 7    I believe also that that finding resolves the issue with

 8    respect to 4C1.1.

 9          THE COURT:  It does.

10          MR. HORNOK:  Specifically, 4C1.1(a)(10) requires

11    that the defendant meet all of the following criteria.

12    Number 10 is that the defendant did not receive an

13    adjustment under 3B1.1, aggravating role, to which the Court

14    has just referenced.  I believe that that resolves that as

15    well.

16          MR. FEITEL:  Not to interrupt my colleague, but I

17    would like to reserve on that because the enhancement has

18    two parts to it, I believe.  I believe it has both

19    leadership and if you are charged with a continuing

20    enterprise offense, so I would like to reserve that.

21          THE COURT:  Okay.  We can talk about that.

22          MR. FEITEL:  I wanted to reserve that because I

23    had not heard this before.

24          THE COURT:  Okay.

25          MR. HORNOK:  With respect to the obstruction

1    enhancement, specifically there are two prongs or two ways

2    in which I believe the defendant obstructed justice, both of

3    them occurred during the course of the sentencing.

4    Specifically, the first with respect to the threatening

5    gesture that the defendant made to the witness as soon as

6    the witness took the stand, and we have got caught on candid

7    camera, amazingly; that, under the definitions and the

8    application notes to the obstruction enhancement, that

9    applies.

10              In addition to that, the presentation of the

11   documents and kind of the way that the documents were

12   presented in this case, it does -- these receipts, I believe

13   that also, likewise, constitutes an obstruction because they

14   are putting them forth as something that the Court has found

15   that they, in fact, are not.

16              MR. FEITEL:  Your Honor, I think it would be

17   prudent to take these up in turn.

18              The first issue that the government claims causes

19   an obstruction of justice is Mr. Flores-Hernandez gesturing

20   at his face.  I don't know if Your Honor has been

21   watching --

22              THE COURT:  He has been doing that all morning.

23              MR. FEITEL:  He does it all the time.  I don't

24   want to belabor the point.

25              I think that most reasonable people would agree

 1    that if Mr. Flores had made a motion across his neck, like

 2    in a knife motion, or pretended -- imagined he had a weapon

 3    and pointed it at his head, at the witness, most people

 4    would understand that to be a threat.  I just don't think

 5    that what he did is reasonably construed as a threat.  I

 6    don't know what made the witness think that it was.

 7              THE COURT:  Because he was scared to be

 8    testifying.

 9              MR. FEITEL:  I have an alternative theory that he

10    was scared because he was testifying falsely.

11              In either event, I don't diminish that he actually

12    was concerned about it.  But I think that his perception of

13    the events is an entirely different matter than the intent

14    of the defendant's.  I would ask Your Honor to not rely on

15    that particular prong as a basis for finding that Mr. Flores

16    attempted to intimidate a witness.

17              I don't know Mr. Flores as well as Ms. Rhee does.

18    But if I had a beard, it would be white now; I don't have it

19    anymore.  People are always -- when you have facial hair,

20    it's an issue -- I think a gender issue.  When you have

21    facial hair, you are always playing with it.  It's just the

22    kind of thing that happens.  I really do think that

23    Mr. Flores is not -- it would be better if he didn't play

24    with his lips and mouth, but I don't think he intended to

25    threaten the witness.  I would ask Your Honor to find that.

1          With respect to the other prong --

2          THE COURT:  I mean, the gesture was not just

3   playing with his mustache or his face, it was having his

4   tongue stick out and touching the tip of it as a warning not

5   to talk about what he was going to say.

6          MR. FEITEL:  I really don't see that's what he is

7   doing.  I think he has a dry mouth.  He is doing it all the

8   time.  He does it all the time.  Even if we assume that the

9   witness felt that way, I don't think that his trepidation is

10  binding.

11          As I said, there are some universal gestures that

12  I think all of us would agree are threats.  I have never

13  heard -- if someone came who was an expert in Mexican body

14  language and said that this is feigness everywhere --

15          THE COURT:  You don't have to spend much more time

16  on that, Mr. Feitel.  Let's move on to the receipts.

17          MR. FEITEL:  To the receipts, Your Honor, first, I

18  would say it's not Mr. Flores who produced them, it's his

19  counsel.  I mean, he is not the one -- first, he didn't

20  create --

21          THE COURT:  Falling on your sword for the binders?

22          MR. FEITEL:  No.  I am not admitting that they're

23  false or fraudulent.  To the extent that they reflect

24  criminal conduct --

25          THE COURT:  Just incomplete?  Insufficient?

1     Questionable?  Highly questionable?

2              MR. FEITEL:  The receipts -- this is a different

3     issue.  The receipts were created as part of Mr. Flores's

4     admittedly illegal conduct involved with smuggling

5     electronics.  In the moment when they were created, the

6     person who made the receipts is a person named Wolf Hoffman;

7     he was the owner of the business.

8              The defense provided the government with his name

9     a long time ago.  The government says that they're false,

10    they're incomplete, they're somehow meant to obstruct.

11             What they didn't say was they contacted

12    Mr. Hoffman.  I know that he is still available because

13    Ms. Rhee spoke with him before the sentencing.  I don't know

14    what the government did to try to verify or unverify them.

15             But to the extent that there is a claim that

16    somehow this is an effort to commit an obstruction of

17    justice on the Court, defense counsel are the ones who

18    submitted -- we didn't consult with Mr. Flores.  And to be

19    fair, Your Honor --

20             THE COURT:  I agree with you.

21             MR. FEITEL:  Okay.

22             THE COURT:  You can be seated, Mr. Feitel.

23             MR. FEITEL:  Always a pleasure.  Thank you, Your

24    Honor.

25             THE COURT:  Okay.  The fifth dispute between the

1    parties has to do with application of an obstruction of

2    justice enhancement under the guideline at Section 3C1.1.

3          That provision provides, quote:  If, one, the

4    defendant willfully obstructed or impeded or attempted to

5    obstruct or impede the administration of justice with

6    respect to the investigation, prosecution, or sentencing of

7    the instant offense of conviction and, two, the obstructive

8    conduct related to, A, the defendant's offense of conviction

9    and any relevant conduct or, B, a closely related offense,

10   increase the offense level by two levels.

11         Examples of covered conduct includes:

12   Threatening, intimidating, or otherwise unlawfully

13   influencing a witness, directly or indirectly, or attempting

14   to do so, or producing or attempting to produce a false,

15   altered, or counterfeit document, or record during an

16   official investigation or judicial proceeding.  See the

17   application note to that guideline; application Note 4(A)

18   and (C).

19         The government urges application of this

20   obstruction upward adjustment.  The presentence

21   investigation report doesn't apply this enhancement, and the

22   defendant argues that the enhancement should not apply.

23         According to the government, this enhancement

24   should apply because the defendant threatened a witness when

25   he attempted to intimidate Pinedo by sticking out his tongue

1    and touching the end of it with his pointer finger, which

2    Pinedo took to mean "watch out" with his tongue.

3           In papers, I think, the government also mentioned

4    that Sanchez, the stepfather, tried to convince Sinuhe, his

5    son, not to testify -- but I think you dropped that, or you

6    don't present that as part of your argument anymore?

7           MR. HORNOK:  We haven't dropped it.  It's still

8    part of the argument, just didn't want to waste your time

9    with something I knew you already had read and digested.

10          THE COURT:  Got it.

11          Okay.  And then, also, that the defendant produced

12   binders full of false documents in the form of 7500 pages of

13   receipts of Mr. Flores purchasing electronics that he

14   smuggled into Mexico.

15          I am going to address each of these in turn.

16          With regard to threatening the witness, Pinedo

17   testified that he understood the defendant's finger movement

18   to his tongue when he was taking the stand to be a threat

19   about his testifying.  I have to say that the defendant does

20   touch his face a lot, as Mr. Feitel said.  And I do

21   understand how the witness could understand, having seen

22   that gesture, particularly if he has some plausible fear for

23   his safety or the safety of his family, that he could see

24   that gesture as threatening.  I think it would be quite a

25   very bold move to make a threatening gesture towards a

1     testifying witness in the courtroom before the very

2     sentencing judge, even if the gesture is somewhat subtle.

3            I do find that that conduct was concerning, that's

4     why I got the tape of the camera in the courtroom, so we can

5     look at what -- precisely what occurred and when; but I am

6     also concerned about treating as a justification for a

7     two-offense level obstruction enhancement physical conduct

8     by a defendant that could be just more general or even

9     somewhat negative if a defendant frowned or shook his head

10    that scared a particular witness.  I am a little bit

11    concerned about setting a precedent of using that kind of

12    conduct as a triggering application of the obstruction

13    enhancement, so I don't find that that is sufficient.

14           Sinuhe testified that he received a text from his

15    stepfather who is a very close friend, I guess, of the

16    defendant; and he interpreted that text to be that Sanchez

17    was trying to convince Sinuhe not to testify against the

18    defendant.  There is nothing about that message, the text of

19    which I am not particularly -- it was never presented to the

20    Court -- that supports any conclusion that that should be

21    attributed to this defendant.  So that is certainly

22    insufficient to warrant an obstruction enhancement.

23           And then with respect to the last issue, which is

24    the dump of a bunch of vague receipts from the late '80s, I

25    guess, through 1993 to help demonstrate by the defense that

 1    what he was smuggling wasn't cocaine but it was illegal

 2    merchandise; that was the reason he had such a large income

 3    and could afford a house with its soccer field.  It was

 4    smuggled illegal merchandise, not cocaine.  And the

 5    defendant's criminal attorney and his friend, Jorge Arturo

 6    Santos Murillo, testified about these receipts; that he used

 7    these receipts successfully in a Mexican court in connection

 8    with his representation of the defendant in a 2017 fraud

 9    case.  And while the belated and questionable dump of

10    receipts for items that are nowhere identified may perhaps

11    prove some kind of nefarious or criminal activity, although

12    it wasn't persuasive to a Mexican court, these receipts that

13    were presented as part of a defense -- and I would put the

14    responsibility for the presentation of those receipts

15    squarely on the shoulders of defense counsel and not on the

16    defendant.  So, accordingly, I find that the dumping of

17    those receipts on the Court is insufficient to warrant an

18    obstruction enhancement.  Accordingly, the two offense

19    levels under the guideline at Section 3C1.1 for obstruction

20    will not be applied.

21            And we're on to dispute number six, acceptance of

22    responsibility.

23            MR. HORNOK:  Your Honor, acceptance of

24    responsibility sets out in Application Note 3, the guideline

25    section, that the defendant may not falsely deny any

1    additional relevant conduct.  It also provides that the

2    defendant falsely denies or frivolously contests relevant

3    conduct that the Court determines to be true and has acted

4    in a manner inconsistent with acceptance of responsibility.

5          What I would specifically point to -- I think of

6    particular note here is the drug quantity.  The Court has

7    now found that the true drug quantity for which the

8    defendant was responsible is at least two orders of

9    magnitude greater than the drug quantity which the defendant

10   has admitted to or has advanced to this Court.

11         THE COURT:  Can I just ask you as a policy matter?

12   I mean, the defendant entered a plea of guilty.

13         MR. HORNOK:  He did.

14         THE COURT:  He entered a plea of guilty to a

15   substantial charge carrying a 10-year mandatory minimum.

16   That's something that -- even if the parties couldn't

17   negotiate a plea agreement, that's kind of acceptance of

18   responsibility; spared the Court a jury trial; translations

19   of tons of transcripts; bringing in witnesses from afar;

20   spared the Court from having to resolve -- I am quite

21   confident, knowing Mr. Feitel and Ms. Rhee -- many, many

22   pretrial motions --

23         MR. HORNOK:  So what is the benefit?

24         THE COURT:  Why is the government taking the

25   position it is?  You should be encouraging this.  Then you

1    get to prove some of these things by a preponderance at a

2    sentencing hearing, as opposed to beyond a reasonable doubt

3    at a trial.

4            So why are you fighting this so hard?  It seems

5    counterproductive to me and counterproductive to the

6    effective preservation of limited prosecutorial,

7    investigative, and judicial resources.

8            MR. HORNOK:  So I think you have identified, I

9    think, an important issue in this case.

10           THE COURT:  I hope this is a tough issue for you

11   to decide.

12           MR. HORNOK:  It is.  It is a tough issue.  And to

13   be frank, as I have been preparing this week, that's been

14   the issue.

15           Why do you take a defendant who pleaded guilty,

16   who didn't put the Court or the government to the burden of

17   a trial -- why do you deny his acceptance of responsibility?

18   And why is it justifiable to stand up here and say that the

19   guy should spend the rest of his life in prison?

20           THE COURT:  It's hard for people to admit when

21   they have done things wrong.  He admitted to a lot.

22           MR. HORNOK:  He did.  The problem is the defendant

23   pleaded guilty, and then it kind of went off the rails from

24   there.  And I think you have to kind of look --

25           THE COURT:  Not from where I sit.

 1              Why do you think it went off the rails?

 2         MR. HORNOK:  First, specifically, the defendant,

 3    in pleading guilty, had an option.

 4              In order to plead guilty, he had to plead guilty

 5    to the elements of the offense.  He had to admit facts

 6    sufficient to demonstrate -- to meet the elements of the

 7    offense.

 8              The defendant went a step further with respect to

 9    the drug quantity.  He affirmatively limited his culpability

10    and then has advanced that limitation over and over and over

11    again.

12         THE COURT:  The defendant could have put the

13    government to prove beyond a reasonable doubt by going to

14    trial.

15         MR. HORNOK:  He could have, and he didn't.

16              But in his process of trying to, kind of, garner

17    this acceptance of responsibility -- it's very different

18    than a defendant who accepts responsibility and, say, does

19    it under the context of a plea agreement or even different

20    from a defendant who accepts responsibility, admits the

21    elements of the offense, and then does not frivolously

22    contest the relevant conduct that is core to the offense at

23    issue in this case.  That's exactly what --

24         THE COURT:  Do you think that it's frivolous for

25    the defense to raise challenges to the testimony of sort of

1    almost huge international narco traffickers?

2              MR. HORNOK:  Absolutely not.

3              THE COURT:  Absolutely not?

4              MR. HORNOK:  Absolutely not.  I think the

5    difference is demonstrated in the --

6              THE COURT:  Why is that frivolous?

7              MR. HORNOK:  The difference is demonstrated in the

8    approach the defendant took with respect to the drug

9    quantity and the aircraft bribery and other enhancements.

10   Okay?  With respect to those enhancements, the defendant's

11   factual basis is completely silent.  And his approach seems

12   to have been, through the course of putting the government

13   to its burden at sentencing, is to test the credibility of

14   the government's witnesses; to subject those witnesses to

15   cross-examination; to make legal arguments about whether the

16   testimony that was presented is legally sufficient.  That's

17   one approach; I think that's perfectly fine.

18             What the defendant did with respect to drug

19   quantity is different.  In his factual basis, he said:  I

20   was responsible for no more than 450 kilograms of cocaine.

21   He swore an oath to a judge in this courthouse that that was

22   the truth.  He then, in the context of his papers, has

23   advanced the position that he was responsible for -- he is

24   kind of making up this evidence of these three loads and

25   this 30 kilograms each.  It's a difference between testing

1    the evidence that the government presents and advancing a

2    specifically false narrative; it's just different.

3              In addition to that, I think that the acceptance

4    of responsibility here, although the Court -- I understand

5    the Court's ruling with respect to obstruction of justice.

6    But I think all of those things -- all of the things that

7    supported that obstruction enhancement are also relevant to

8    the Court's determination of acceptance of responsibility.

9              In addition to that -- so you have got the

10   defendant's conduct.  In addition to that, I would point out

11   the other of the defendant's conduct which the Court has

12   witnessed.  For example, you have got the witness who is

13   sitting up there and asked the Court:  Why is it that the

14   defendant keeps laughing every single time I say something?

15   The Court noticed it, pointed it out.

16             What was the defendant's response?  It wasn't

17   contrition.  He turned around in his seat and started

18   looking at the back of the courtroom in complete disrespect

19   for the Court.

20             In this morning's hearing, while the Court was

21   resolving -- was identifying and kind of laying out the

22   basis for some of its rulings, the defendant was shaking his

23   head as if it were not true.  His defense counsel got right

24   up here with respect to the role enhancement and said:  The

25   defendant has no idea who any of these individuals are.

1           So the difference is, do you put the government to

2       the test and do you challenge the evidence that is presented

3       or do you advance a specifically false narrative?

4           The defendant has done that.  He has demonstrated

5       through the course of these proceedings that he has not

6       accepted responsibility.  He still thinks he is a small-time

7       drug dealer --

8           THE COURT:  And perhaps compared to some of the

9       other people running the Sinaloa cartel, the Milenio cartel,

10       and the CJNG, he probably is smaller than they are.

11           MR. HORNOK:  He is probably smaller than they are,

12       that is true.  But he is incredibly different than any drug

13       dealer who is in this court because they are committing that

14       drug trafficking conduct here in the District of Columbia;

15       different than any drug dealer I ever prosecuted in Texas or

16       Arizona.  He is by orders of magnitude a big -- a larger

17       drug dealer, and I think that's the difference.  Are you

18       going to affirmatively present -- and that's a needle that's

19       difficult to thread in the context of pleading guilty,

20       right?

21           Because you could plead guilty and you have a plea

22       agreement and then, absolutely, you have acceptance of

23       responsibility.  But he chose a middle ground.  He tried to

24       gain his acceptance of responsibility but retain the

25       benefits of most of the results of going to trial, right?

1     Because the sentencing is -- that is the ball game here, and

2     that's really what he contested.

3            In doing that, he got a lot of the benefits of

4     going to trial.  He got to call, out of the darkness, the

5     cooperating individuals who -- it was not publicly known

6     that those individuals were able to cooperate and were -- so

7     now there are individuals who are subject to retaliation

8     because of the defendant's tack in this particular case.  So

9     I think it's different.  There is acceptance of

10    responsibility --

11           THE COURT:  So he should be -- despite all of the

12    benefits to the court system, to the prosecutors, to all of

13    the citizens of the District of Columbia who would be called

14    upon to serve as jurors for a fairly lengthy trial given the

15    extent of conspiracy, the numbers of witnesses, the language

16    issues, et cetera -- all of those benefits should be put

17    aside in assessing whether he gets two levels off for

18    acceptance of responsibility because by putting the

19    government to its proof at a sentencing hearing cooperators

20    who have been otherwise shielded had to be fronted and are

21    now known.  That would have happened had the case gone to

22    trial as well, so why should I hold that against the

23    defendant in denying him acceptance of responsibility for

24    pleading guilty for a 10-to-life narcotics charge?

25           MR. HORNOK:  Because those cooperators -- sure,

1    they would have come out in the context of trial.  But in

2    the context of trial, the defendant wouldn't have gotten the

3    benefit of a three-level reduction.

4             THE COURT:  Well, we're only talking about two

5    levels here because, certainly, the third point requires a

6    government motion which you are not making, right?  So it's

7    just two levels.

8             MR. HORNOK:  I have not made a motion.  That is

9    correct, I have not made a motion for a third level.

10            THE COURT:  So we're just talking about two, not

11   three.

12            MR. HORNOK:  That's correct.

13            THE COURT:  Okay.  I just wanted to make sure I

14   hadn't missed something in the flurry of paperwork in the

15   case.

16            MR. HORNOK:  He shouldn't get the benefit -- so

17   the fact that the cooperators come out in the context of the

18   sentencing, that mitigates his acceptance.  So, yes, it does

19   say --

20            THE COURT:  I am sure all of the cartels want to

21   know exactly who is cooperating with the government, and

22   that's one of the things that happens in our process; they

23   get revealed.

24            MR. HORNOK:  It is one of the things that happens.

25   But one of the things that can't happen in our process, the

1    defendant can't claim the benefits -- the full benefits of

2    acceptance of responsibility and then come into this court

3    and advance a specifically false narrative which is

4    completely undermined by any fact that has been presented to

5    the Court.

6             THE COURT:  I appreciate the government's

7    position.  But I think you also understand what I view as

8    sort of the countervailing considerations.

9             MR. HORNOK:  Absolutely.

10            And I think the way to balance those is to focus

11   on the defendant's post-plea conduct.  He pleaded guilty.

12   The question is:  What did he do afterwards?

13            If a defendant cannot lose his acceptance of

14   responsibility after pleading guilty, then there isn't that

15   basis -- there is not a motivation for a defendant to not

16   flood the court with false information in the context of a

17   contested sentencing hearing; to not -- the defendant's got

18   to have an interest to continue to actually stay the course

19   with acceptance of responsibility.  And I think you look at

20   that from the moment he pleads guilty going forward, and

21   this defendant did not stay the course.

22            THE COURT:  Well, let me just be clear.  Had I

23   found clearer evidence of obstruction by threats to

24   witnesses in any way, there would be -- post plea, there

25   would be no acceptance of responsibility given here.

1        I have noticed very well the defendant's demeanor

2    in the court, both through the evidentiary hearing, and so

3    on.  To me, that plays a role where within a guidelines

4    range an appropriate sentence should be given as opposed to

5    whether acceptance of responsibility with all of the

6    benefits that that provides to the system writ large should

7    be granted.  But there you have it.

8              MR. HORNOK:  Thank you.

9              THE COURT:  Ms. Rhee or Mr. Feitel.

10             MR. FEITEL:  I will truly try to be brief.

11             The new amendment to the sentencing guidelines

12   provides that the *sine qua non* for getting the two-level

13   downward adjustment for acceptance of responsibility is

14   saving the government the necessity to have a trial, and

15   that's exactly what Mr. Flores did.

16             What the government has suggested is that he would

17   have been better off admitting to just the barest offense,

18   the five kilos, and having said nothing more about it.  That

19   is actually what the government articulated in its pleading.

20   They said had he admitted to just the offense conduct, and

21   then he would have fought over everything else, that would

22   have been better.  I disagree.

23             He saved the government the trial.  He saved the

24   court the trial.  He saved the community the trial.  He

25   admitted responsibility for what he had done.

1          I want to read from the commentary note before I

2     conclude.  But I wanted to --

3          THE COURT:  But you understand that -- you are

4     just talking, you are just debating the two offense levels

5     under 3E1.1(a)?

6          MR. FEITEL:  Yes.

7          THE COURT:  You are not talking about (b)?

8          MR. FEITEL:  No.

9          THE COURT:  Okay.  Which requires the government

10    motion which we do not have here.

11         MR. FEITEL:  I don't think they are going to, and

12    I will leave it for now.

13         There are two things.  The first is that the

14    Narcotics and Dangerous Drug Section has decided -- that

15    decision is within their discretion -- to call the actual

16    witnesses at contested sentencing hearings.

17         There is another formula that used to be all the

18    rage, I mean -- because hearsay is admissible at sentencing

19    hearings.  The government used to call the case agent, like

20    Agent Novick.  And he would get up on the witness stand and

21    he would dutifully relay -- Your Honor gets the point --

22    what Witness No. 1 said, what Witness No. 2 said.  The

23    actual identity of the witness was disclosed to defense

24    counsel and the defendant, but not writ large to the

25    community, which is what happened here in this case.

1          I remember thinking during this case they would

2     have been a lot better off with Agent Novick -- it would not

3     have been, I think, the same event.  I applaud them for

4     calling the witnesses, but that's a tactical decision that

5     they made.  We didn't cause them to call the actual

6     witnesses at sentencing, Your Honor.

7          If they had presented hearsay testimony of an

8     agent and I had objected, I think Your Honor would have

9     said:  Mr. Feitel, you know the rule, which is that hearsay

10    is admissible.  So it is not Mr. Flores's sole

11    responsibility for who they called.

12         But finally, Your Honor, I do note that the

13    commentary note to the acceptance of responsibility

14    guideline at 3E1.1 says that:  The fact that a defendant's

15    challenge is unsuccessful does not necessarily establish

16    that it was either a false denial or frivolous.  I think

17    that's where we are in this case.

18         To be fair, I think we have done okay this morning

19    with challenges to the enhancements.  We didn't win them

20    all, but we're batting more than 500.  So I think, on

21    balance, Your Honor should give Mr. Flores the benefit of

22    the two-level downward adjustment in this case.

23              THE COURT:  I plan to.

24              MR. FEITEL:  Okay.  Yes, ma'am.

25              THE COURT:  If you couldn't tell from my

1    conversation with the government.

2         But as I pointed out, I am always curious to

3    hear -- not "curious" -- I need to hear what everybody's

4    views are.

5         You may sit down.

6         MR. FEITEL:  Thank you.

7         THE COURT:  All right.  The guideline at Section

8    3E1.1(a) provides, quote:  If the defendant clearly

9    demonstrates acceptance of responsibility for his offense,

10   decrease the offense level by two levels.

11        The probation office applied the two-level

12   decrease for defendant clearly demonstrating acceptance of

13   responsibility for the offense.  The defendant clearly

14   agrees with the probation office's recommendation.  The

15   government argues that the two-offense level decrease should

16   no longer be applied because he falsely denied and

17   frivolously contested his relevant conduct.  Specifically,

18   the government takes issue with defendant's position that he

19   trafficked no more than 450 kilograms of cocaine; in other

20   words, he admitted to a whole lot of cocaine, but not all of

21   his drug trafficking activity.

22        I am sympathetic to the government's view.  I also

23   appreciate that the government has -- in order to support

24   both the full amount of cocaine involved and its other

25   specific offense characteristics that it believes applies in

1    this case, was put through the task of presenting that

2    evidence in an evidentiary hearing.  But I, for the reasons

3    that I have already talked about in the colloquy with the

4    government, believe that the defendant here did accept

5    responsibility for a whole lot of his drug trafficking

6    activity, and that needs to be acknowledged.  Under the

7    guidelines, it is acknowledged with a two-level decrease.

8    And given the seriousness of the charge to which this

9    defendant admitted his culpability, I will grant that

10   two-level reduction.

11           All right.  Yes?

12           MR. HORNOK:  There is a matter we want to address

13   with respect to the guidelines.

14           With respect to the third point, given the Court's

15   ruling and in reliance on the Court's ruling that the two

16   points should apply, the government, likewise, is moving for

17   the third point of a reduction.

18           THE COURT:  Okay.  That will be encouraging a lot

19   more people in Mr. Flores's situation to perhaps take the

20   same tack he has.

21           All right.  So clearly there is no objection to

22   that?

23           MR. FEITEL:  No.

24           THE COURT:  So I will grant the government's

25   motion so that there are three offense levels that will be

1    reduced under 3E1.1(a) and (b).

2              Now, I think we have the 7th issue.  I lost track

3    of my issues here.  One second.

4              I think the 7th issue has to do with --

5              MR. FEITEL:  4C1.1, qualifying zero-point

6    offenders.

7              THE COURT:  Yes.  4C1.1, qualifying zero-point

8    offenders, and he is a zero-point offender.

9              I will hear the government on that.

10             I have been talking all morning.  Excuse me while

11   I have a sip of water.

12             MR. HORNOK:  4C1.1(a) says that:  If the defendant

13   meets all of the following criteria -- there are ten

14   subparts; looking at the bottom, then decrease the offense

15   level by two.

16             So the question is:  Does the defendant meet all

17   of the criteria?

18             There are ten criteria.  I have just given the way

19   that that provision is set out.  If the defendant were to

20   fail to qualify for any of the criteria, then he would be

21   ineligible for the two-point reduction.  Those criteria 1

22   through 10 are connected at the end of paragraph 9 with an

23   "and."

24             Ten is broken up into two different parts joined

25   with an "and"; the first clause of which is that the

1    defendant did not receive an adjustment under 3B1.1,

2    aggravating role.

3           In this particular case, the defendant did receive

4    an adjustment for aggravating role; therefore, because the

5    defendant must satisfy all of the criteria in 4C1.1(a) given

6    the plain text of that provision, he is not qualified for a

7    two-level reduction.

8           THE COURT:  But 10 also says:  The defendant did

9    not receive an adjustment under -- for aggravating role and

10   was not engaged in a continuing criminal enterprise.  And he

11   wasn't here.  Okay.  Right.  I get it.  Thank you.

12          MR. HORNOK:  All right.

13          THE COURT:  Mr. Feitel, why doesn't the

14   aggravating role make him ineligible?

15          MR. FEITEL:  I am going to ask Your Honor to

16   strictly construe the subparagraph 10 where "and" means

17   "and."

18          I will say that, as a relevant interpretive

19   analysis, when they changed the disqualifiers for criminal

20   history for the safety valve, there was another example;

21   they used the word "and"; like you had to be disqualified by

22   not having four points for violence and three.  And in this

23   court -- I can provide Your Honor the case citation.  Judge

24   Walton found that "and" meant "and."

25          I think in the statute to be disqualified you have

1    to satisfy each -- you have to -- they're framed in the

2    negative.  You have to dissatisfy or not be able to satisfy

3    all of them.  And it says --

4                THE COURT:  Wait, wait, wait.

5                So you are saying that he --

6                MR. FEITEL:  He failed to qualify --

7                THE COURT:  So you are saying that I have to

8    find -- even if he received an aggravating role adjustment,

9    I have to find that he was not engaged in a continuing

10   criminal enterprise; and I can't find that because there's

11   been no proof as to that and so, therefore, 10 doesn't

12   apply?

13               MR. FEITEL:  I think Your Honor would have to find

14   not only that he was involved in a continuing criminal

15   enterprise but that it satisfied the statutory requirements

16   of 21 U.S.C. 848.  I think it's different.

17               THE COURT:  So what you are saying is, like, based

18   on the evidence and the statement of facts underlying his

19   plea, it was sufficient to find him engaged in a continuing

20   criminal enterprise so -- what?

21               MR. FEITEL:  No.  It's the negative.

22               I think Your Honor would have to find that he

23   satisfied both of the separate requirements of

24   subparagraph 10 to be -- this is one of those -- I know Your

25   Honor worked for the Commission.  I don't know who writes

1     these.  I only -- we follow the rules of strict

2     interpretation.

3              It says to be disqualified you have to not have

4     any of it.  It says you have to not have the enhancement and

5     not -- or you have to have both.  So he is not charged with

6     18 U.S.C. 848.  And to be fair, if the Court --

7              THE COURT:  He hasn't been found -- you would

8     admit he has not been found to have engaged in a continuing

9     criminal enterprise; he hasn't been convicted under 21

10    U.S.C. Section 848; that was never a charge brought against

11    him.  The government hasn't attempted to present any proof

12    about whether he was not involved or was involved in a

13    continuing criminal enterprise, so the CCE charge is

14    irrelevant here.

15             Why isn't that enough for him not to have been

16    engaging in a continuing criminal enterprise?  I mean, why

17    isn't that enough to --

18             MR. FEITEL:  I think he's only --

19             THE COURT:  So what you are saying --

20             MR. FEITEL:  He's only disqualified if he is

21    charged -- if he's found to have a leadership enhancement

22    and he was charged with a CCE.

23             THE COURT:  I see.  Okay.

24             MR. FEITEL:  I just want to say that if they had

25    intended each of them to be a separate disqualifier and not

1    conjunctive because "and" means "and," they could have made

2    subparagraph 11 convicted or charged with a CCE.

3              THE COURT:  Yes.  And that's probably what they

4    should have done but they wanted a round number, but who

5    knows what they were doing.  I am not on the Commission

6    anymore, so I can't take responsibility for how they're

7    drafting, but this is something that I probably should bring

8    to their attention as a confusion.

9              I am going to reject that statutory interpretation

10   argument, Mr. Feitel.  I think, clearly, read in a

11   reasonable way, the disqualifier in paragraph 10, under

12   Section 4C1.1, is that a defendant is not -- is only

13   eligible if he did not receive an adjustment as an -- for an

14   aggravating role and he was not engaged or found to have

15   engaged in a CCE.

16             This defendant was found to have engaged in an

17   aggravating role, and so he is ineligible for the zero

18   point.  So that is my finding on that.

19             But interesting argument.

20             Okay.  Unless the government wants to respond and

21   make a fuller record on this...

22             MR. HORNOK:  For the record, the government agrees

23   with the Court's ruling.

24             And I would -- so one of the pieces of

25   Mr. Feitel's argument was that this language, somehow or

 1    another, would require -- would only be triggered if the

 2    defendant had been charged with a violation of 848.  There

 3    are other instances in the guidelines, specifically in

 4    2D1.1(a) which -- where the commission has demonstrated a

 5    capacity to craft language that would require a defendant to

 6    trigger enhancements only when a defendant is charged with

 7    an offense.  That kind of language and structure, which is

 8    present in 2D1.1(a)(1) -- a couple of those different

 9    subsections there is, obviously, not present in 4C1.1 and is

10    another basis to support the Court's ruling.

11           THE COURT:  All right.  Thank you.

12           Okay.  So --

13           MS. RHEE:  Your Honor.  I'm sorry.  Can we just

14    have a really short break so I can --

15           THE COURT:  Yes.  Yes.  This day is disappearing

16    quickly.  Yes, we'll take a ten-minute break.

17           (Whereupon, a recess was taken.)

18           THE COURT:  All right.  Are we ready to begin?

19           Okay.  So let me just sum up here.

20           I found that the government has not sustained its

21    burden of proof, proving by a preponderance of the evidence

22    to support application of the two-level increase for using

23    an aircraft; the two-level increase for bribery of a law

24    enforcement officer; the two-level increase for obstruction;

25    and I found that the defendant is not eligible for safety

 1     valve relief; that the two-level increase for certain

 2     qualifying zero-point offenders does not apply and,

 3     therefore, that the guidelines apply to this defendant as

 4     follows:

 5              The base offense level is 38.  Under Section

 6     2D1.1(a)(5) and (c)(1).  That is increased by four offense

 7     levels for being an organizer or leader of five or more

 8     participants under -- for a role adjustment under Section

 9     3B1.1(a); and then there is a two-level decrease for

10     acceptance of responsibility under Section 3E1.1; and

11     another one-level decrease under 3E1.1(b) upon grant of the

12     government's motion for that third point.  That results in a

13     total offense level of 39 which, in combination with a

14     Criminal History Category of I produces an advisory

15     sentencing range of 262 to 327 months' imprisonment; a fine

16     range of 50 million to $10 million; a special assessment of

17     $100 for the one count of conviction.

18              Are there any objections to that guideline

19     determination not already noted on the record from the

20     government?

21              MR. HORNOK:  No, Your Honor.

22              THE COURT:  Ms. Rhee?

23              MS. RHEE:  No, Your Honor.

24              THE COURT:  All right.  So I was going to talk

25     about the order of forfeiture now.  Have the parties

 1   conferred on the order of forfeiture at all or do I have to

 2   make findings about that?

 3          I know I have entered a preliminary order of

 4   forfeiture on September 18, 2023.  Is that ready to be

 5   finalized, or no?

 6          MR. HORNOK:  The parties have not conferred, to

 7   answer your first question.

 8          With respect to the second question, in our

 9   briefing we have asked for an upward revision of that

10   forfeiture amount based on the evidence that was presented

11   and I think now based on the findings the Court has made.

12          THE COURT:  Right.  So your original forfeiture

13   judgment was in the amount of 280 million derived from

14   28,000 kilograms of cocaine involved in the offense; and I

15   think you now seek a forfeiture judgment in the amount of

16   680 million.  Is that right?

17          MR. HORNOK:  That is correct, Your Honor.

18          THE COURT:  Okay.  And as I understand it, that is

19   attributable to the defendant's presentation of 16 binders

20   of receipts from 1985 to 1993, which you say total over

21   $100 million; is that right?

22          MR. HORNOK:  That is correct, Your Honor.  That

23   was the testimony of the defense witness who --

24          THE COURT:  I know exactly where the receipts came

25   from.

1          MR. HORNOK:  Yes.  But the $100 million was

2     actually part of that testimony of that witness.  He said he

3     actually thought it might have been more.  He conservatively

4     estimated it was 100 million.

5          In addition to that --

6          THE COURT:  Reflected in those receipts.

7          MR. HORNOK:  Reflected in those receipts.

8          In addition to that, kind of back-of-an-envelope

9     math, I looked at those; there are approximately 17 binders.

10    The binders have a ledger actually in them.  It was about

11    $6 million per ledger as kind of an average.  17 times

12    6 million gets you over 100 million.  So I think, in

13    addition to the witness's statement, it is reflected in my

14    general review of those binders.

15         THE COURT:  Do you think it's appropriate -- we

16    don't really have evidence about -- I mean, some illegal

17    activity was involved.  He says it was electronic smuggling

18    of -- smuggling of electronics equipment.

19         But do you think that that is properly

20    attributable to forfeiture in connection with a narcotics

21    trafficking offense?

22         MR. HORNOK:  I do, Your Honor.  I think that's the

23    nub of the issue there.  The Court correctly --

24         THE COURT:  Or the big, fat question?

25         MR. HORNOK:  It is the question.

1          So I would point you to paragraph 3 of the PSR

2     which the Court has adopted, which is that the criminal

3     conduct charged in the indictment occurred from in or around

4     1983 and continued until March of 2017.  So the charges to

5     which the defendant pleaded guilty included the time period

6     from which those receipts actually came from.

7          In addition --

8          THE COURT:  I am supposed to take the leap to

9     believe -- to disregard his Mexican criminal attorney's

10     testimony that it was electronics equipment and think that

11     it was narcotics trafficking?

12          MR. HORNOK:  Well, so in addition to that, you

13     have the evidence of Jack Sinuhe who described meeting the

14     defendant in the mid to late '90s and how he was already

15     engaged in drug trafficking at that time.

16          So, essentially, what the evidence is:  These are

17     receipts from a time period in which the defendant was

18     already engaged in drug trafficking.

19          Your Honor has identified that these receipts do

20     appear to be evidence of -- I believe Your Honor's statement

21     was something -- essentially, money laundering, right?  I

22     don't know how these don't prove anything other than money

23     laundering.

24          Even if these receipts somehow or another

25     accurately represented the purchase of TVs and other kinds

1    of equipment, that is just a different variation of money

2    laundering.  That is kind of a trade-based money laundering

3    idea so, essentially, you have cash in the United States;

4    for example, in Laredo, Texas.  You need to get that cash to

5    Mexico, you want to conceal the ownership of those things.

6              THE COURT:  Can I stop you for just a second and

7    ask -- don't leave.

8              MR. HORNOK:  Yes.

9              THE COURT:  Is there an objection from the

10   defendant to me finalizing the forfeiture judgment -- the

11   preliminary order of forfeiture which was for $280 million?

12             MS. RHEE:  No, Your Honor, not the preliminary

13   one.

14             THE COURT:  So you would just debate and dispute

15   the final order of forfeiture that was different from the

16   preliminary order of forfeiture?

17             MS. RHEE:  Yes.  Yes, Your Honor.

18             THE COURT:  So my question to the government is:

19   Do we really need to fight about it because I don't know how

20   you are going to get $280 million?

21             MR. HORNOK:  The statute commands the Court figure

22   out what the right number is regardless of whether the

23   defendant has the ability to pay or whether the government

24   has the ability to actually recover.

25             The reason that I think it's worth fighting about

1    in this particular case, in addition to just getting the

2    right number, is that I think this discussion feeds into the

3    Court's ultimate decision with respect to the sentence.

4          The value of the drugs the defendant trafficked

5    and is responsible for trafficking, it's kind of hard -- I

6    mean, I have never seen 450 kilograms of cocaine and I am in

7    this business.  I imagine the Court hasn't either.  So I

8    think it's kind of hard --

9          THE COURT:  I have seen pictures of it.

10          MR. HORNOK:  Pictures of it.  So you kind of have

11    an idea, generally, as to what this might look like.  But

12    it's really quite difficult, I think, to kind of have a

13    sense of:  What does 56,000 kilograms of cocaine actually

14    look like?  It's kind of just big numbers that sound bad.

15          But I think when you put a dollar amount to it, it

16    actually drives home the point.  Because I think we are

17    accustomed to using dollars and cents, and I think we have a

18    sense that $680 million is a whole lot of money; and it's a

19    very different amount of money than $280 million.  And so

20    this, I think, kind of falls into the category of -- in

21    addition to:  We just congressionally have the mandate to

22    get the number right.  This is a step in the way to our

23    eventual discussion of:  What's the right outcome for a guy

24    who traffics $680 million worth of cocaine versus

25    $280 million worth of cocaine?

1          THE COURT:  All right.  I will hear Mr. Feitel.

2          MR. FEITEL:  Your Honor, to the extent that the

3     government initially offered $280 million, we do not object.

4          If the government now wants to use the ledgers

5     that were produced in the case to kind of create another

6     argument about the drug trafficking that the defendant

7     engaged in, we object.  I think that's what the government

8     is trying to do here.  They're trying to suggest that those

9     were all the proceeds of crime and money laundering.

10          Mr. Flores is not charged with a money laundering

11     offense in this case, and I believe those ledgers are

12     outside the scope of the charged criminal conduct.

13          To be charitable, the government said themselves:

14     It doesn't matter whether we can collect or not.  They are

15     not going to get the 280 million; they're not going to get

16     600 million either, I don't really believe.

17          But to the extent that a concession means that our

18     client now is responsible for more drugs, we are just unable

19     to agree to it.  I don't understand how the computation of

20     $100 million more in the ledgers changes the forfeiture

21     number from 280 to 6-whatever.  I mean, I am also not a

22     mathematician and not a doctor -- to my mother's everlasting

23     chagrin, as I always say.

24          But I just don't see how $100 million more gets

25     you to $680 million.  I think 280 is sufficient.  We agree

1    that it doesn't require any more fact-finding by Your Honor

2    because it's by consent between the parties.  I would ask

3    you to do that and to reject any other kind of further

4    argument -- or we can discuss it later at least -- about

5    whether those ledgers are somehow related to this particular

6    charged criminal conspiracy, because we do not believe that

7    they are at all.

8              THE COURT:  Thank you.

9              MR. HORNOK:  The 680 million, to be clear,

10   100 million from the ledgers, 56 -- 560 million comes from

11   the description of 56 loads of 1,000 kilograms each at a

12   rate of $10,000 per kilogram; that is a conservative view of

13   the evidence that Mr. Feitel cross-examined the witness

14   about.

15             He nailed down the witness.  He said:  It was 56

16   loads, right?  And the witness agreed that it was, in fact,

17   56 loads.

18             That's the 56 times 1,000 times 10,000 gets you

19   560 million.  That's -- a portion of that --

20             THE COURT:  But those loads were only half

21   attributable to the defendant, right?

22             MR. HORNOK:  Yes.  Mr. Feitel also nailed down

23   that it was 2000 kilos per load, so that is the half.  That

24   is where that thousand comes from.  Half of it was for the

25   defendant.  All of that -- the testimony was also that all

1   of those -- all that cocaine was going to the United States.

2   And so that -- when we made the initial motion for

3   280 million, there was somewhat of a question based on the

4   notes that we were looking at as to precisely how that

5   number -- specifically with respect to the defendant's

6   cocaine versus the amount of cocaine that was actually going

7   to the United States, how that testimony was precisely going

8   to come out.  That's why we kind of took the conservative

9   estimate because we weren't quite sure, based on the notes

10  that we had, how that number was going to --

11  THE COURT:  And you also haven't included the

12  450-kilogram cocaine load from Ramirez?

13  MR. HORNOK:  That is correct.  We have not

14  included that number or the $20 million that was laundered

15  for the defendant in 2007 to 2008.

16  THE COURT:  So you view this as conservative?

17  MR. HORNOK:  Yes.  Because I think the

18  nonconservative number is $2.7 billion, and that is using

19  the much larger $26,000 per kilogram range that was

20  testified to as the possible wholesale value of that

21  cocaine.  So we have used the low-end value of a kilogram of

22  cocaine in the United States and we have focused on the

23  statement specifically.

24  THE COURT:  Okay.  This is what I am going to do.

25  I am going to take the preliminary order of

1      forfeiture, I am going to make that the final order of

2      forfeiture.

3              I do find that Pinedo did talk about the 53 to 56

4      loads ranging from 1,000 to 2,000 kilos per truckload, one

5      to two every two weeks; 53 to 56 shipments, half of which

6      each load belonged to the defendant.  I thought his numbers

7      were sufficiently clear.  But at the same time, given the

8      length of time that has passed, appropriately cabined; and

9      the conservative estimate of kilograms of cocaine was about

10     2800 kilograms of cocaine.  At 10,000 each, you get 280

11     million; that's going to be the final order of forfeiture.

12             MR. HORNOK:  28,000 kilograms of cocaine.

13             THE COURT:  28,000.  So $280 million, as set out

14     in the preliminary order of forfeiture, which I originally

15     thought made sense; and I was a little bit surprised to see

16     the government's -- I don't know, I can't do the math -- but

17     doubling of it at least in the final -- the request for the

18     final order of forfeiture.  All right.

19             MR. HORNOK:  With respect to the government's

20     argument as to the $20 million laundered, separate

21     testimony, 2007 to 2008 --

22             THE COURT:  All right.  I am just going to be

23     conservative.

24             MR. HORNOK:  Thank you.

25             THE COURT:  Okay.  Now, returning to the third

1    part of this hearing where I will hear from the parties

2    about their sentencing recommendations.

3         The probation office has recommended 162 months'

4    incarceration; the defendant has recommended 120 months'

5    incarceration, with a variance below the guidelines; the

6    government had asked for life imprisonment.

7         I will start with the government.

8         MR. HORNOK:  Thank you, Your Honor.

9         To be clear, just as a preparatory point, the

10   probation office made its recommendation before any of the

11   evidence --

12        THE COURT:  I know.  You don't have to deal with

13   that.

14        MR. HORNOK:  Okay.  So with respect to the range

15   that the Court has now established with respect to the

16   guidelines, we have now come to the point where the question

17   is:  Is this a heartland case for that particular guideline

18   range?

19        The defendant has said that this is something

20   below the heartland and that he should somehow or another be

21   sentenced to 120 months.

22        I would argue that this -- although I am not

23   asking for --

24        THE COURT:  I think he's partially arguing for

25   that.  So given his age -- I think he is in his 70s -- so

1     that he sees daylight outside the prison walls.

2          MR. HORNOK:  That certainly -- I understand that

3     that could or should be his argument; and the defendant's

4     age is certainly relevant to the Court's determination.

5          But with respect to the defendant's conduct,

6     although I am not asking for the Court to go above the

7     guideline range -- I think 327 months, which is the top of

8     guideline range as the Court has now found it, is an

9     appropriate sentence.  We are revising that recommendation

10    down based on the Court's determination with respect to the

11    guidelines.

12         But I think there are a whole lot of reasons, even

13    though I am not asking -- maintaining our position that it

14    should be life, I think there are actually a whole lot of

15    reasons why this is not a heartland case with respect to the

16    guidelines.  In fact, it is much, much worse than the

17    heartland case that is represented by this guideline range

18    because this is a drug trafficker who is categorically

19    different from a drug trafficker who traffics 450 kilograms

20    of cocaine.

21         As the Court has just held, a conservative -- very

22    conservative, excluding buckets and buckets and buckets of

23    evidence estimate of the quantity of drugs that the

24    defendant is responsible for -- 28,000 kilograms; that is

25    much, much, much, much more than the 450 kilograms that

1    would be sufficient to get you into this category.

2          Likewise, the defendant's role is not somehow or

3    another unique; many defendants have this.  But, really,

4    it's the quantity of the cocaine that was at issue in this

5    particular case that really makes it -- it's just a

6    different case.  So much more than 450 kilograms.

7          And the guidelines -- so I am going to reference

8    some of the guidelines that generally would support a basis

9    for the Court to depart upward from the guidelines.  I am

10   not asking the Court to do that.  But what I think that they

11   are is that they're instructive for where within the

12   guidelines the Court should find the sentence because these

13   are things that the sentencing commission has sat down and

14   said:  These are things that matter.

15         One of the provisions is guideline Section

16   5K2.0(a)(3).  It provides that:  A departure may be

17   warranted in an exceptional case even though the

18   circumstance that forms the basis for the departure is taken

19   into consideration in determining the guideline range if the

20   Court determines that such circumstance is present in the

21   offense to a degree substantially in excess of or

22   substantially below that which ordinarily is involved in

23   that kind of offense.

24         One of the things that the probation office did --

25   and this is often very helpful information; is they go look

1    to see, okay, for people who have a base offense level of

2    38, who have some kind of an aggravated role adjustment,

3    what's the typical sentence that that kind of an individual

4    receives.

5         Those numbers represent those individuals who only

6    trafficked 450 or maybe 500 kilograms of cocaine.  This is a

7    defendant who conservatively trafficked much, much, much,

8    much more for decades; absolute decades.  That is -- the

9    quantity of cocaine just makes this case different.

10        THE COURT:  So the record is absolutely clear, you

11   are not asking me to make an upward departure under

12   Chapter 5?

13        MR. HORNOK:  I am not asking you to make the

14   upward departure or to make an upward variance.

15        What I am alluding to is:  The guidelines focus in

16   on this, and that is a basis for the Court to go to the top

17   of the guideline range in this case.

18        In addition to conduct which has been accounted

19   for by the guidelines but insufficiently so, there is also

20   conduct which now, under the Court's rulings, has not been

21   accounted for by the guidelines at all.  I would direct you

22   to all of the conversation that we have had for the last

23   couple of hours about all of the guideline enhancements

24   which we have brought to the Court's attention which the

25   Court have now found don't apply.

1          So in some ways this is kind of like an imperfect

2     guideline enhancement argument, which is:  Look to the

3     conduct of the defendant and the fact that it does appear to

4     be obstructive.  There is a difference.

5          I would point out the defendant, throughout the

6     course of this hearing -- and if you looked at the video --

7     he was typically sitting as he was here with his elbow on

8     the table with his right hand stroking his face.  When he

9     made the threatening gesture -- and I do think it was a

10    threatening gesture, it was very different.

11         It wasn't just, he happened to stick out his

12    tongue and used that same right hand to touch his tongue.

13    It was: His hand was down, he picked up his left hand; he

14    stuck his tongue out.  He then touched the tip of his tongue

15    using his finger.

16         I understand the Court's ruling with respect to:

17    That is not sufficient to meet the guideline enhancement in

18    this case.  But it is relevant information which I believe

19    the Court should consider when determining where within the

20    guideline range this defendant should be sentenced.

21         In addition to that, I understand it's the Court's

22    ruling with respect to acceptance of responsibility.  But

23    for all of the reasons which I think -- all of the arguments

24    we have made as to why that may not have been -- the

25    position we took that he shouldn't have received

1    acceptance -- all of that, as the Court has acknowledged,

2    reflects on where within the guideline range he should be

3    sentenced.  None of those things have now been taken into

4    account under the guidelines.

5         This is a defendant whose acceptance of

6    responsibility truly is imperfect because of this -- at

7    least what was understood to be obstructive conduct by a

8    witness who was sitting on the stand.  And the defendant's

9    decision to advance a strategy after pleading guilty that

10   actually advanced a false narrative.

11        The Court has now said conservatively 28,000

12   kilograms of cocaine.  He said under oath to a judge, in

13   this Court when he pleaded guilty, it was absolutely no more

14   than 450 kilograms.  That is a position he has reiterated

15   over and over and over again.  That is just different than a

16   defendant who walks in here, who has taken full

17   responsibility for his conduct and has given a full account

18   of that conduct in a plea agreement and accepted that

19   sentence.

20        I would direct your attention to the sentencing

21   hearing you had this morning; that defendant took this

22   responsibility.

23        THE COURT:  Was that only this morning?

24        MR. HORNOK:  It was only this morning.

25        That defendant took responsibility for the most

1    serious aspects of the conduct that he was responsible for,

2    and he accepted that he was going to get a sentence that was

3    very significant even though the guidelines gave you the

4    ability to possibly do something lower than the sentence he

5    agreed to; that's different than what this defendant has

6    done.

7            This defendant has affirmatively, to you, in court

8    enhanced a false narrative and has denied responsibility for

9    what is core to -- we are not talking about ancillary

10   things.  This is to -- core to what kind of drug trafficker

11   the defendant was.  Was he a 450 or less kind of drug

12   trafficker who, because of his bad friends in prison,

13   invested in three loads because he was kind of rough on

14   luck?  Or is this a defendant who trafficked conservatively

15   in a one- to two-year period out of his 30-plus years as a

16   drug trafficker at least 28,000 kilograms of cocaine?

17           It's a different kind of acceptance of

18   responsibility and it should be reflected in the Court's

19   sentence as to where within the guideline range the Court

20   should sentence the defendant.

21           I would also point the Court's direction to

22   guideline Section 5K2.7, similar with respect to the

23   guideline -- things that have been accounted for by the

24   guidelines.  This is an additional thing which is not

25   accounted for by the guidelines; but the guidelines say:  If

1    this occurred, this might be relevant to the Court's

2    sentence.  That provision says:  If the defendant's conduct

3    resulted in a significant disruption of a governmental

4    function, the Court may increase the sentence above the

5    authorized guideline to reflect the nature and extent of the

6    disruption and the importance of the governmental function

7    affected.

8                In this particular case, we have lots and lots and

9    lots of testimony about how the defendant's conduct and the

10   conduct of those with whom he was working to traffic drugs

11   was disrupting the important governmental functions across

12   the country of Mexico.

13               We have testimony of how you've got the leader of

14   the Milenio cartel has coopted the Mexican Navy to be his

15   spy in the port and to do his dirty work.  You have

16   testimony of how a money mule has coopted the commander of

17   an airport $50,000 a week to allow money to be waltzing

18   through an airport in Mexico to head back to Colombia.

19   These are effects on the government of Mexico

20   collectively -- I think it is just almost common sense, I

21   mean, general knowledge that the government of Mexico has

22   been affected -- and the ability of that government to

23   function properly has been affected by the defendant and

24   those with whom he was closely associating; El Chapo, the

25   Beltran Leyva organization.  These are not insignificant

1    people.  The defendant was very tied into people who were

2    causing conduct which caused the government of Mexico not to

3    function the way that it should have.

4         Likewise, there is a two-level enhancement if the

5    defendant -- under 2D1.1(b)(16)(E) if the defendant receives

6    an adjustment under 3B1.1 -- which he did -- and the

7    defendant committed the offense as part of a pattern of

8    criminal conduct engaged in as a livelihood.  The thrust of

9    this enhancement is:  If you've got somebody who isn't just

10   kind of -- their side gig -- their side hustle is to sell a

11   little bit of drugs, but this is somebody who is living --

12   making a living, their livelihood is this criminal conduct,

13   then there is a two-level enhancement.  That is exactly the

14   kind of individual that this defendant is.  That's the

15   picture that was painted by the testimony that we have here.

16        This is not somebody who somehow or another -- as

17   a side business to his -- you know, playing soccer in his

18   backyard soccer field happened to sell drugs.  This is a

19   person who was able to buy that soccer field in the backyard

20   of his house because he was selling drugs.

21        This is a person who in the 1980s- -- I mean, his

22   mitigating defense in this case is:  Well, I was already

23   smuggling things into Mexico, and that was the way that I

24   was able to accumulate that $6 million that the Mexican

25   government took out of my house.

1          So this defendant made his livelihood by engaging

2     in criminal conduct.  This was a part of his criminal

3     conduct and therefore that, too, should be considered,

4     because it has not been considered by the guideline

5     calculation so far.

6          So I think to kind of -- going to the last

7     question, which is 327 months -- it's a long time.  It's a

8     very long time for a defendant who is in his 70s.  It may be

9     an effective life sentence for a defendant depending on his

10    health situation.  Why is that an appropriate sentence in

11    this particular case?

12         I think it really does go back down to -- look at

13    his post-plea conduct.  I mean, all of his other conduct is

14    incredibly bad and supports the top of the guideline range.

15         THE COURT:  Can I just interrupt you for a second,

16    because in other cartel-related cases I have imposed life

17    sentences.

18         MR. HORNOK:  Yes, Your Honor.

19         THE COURT:  And in those cases, by my

20    recollection, the defendant has been involved in

21    egregious -- directly egregious corruption, violence,

22    murder, torture, and mayhem.

23         MR. HORNOK:  Yes.

24         THE COURT:  There is no evidence of that with this

25    defendant, so shouldn't that -- in terms of avoiding

 1   unwarranted sentence disparities, shouldn't I take that into

 2   account in combination with the defendant's age, in

 3   evaluating whether a top-of-the-guidelines sentence should

 4   be imposed?

 5            MR. HORNOK:  You absolutely must --

 6            THE COURT:  I mean, I have seen other cases that

 7   are really chilling.

 8            MR. HORNOK:  You absolutely must consider that.

 9   And that is something different with respect to Mr. Flores,

10   is that he was not personally engaged in that kind of

11   violence.

12            What I would direct you to, though, is that those

13   individuals who were engaged in that kind of violence are

14   the individuals with whom Mr. Flores was closely associated.

15   Where the individuals who were protecting Mr. Flores's

16   business, where the individuals that Mr. Flores was

17   supporting with his business -- you don't get to be an ally,

18   an associate, of the Sinaloa cartel and be buddies with

19   El Chapo without supporting what El Chapo is doing.  You

20   don't get to be in that position without supporting the

21   system which is so incredibly violent, as the Court has

22   seen.

23            But I do think it is different, his kind of arm's

24   length relationship with that violence does make it

25   different.  I don't think it absolves him of that violence

1    because it is still at arm's length.  He's still benefiting

2    from it the same way that he's benefiting from the commander

3    of an airport getting $50,000 a week.  He is still

4    responsible for or getting the benefit of -- and, in some

5    way, in a mitigated way responsible for that conduct.  So,

6    yes, you must consider that as a difference.

7           But what is different with those individuals, I

8    believe, is the post-plea conduct, and that really does make

9    the defendant different in this case.

10          Instead of taking responsibility for this kind

11   of -- his conduct, the defendant tried to cut a path --

12   tried to kind of thread that needle in a way that had his

13   cake -- he'd get to keep his cake and eat it too.

14          He got to push the government, advance this false

15   narrative while also getting now the benefit of acceptance

16   of responsibility.  Because of that approach -- I am not

17   standing up here asking that he be sentenced to life in

18   prison.  In that sense, he has already received -- he is

19   getting the benefit of that approach.  But within the

20   guideline range he shouldn't double get the benefit because

21   of that distinction.

22          THE COURT:  All right.

23          MR. HORNOK:  So, for all of these reasons, a

24   sentence of 327 months is absolutely appropriate.

25          One more point.  I'm sorry, I said that was it.

1              One more point with respect to the unwarranted

2      sentencing disparities.  Certainly, there are top-level

3      people that you need to distinguish down from; but there are

4      also bottom-level people that you need to distinguish up

5      from.  The sentence of 120 months would be less than the

6      20-year-old or 22-year-old -- or however old that guy was --

7      who engaged in a couple of years' worth of admittedly

8      violent and terrible conduct versus somebody who has been at

9      the very highest levels of drug trafficking over the course

10     of many decades.  It has to be a lot more than 180 months.

11     It has to be more than 262 months.

12             I don't think -- under the statute, I don't think

13     it would be possible for the Court to uphold its duty to

14     provide an appropriate sentence to go below 327 months.

15     That is the number that is necessary in this case.  It is

16     supported by the guidelines, in the findings that the Court

17     has found so far, and it is just common sense in this

18     particular case.

19             THE COURT:  Thank you.

20             MR. FEITEL:  Your Honor, Ms. Rhee is going to

21     deliver the main part of the argument.  But I wanted to

22     address something that I was paying attention to when the

23     government was speaking.

24             For the first time in the history of this case,

25     the government made reference to other guidelines that

1     they're asking Your Honor to consider that heretofore were

2     not referenced in any of the pleadings in this case,

3     including being in the business of drug trafficking and the

4     effect of other governmental activities.

5              Now, I am concerned that these are matters that we

6     had not been aware of before we came to Court.  Had I been

7     aware of them, I would have tried to respond.

8              THE COURT:  Except I think that he was borrowing

9     the words of some of the Chapter 5 provisions to help him

10    make his argument that would otherwise apply, and he is not

11    using them to ask for upward departures.

12             The fact that this defendant made a business for a

13    very long time of engaging in international narco

14    trafficking is no secret.  The fact that -- I think that I

15    am using that as -- I am viewing that as borrowing some of

16    the words carefully crafted and articularly put out by the

17    sentencing commission without requesting an upward

18    departure.  I make that clear on the record, Mr. Feitel.

19             MR. FEITEL:  As long as they are sort of in the

20    nature of parables, that's fine.  I don't want to be in the

21    position where the government makes arguments about the

22    application of other guidelines and we stand silent without

23    saying anything about it would look bad in an appellate

24    record if someone ever looked back and said:  What were

25    Mr. Feitel and Ms. Rhee doing standing there?

 1          THE COURT:  Well, Rule 32 saves us all because you

 2     can't actually invoke a departure provision without prior

 3     notice prior to the hearing and so -- as a procedural

 4     matter, we can't address that.

 5          MR. FEITEL:  I was going with jet but I thought

 6     maybe discretion was the better part of it.  With that, I am

 7     going to let Ms. Rhee address the Court about the

 8     sentencing.

 9          THE COURT:  All right.  Ms. Rhee, why don't you

10     call whoever it is you want to speak on behalf of the

11     defendant first and then you can get to whatever you have to

12     say.

13          MS. RHEE:  Your Honor, right before Your Honor

14     took the bench, I did go through the group and said:  Who

15     wrote a letter and who didn't?

16          I found two individuals who had not written

17     letters so they would like to address the Court.  I can tell

18     you the names -- it's not the complete names.  But I don't

19     know if Your Honor wants me --

20          THE COURT:  Do you not have the complete names?

21          MS. RHEE:  Because it was right before Your Honor

22     took the bench, I didn't get to --

23          THE COURT:  I see.  Why don't you get their

24     complete names -- two of them?

25          MS. RHEE:  Two of them, Your Honor.

1          THE COURT:  Let's do that quite quickly.  Call

2     them right up, and we will hear them.

3          MS. RHEE:  His name is Oscar Jesus Flores, and he

4     is Mr. Raul Flores's grandson.

5          THE COURT:  All right.  Could Mr. Oscar Jesus

6     Flores step forward, please.

7          THE COURT:  Ms. Rhee, does Mr. Oscar Jesus Flores

8     speak English?

9          MS. RHEE:  He does.  But he says he's so nervous

10    that he doesn't think that he is going to able to testify in

11    English --

12         THE COURT:  He is not testifying, he is making a

13    statement.

14         MS. RHEE:  To speak to Your Honor.  He would

15    prefer to speak to Your Honor in Spanish.

16         THE COURT:  Okay.  Can the interpreters handle that?

17         THE INTERPRETER:  Yes, Your Honor.

18         THE COURT:  Okay.  You can speak in Spanish.

19         MR. O. J. FLORES:  Okay.  So my name is Oscar

20    Flores, and I am Mr. Raul Flores-Hernandez's grandson, and I

21    would like to say a few words.

22         I would like to speak from my heart.  I would like

23    to say that my grandfather is a very loving person, that he

24    has a very big heart, that is extended to all of his family

25    members.

1              He is my pillar.  Both my pillar and -- I am

2    speaking for my entire family.  He is also a very happy

3    person, a very simple person, and a very honest person.

4              And honestly, what I would like, God willing, is

5    for him to be out and be with us soon.  We really miss him,

6    and especially me because he is like my second father.

7              When I speak with him on a daily basis he makes me

8    laugh.  He listens to me, he understands me a lot.  He gives

9    me life advice, how to be a man -- and for the whole family.

10   And honestly, I just love him very much.

11             THE COURT:  And I hope one of the things he

12   teaches you is not to get involved -- I hope one of the

13   things he teaches you is not to get involved in narcotics

14   trafficking.

15             MR. O. J. FLORES:  Never.  Never.  What he always

16   says to me is to study, to work hard so that I can help my

17   family.  Because as he tells me, I am also a family man; I

18   am the head of the family.  And I would just like to say one

19   more time I would just really look forward to having him

20   back with us at home again.

21             THE COURT:  Okay.  Thank you.

22             MR. O. J. FLORES:  Thank you, Your Honor.

23             MS. RHEE:  The other individual is named Pablo

24   Vazquez.

25             THE COURT:  Is Pablo Vazquez here?

```
1              Is it Vazquez, V-A-S, or V-A-Z?
2         MS. RHEE:  V-A-Z-Q-U-E-Z.
3         THE COURT:  All right.  Mr. Vazquez you may speak.
4         MR. VAZQUEZ:  So the only thing I really want to
5    say is that I am Mr. Flores's nephew.  And I would like to
6    reiterate what my cousin -- nephew said, and that is that
7    Mr. Flores is a really wonderful person.  And as people
8    know, he has a really big heart that he shares with
9    everybody, and we really want him back home with us.  We
10   really miss him, and we would really like him back with us.
11        THE COURT:  Thank you.
12        Ms. Rhee.
13        MS. RHEE:  Your Honor, as Your Honor noted,
14   Mr. Flores is a 71-year-old man.  As Your Honor can see, he
15   is a beloved father, brother, husband, uncle, nephew.  And
16   there are some friends in the audience, also, who traveled
17   from California, Atlanta, Chicago, and even Mexico to show
18   their support.
19             The defense had previously submitted a binder of
20   letters.  I have never honestly seen that many letters.  I
21   have never submitted that many letters to a Court on behalf
22   of a defendant at all.
23        THE COURT:  I have never seen so many letters.
24        MS. RHEE:  From my conversation with the family,
25   it's clear that he is the glue that keeps the family
```

1    together even now.

2          I understand, with my -- from my conversations

3    with the family last night, that they have videos at the

4    jail; and whenever they have videos he makes sure the family

5    gathers.  If there is someone missing he will say:  Why are

6    they missing?  Is there a problem with that person?  And he

7    encourages the family to support each other, his children,

8    his grandchildren; and he is the youngest of 18.  He has

9    nieces and nephews here who are actually older than he is.

10          We make no mistake, Your Honor, Mr. Flores

11   accepted responsibility for what he did.  He pled guilty to

12   drug trafficking.  He understands and acknowledges the

13   terrible errors and he is paying for those errors in jails

14   far away from home.  He was at the D.C. Jail where the

15   conditions of confinement were horrible.  He was extradited

16   here at the height of the pandemic.  Before that, when he

17   was in Mexico, he was held at Altiplano; it's a maximum

18   security prison.  It's not a regular jail as it is here;

19   it's like the super max of Mexico.

20          THE COURT:  And that's because he was fighting

21   extradition, right?

22          MS. RHEE:  At the end, he decided to drop all

23   challenges and come to the United States because -- I

24   believe he came to the United States after four years.  And

25   if he wanted, he could have held off extradition for years.

1    There was one individual who was recently extradited here

2    after 14 years.  And I think there are others who are in

3    Mexico now awaiting extradition who have been waiting

4    extradition even longer.  Given his age, he could have done

5    so and finished off his time there.

6         But he was extradited here.  He was in the D.C.

7    Jail where the first, I believe eight months, nine months we

8    had no personal contact visits at the jail.  Then he was

9    transferred to Lewisburg where he was -- he was there for

10   several months.  But because of the separation order he was

11   kept away from the majority of the Hispanic inmates who were

12   transferred there, and he was the victim of an assault from

13   a cellmate.  I confirmed with other inmates that he was,

14   indeed, assaulted by the other inmate for his fault of

15   respect or his lack of respect.

16        He lacks any and all language skills even though

17   he has been here, I believe, three years now.  So it's easy

18   for him to be a victim.  He can't communicate with the

19   guards.  He can't communicate when he has health issues.  He

20   has had to call me and I have had to call the jail or

21   contact the jail.  And because of his advanced age, any

22   medical issues will only worsen dramatically.

23        Mr. Flores does stand apart from any of the other

24   drug traffickers who generally come before this Court.  He

25   never carried weapons and no violence has ever been alleged.

1          At his age there is no question of recidivism.

2    Given the circumstances, there is no reason to believe that

3    he would go back to any sort of illegal activity.  He only

4    wants to return home to Mexico and to isolate himself on a

5    family farm surrounded by family.  This is what he's

6    actually told me.

7          For this defendant, even a 15-year sentence is the

8    functional equivalent of a life sentence.  He is more than

9    71 years old.  Once his time is done here, he will be

10   transported to immigration custody where -- we can't tell

11   how long -- it's impossible to determine how long he will

12   spend in immigration custody before he is eventually

13   transferred back to Mexico.

14         What we're asking for, Your Honor -- because of

15   his age, because of his lack of violence -- is for a

16   downward variance and for a sentence of 120 months.

17         Mr. Flores has prepared a statement that he will

18   be reading.

19         THE COURT:  Mr. Flores, this is your opportunity

20   to speak directly to me.  You can step forward.

21         THE DEFENDANT:  Your Honor, with all due respect I

22   speak to you.  I pled guilty of what I did.  From the very

23   first day that I came, I told my lady attorney that I came

24   to the United States not to fight, but the government

25   accused me of things that I didn't do.

1          I pled guilty of what I did, nothing more.

2          I want to apologize to you, Your Honor, because of

3    my behavior in the sentencing hearing.  Sometimes my actions

4    may seem not appropriate.  When I am stressed, I laugh.  I

5    simply couldn't believe the false things that these people

6    were saying about me.

7          Your Honor, I am 71 years old and I ask you to

8    allow me to go back to my house in Mexico.  I have been in

9    prison for some six and a half years, and a great part of

10   that time has been very difficult.

11         In Mexico I was in a high-security prison in

12   Mexico, in Altiplano where the conditions were very

13   difficult.  I am a family man.  And I am asking you to allow

14   me to go back to my house to spend my last few years that I

15   have left to be with my family, with my children, with my

16   grandchildren, and with my loved ones.  Thank you, Your

17   Honor.

18         THE COURT:  Thank you.  You can -- all right.  Let

19   me hear from the government first.

20         MR. HORNOK:  If I could just briefly respond to

21   some of the statements that he made.

22         The defendant has continued to falsely --

23         MR. FEITEL:  We object, Your Honor.

24         THE COURT:  I actually think you don't have to

25   repeat what you have already said.  I can take account of

1    everything I can anticipate you are going to say, and I get it.

2              MR. HORNOK:  Thank you.

3              THE COURT:  All right.

4              Ms. Rhee, and your client -- could you step

5    forward.  I am going to explain the sentence I am about to

6    impose and impose sentence.

7              So after determining how the sentencing guidelines

8    apply in this case, having heard testimony at a three-day

9    evidentiary hearing, having reviewed the extensive exhibits

10   presented at that evidentiary hearing and in supplemental

11   briefs, and in other notebooks full of correspondence that

12   has been provided by the defense, I have to consider the

13   relevant factors set out by Congress in 18 U.S.C. Section

14   3553(a) to ensure that I impose a sentence that is

15   sufficient but not greater than necessary to comply with the

16   purposes of sentencing.

17             I always think it's good to remind ourselves about

18   what those purposes of sentencing are because this is a

19   sober moment.

20             We have heard from the defendant's family members,

21   heard from the defendant, all he wants to do is go home and

22   remain in the bosom of his family.  And yet the purposes of

23   sentencing are far broader than what a defendant wants and

24   what his family wants.

25             The purposes of sentencing include the need for

1    the sentence imposed to reflect the seriousness of the

2    offense.  And who I have standing before me is a person who

3    dealt with importing vast quantities -- tonnage quantities

4    of cocaine into this country.

5         I also have to consider the need to promote

6    respect for the law and to provide just punishment for the

7    offense.  The sentence also should deter criminal conduct,

8    protect the public from future crimes by this defendant, and

9    promote rehabilitation.

10        So in addition to the guidelines and policy

11   statements, I have to consider the nature and circumstances

12   of the offense, this defendant's history and

13   characteristics, the types of sentences available, the need

14   to avoid unwarranted sentence disparities among defendants

15   with similar records found guilty of similar conduct, and

16   the need to provide restitution to any victims of the offense.

17        With respect to the restitution factor which I

18   will deal with first, this is not the type of case where

19   there are identifiable victims warranting restitution, so I

20   will not address that factor any further.

21        Regarding the nature and circumstances of the

22   offense, he engaged in a large international drug conspiracy

23   in which he facilitated, as I have already said, the

24   importation of tonnage quantities of cocaine into the

25   United States over a period of years.

1    He admits, in the statement of facts supporting

2    his plea, that he trafficked drugs from 2007 to 2017.  And

3    the facts of his drug dealings are corroborated by the

4    government witnesses at the evidentiary hearing, Mr. Pinedo,

5    Murillo Ramirez, and Jack Sinuhe.

6        This defendant was -- if not a member of some of

7    the more significant and violent cartels -- the Sinaloa

8    cartel, the CJNG, the Milenio cartel -- he certainly was

9    associated with the leaders of at least the Milenio and

10   Sinaloa cartels which, I think, as the government said --

11   they all helped each other in various ways, either with

12   protection, either with deals -- certain deals, and so on.

13       Regarding his history and characteristics, he is

14   71 years old.  He was first arrested in Mexico in 2017.

15   While he contested extradition, he was held there; arriving

16   in the United States somewhat later.  He has, clearly, a lot

17   of family; a lot of community support and family support.

18       Based on everything I have read, he is a pretty

19   likeable guy.  But he is not standing before this Court

20   based on whether he is likeable or not, whether he is a good

21   father or a good grandfather or not.  He is here for offense

22   conduct that is very damaging to this country with the

23   amount of cocaine being shipped here.

24       He has no prior criminal convictions, although he

25   was prosecuted in Mexico and found not guilty for a money

1    laundering offense.  It's not clear to me that he has ever

2    had legitimate ways that he has made money other than

3    cocaine trafficking.  Based on the testimony at the

4    evidentiary hearing, he was a smuggler of illegal goods.

5           But in any event, the need for the sentence

6    imposed to deter criminal conduct and protect the public

7    from further crimes are critical considerations for every

8    sentencing judge.  And here, regarding general deterrence,

9    people who are abroad who are engaged in huge narcotics

10   trafficking operations, shipping tonnage quantities of

11   cocaine here is a matter that this government and this Court

12   takes very seriously, needs to be deterred.

13          Regarding specific deterrence, this defendant

14   admitted to being on the run for a number of years even

15   before his arrest, from 2010 to, I guess, 2015.  I have to

16   say that some of his conduct during the evidentiary hearing

17   was troubling, in terms of demonstrating a lack of disregard

18   for law and order, which is consistent with him being on the

19   run for quite some time from Mexico authorities.

20          Regarding the need to avoid unwarranted sentence

21   disparities among defendants with similar records found

22   guilty of similar conduct, generally, a sentence within the

23   guidelines range addresses that factor, although it is only

24   one factor for the Court to consider.

25          Neither the government nor the defendant has

1     provided any specific comparators to which they want to

2     direct the Court's attention.  But in any event, this

3     defendant, given his role in an international narcotics

4     operation with a management responsibility, is somebody who,

5     in some ways, stands alone and not comparable to a lot of

6     the other defendants sentenced under the guidelines.

7            Regarding the types of sentences available, his

8     guidelines range is 262 to 371 [sic] months' imprisonment

9     which recommends a sentence of -- a lengthy period of

10    incarceration, which I think is amply reasonable in this case.

11           Yes?  Do you want to say something?

12           MR. HORNOK:  Your Honor, I believe you may have

13    misspoken with respect to the top of the guideline.

14           THE COURT:  No.  262 to 327.

15           MR. HORNOK:  327.  Yes, Your Honor.

16           THE COURT:  I'm sorry.  I thought that's what I

17    said.  Okay.

18           I think the defendant has pointed out that his

19    status as a foreign national is going to make it more

20    difficult for him and that, when he is released, he will be

21    sent to an ICE detention center pending his deportation and

22    asks for a *Smith* departure, which the probation office also

23    recommends, of six months; and I will grant the *Smith*

24    departure.  But given the fact that I was not planning on

25    giving a sentence at the bottom of the range, I will give

1    him, with the *Smith* departure, a sentence at the bottom of

2    the range of 262 months.

3         So pursuant to the Sentencing Reform Act of 1984

4    and in consideration of the provisions of 18 U.S.C. Section

5    3553, as well as the advisory sentencing guidelines:  It is

6    the judgment of the Court that you, Raul Flores-Hernandez,

7    are hereby committed to the custody of the Bureau of Prisons

8    for a term of 262 months as to Count 1.

9         In addition, you are ordered to pay a special

10   assessment of $100 in accordance with 18 U.S.C. Section

11   3013, and to a supervised release term of 60 months.

12        While on supervision, you shall abide by the

13   following mandatory conditions as well as all discretionary

14   conditions recommended by the probation office in Part D,

15   Sentencing Options, of the presentence report, which are

16   imposed to establish the basic expectations for your conduct

17   while on supervision.

18        The mandatory conditions include:  You must not

19   commit another federal, state, or local crime.  You must not

20   unlawfully possess a controlled substance.  You must

21   cooperate in the collection of DNA as directed by the

22   probation office.

23        You shall comply with the following special

24   condition:  You must immediately report to the U.S.

25   Immigration and Customs Enforcement and follow all of their

1    instructions and reporting requirements until any

2    deportation proceedings are completed.  If you are ordered

3    deported from the United States, you must remain outside the

4    United States unless legally authorized to reenter.  If you

5    reenter the United States, you must report to the nearest

6    probation office within 72 hours after your return.

7          The Court waives imposition of a fine in this case

8    in light of the very significant forfeiture order that will

9    be entered.

10         You are ordered to pay a money judgment to the

11   United States in the amount of $280 million, which is what

12   the preliminary order of forfeiture called for.

13         The financial obligations are immediately payable

14   to the Clerk of the Court, U.S. District Court, 333

15   Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

16   days of any change of address you shall notify the Clerk of

17   the Court of the change until such time as the financial

18   obligation is paid in full.

19         The probation office shall release the presentence

20   investigation report and/or Judgment and Commitment order to

21   the Bureau of Immigration and Customs Enforcement to

22   facilitate any deportation proceedings.  The probation

23   office shall release the presentence investigation report to

24   all appropriate agencies as necessary in order to execute

25   the sentence of the Court.

1          You can appeal your conviction to the U.S. Court

2     of Appeals for the D.C. Circuit if you believe that your

3     guilty plea was somehow unlawful or involuntary, or if there

4     was some other fundamental defect in the proceedings that

5     was not waived by your guilty plea.

6          Pursuant to 18 U.S.C. Section 3742A, you also have

7     a statutory right to appeal your sentence to the

8     D.C. Circuit under certain circumstances, including if you

9     think this sentence was imposed in violation of law or was

10    imposed as a result of an incorrect application of the

11    sentencing guidelines or is more severe than the maximum

12    established in the guideline range.

13         You may also appeal your sentence if you believe

14    you received ineffective assistance of counsel at sentencing.

15         Pursuant to 28 U.S.C. Section 2255, you also have

16    the right to challenge the conviction entered or sentence

17    imposed to the extent permitted by that statute.  Any notice

18    of appeal must be filed within 14 days of the entry of

19    judgment or within 14 days of the filing of a notice of

20    appeal by the government.  If you are unable to afford the

21    cost of an appeal, you may request permission from the Court

22    to file an appeal without cost to you.  On appeal, you may

23    also apply for court-appointed counsel.

24         Are there any objections to the extent imposed not

25    already noted on the record from the government?

```
 1              MR. HORNOK:  No, Your Honor.  Thank you.

 2              THE COURT:  Ms. Rhee?

 3              MS. RHEE:  No, Your Honor.

 4              THE COURT:  Do you have a recommendation for

 5    designation?

 6              MS. RHEE:  We would ask for Southern California

 7    and --

 8              THE COURT:  Do we have the name of a facility in

 9    Southern California?

10              MS. RHEE:  I don't, Your Honor.

11              THE COURT:  Okay.  I will make a recommendation to

12    the Bureau of Prisons that Mr. Flores-Hernandez be

13    designated to a facility in Southern California.

14              MS. RHEE:  And if I could ask that Your Honor note

15    on the Judgement and Commitment order his arrest date of

16    July 20, 2017.

17              THE COURT:  And is that when he was arrested on

18    the warrant in this case?

19              MS. RHEE:  Yes, Your Honor.

20              THE COURT:  Does the government have any objection

21    to that?

22              MR. HORNOK:  That is the date that he was arrested

23    in Mexico pursuant to a provisional arrest warrant; it is

24    the correct date.

25              I think the Bureau of Prisons probably will give
```

1   him credit for it; I just wanted to make that clear on the

2   record.

3              THE COURT:  I will make that clear on the J and C

4   just in case the Bureau of Prisons is puzzling over it.

5              MS. RHEE:  Thank you, Your Honor.

6              THE COURT:  All right.  Is there anything further

7   today from the government?

8              MR. HORNOK:  No, Your Honor.  Thank you.

9              THE COURT:  Ms. Rhee, anything further?

10             MS. RHEE:  No, Your Honor.  Thank you.

11             THE COURT:  All right.  You are all excused.

12             (Whereupon, the proceeding concludes, 3:10 p.m.)

13                           *  *  *  *  *

14                          <u>**CERTIFICATE**</u>

15             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
    certify that the foregoing constitutes a true and accurate
16  transcript of my stenographic notes, and is a full, true,
    and complete transcript of the proceedings to the best of my
17  ability.

18             This certificate shall be considered null and void
    if the transcript is disassembled and/or photocopied in any
19  manner by any party without authorization of the signatory
    below.

20
        Dated this 2nd day of March, 2024.

21
        /s/ Elizabeth Saint-Loth, RPR, FCRR
22      Official Court Reporter

23

24

25

## $

**$10** [1] - 80:16
**$10,000** [1] - 87:12
**$100** [6] - 80:17, 81:21, 82:1, 86:20, 86:24, 117:10
**$100,000** [2] - 30:3, 44:2
**$17** [1] - 30:22
**$20** [2] - 88:14, 89:20
**$26,000** [1] - 88:19
**$280** [7] - 84:11, 84:20, 85:19, 85:25, 86:3, 89:13, 118:11
**$30,000** [1] - 30:2
**$50** [2] - 20:7, 20:9
**$50,000** [4] - 45:15, 45:23, 97:17, 101:3
**$680** [3] - 85:18, 85:24, 86:25

## '

**'80s** [1] - 58:24
**'90s** [1] - 83:14

## /

**/s** [1] - 121:21

## 1

**1** [4] - 31:12, 70:22, 74:21, 117:8
**1,000** [5] - 32:24, 33:6, 87:11, 87:18, 89:4
**1,000-kilogram** [2] - 24:16, 25:6
**10** [8] - 29:4, 51:12, 74:22, 75:8, 75:16, 76:11, 76:24, 78:11
**10,000** [2] - 87:18, 89:10
**10-to-life** [1] - 66:24
**10-year** [1] - 60:15
**100** [5] - 33:23, 45:17, 82:4, 82:12, 87:10
**1000** [1] - 20:3
**101** [1] - 45:12
**11** [1] - 78:2
**112,450** [1] - 12:14
**11:56** [1] - 1:5
**12** [1] - 1:5
**120** [4] - 90:4, 90:21, 102:5, 110:16
**1300** [1] - 2:4
**1348** [1] - 49:11
**1352** [1] - 49:11
**14** [5] - 15:15, 30:21,

109:2, 119:18, 119:19
**145** [1] - 1:13
**148** [1] - 15:25
**15-year** [1] - 110:7
**150** [3] - 31:19, 31:23, 32:16
**1500** [1] - 37:13
**156** [1] - 16:20
**16** [2] - 23:11, 81:19
**162** [1] - 90:3
**17** [2] - 82:9, 82:11
**17-051** [2] - 1:3, 3:3
**18** [9] - 9:9, 50:20, 77:6, 81:4, 108:8, 112:13, 117:4, 117:10, 119:6
**180** [1] - 102:10
**18th** [1] - 4:18
**1975** [1] - 27:25
**1980s** [2] - 42:18, 98:21
**1983** [1] - 83:4
**1984** [1] - 117:3
**1985** [1] - 81:20
**1988** [2] - 28:1, 41:2
**1989** [1] - 41:2
**1992** [1] - 16:2
**1993** [2] - 58:25, 81:20
**1997** [3] - 15:25, 16:15, 28:24

## 2

**2** [2] - 20:8, 70:22
**2,000** [2] - 32:24, 89:4
**2.7** [1] - 88:18
**20** [5] - 46:17, 47:24, 48:24, 49:16, 120:16
**20-year-old** [1] - 102:6
**2000** [3] - 12:23, 19:20, 87:23
**20001** [1] - 118:15
**20008** [1] - 2:4
**2000s** [2] - 22:15, 28:15
**2001** [1] - 16:1
**2002** [1] - 33:5
**2003** [7] - 12:20, 16:16, 19:7, 19:19, 33:1, 33:7, 46:17
**2004** [3] - 19:19, 20:13, 49:12
**2005** [4] - 17:5, 33:1, 33:5, 33:7
**2007** [3] - 88:15, 89:21, 114:2
**2008** [2] - 88:15, 89:21
**2009** [3] - 15:22, 24:3, 33:13

**2010** [7] - 13:4, 20:15, 20:23, 23:13, 28:15, 33:13, 115:15
**2011** [2] - 23:14, 30:21
**2012** [2] - 21:1, 30:21
**2014** [1] - 21:2
**2015** [3] - 21:3, 37:12, 115:15
**2017** [10] - 25:20, 25:23, 26:1, 37:21, 43:15, 59:8, 83:4, 114:2, 114:14, 120:16
**2019** [2] - 15:16, 49:5
**202** [2] - 1:14, 2:5
**2023** [7] - 4:6, 4:19, 16:25, 17:1, 45:13, 49:11, 81:4
**2024** [2] - 1:5, 121:20
**20530** [1] - 1:14
**21** [3] - 4:9, 76:16, 77:9
**22** [1] - 17:1
**22-year-old** [1] - 102:6
**220** [1] - 17:5
**22314** [1] - 1:23
**2255** [1] - 119:15
**228** [1] - 1:22
**24** [2] - 15:16, 17:16
**246** [1] - 16:1
**255-6637** [1] - 2:5
**26,500** [1] - 33:3
**262** [6] - 80:15, 102:11, 116:8, 116:14, 117:2, 117:8
**28** [1] - 119:15
**28,000** [6] - 81:14, 89:12, 89:13, 91:24, 95:11, 96:16
**280** [6] - 81:13, 86:15, 86:21, 86:25, 88:3, 89:10
**2800** [1] - 89:10
**2838187** [1] - 43:15
**29** [1] - 15:17
**2C1.1** [1] - 10:19
**2D** [1] - 11:13
**2D1.1** [4] - 10:5, 11:12, 13:20, 31:12
**2D1.1(a** [1] - 79:4
**2D1.1(a)(1** [1] - 79:8
**2D1.1(a)(5** [2] - 31:17, 80:6
**2D1.1(b)(11** [5] - 10:12, 40:23, 43:4, 44:9, 46:4
**2D1.1(b)(16)(E** [1] - 98:5
**2D1.1(b)(3)(A** [3] - 36:18, 38:4, 38:13

**2d1.1(b)(3)(A** [1] - 35:9
**2D1.1(b)(3)(B** [1] - 10:9
**2D1.1(c)(2** [1] - 34:8
**2D1.1(c)(2)** [1] - 31:21
**2nd** [1] - 121:20

## 3

**3** [2] - 59:24, 83:1
**30** [3] - 32:10, 63:25, 118:15
**30-plus** [1] - 96:15
**300** [1] - 1:22
**3013** [1] - 117:11
**32** [1] - 104:1
**327** [7] - 80:15, 91:7, 99:7, 101:24, 102:14, 116:14, 116:15
**328** [1] - 16:22
**333** [1] - 118:14
**3553** [1] - 117:5
**3553(a** [1] - 112:14
**3553(f)** [1] - 50:20
**36** [3] - 13:21, 14:5, 31:21
**371** [1] - 116:8
**3742A** [1] - 119:6
**38** [9] - 13:14, 13:20, 14:1, 14:5, 31:15, 33:11, 34:7, 80:5, 93:2
**39** [1] - 80:13
**3:10** [1] - 121:12
**3B1.1** [4] - 50:18, 51:13, 75:1, 98:6
**3B1.1(a** [4] - 10:16, 48:13, 48:20, 80:9
**3C1.1** [2] - 56:2, 59:19
**3E1.1** [3] - 10:21, 71:14, 80:10
**3E1.1(a** [3] - 70:5, 72:8, 74:1
**3E1.1(b** [1] - 80:11

## 4

**4** [1] - 17:1
**4(A** [1] - 56:17
**4-level** [1] - 48:20
**41** [1] - 4:14
**42** [1] - 4:14
**450** [26] - 13:7, 13:10, 13:13, 13:15, 14:10, 24:18, 25:2, 25:8, 31:16, 31:19, 31:23, 32:3, 32:17, 33:14, 33:21, 34:9, 63:20,

72:19, 85:6, 91:19, 91:25, 92:6, 93:6, 95:14, 96:11
**450-kilogram** [1] - 88:12
**4C1.1** [6] - 10:24, 51:8, 74:5, 74:7, 78:12, 79:9
**4C1.1(a** [2] - 74:12, 75:5
**4C1.1(a)(10** [1] - 51:10

## 5

**5** [4] - 4:7, 31:13, 93:12, 103:9
**50** [4] - 13:7, 24:18, 33:15, 80:16
**500** [3] - 33:4, 71:20, 93:6
**500-kilogram** [2] - 24:17, 25:15
**514-0917** [1] - 1:14
**519** [2] - 15:25, 16:20
**53** [5] - 19:24, 33:1, 33:5, 89:3, 89:5
**53,000** [1] - 20:4
**543** [1] - 17:5
**546-8874** [1] - 1:19
**55** [1] - 4:19
**56** [11] - 12:24, 19:24, 33:1, 33:6, 87:10, 87:11, 87:15, 87:17, 87:18, 89:3, 89:5
**56,000** [3] - 20:4, 33:8, 85:13
**56,450** [1] - 12:16
**560** [2] - 87:10, 87:19
**571** [1] - 1:23
**5K2.0(a)(3)** [1] - 92:16
**5K2.7** [1] - 96:22

## 6

**6** [6] - 4:18, 9:9, 45:12, 82:11, 82:12, 98:24
**6-whatever** [1] - 86:21
**60** [2] - 4:23, 117:11
**600** [1] - 86:16
**619** [1] - 1:19
**64** [1] - 49:10
**661** [1] - 16:22
**680** [2] - 81:16, 87:9
**696** [1] - 16:2
**698** [1] - 16:2
**6A1.3** [1] - 15:19

## 7

**7** [2] - 4:18, 9:9

2

**70s** [2] - 90:25, 99:8
**71** [3] - 110:9, 111:7, 114:14
**71-year-old** [1] - 107:14
**72** [1] - 118:6
**73** [1] - 4:24
**7500** [1] - 57:12
**761** [1] - 49:4
**7th** [2] - 74:2, 74:4

## 8

**8** [1] - 4:6
**80** [1] - 4:19
**800-6900** [1] - 1:23
**801** [1] - 49:4
**848** [4] - 76:16, 77:6, 77:10, 79:2
**85** [1] - 4:23
**86** [1] - 4:19
**880** [1] - 1:18
**8853035** [1] - 17:1

## 9

**9** [3] - 25:23, 37:21, 74:22
**90** [4] - 32:12, 32:13, 32:17, 32:19
**916** [2] - 15:15, 17:16
**92101-8807** [1] - 1:18
**926** [1] - 49:4
**959(a** [1] - 4:9
**960** [1] - 4:9
**963** [1] - 4:9
**98** [2] - 45:12, 45:16

## A

**a.m** [1] - 1:5
**abetted** [1] - 42:13
**abide** [1] - 117:12
**ability** [5] - 84:23, 84:24, 96:4, 97:22, 121:17
**able** [6] - 30:14, 66:6, 76:2, 98:19, 98:24, 105:10
**abroad** [1] - 115:9
**absent** [1] - 27:22
**absolute** [1] - 93:8
**absolutely** [11] - 39:25, 63:2, 63:3, 63:4, 65:22, 68:9, 93:10, 95:13, 100:5, 100:8, 101:24
**absolves** [1] - 100:25
**accept** [4] - 9:6, 28:8, 35:7, 73:4

**acceptance** [29] - 59:21, 59:23, 60:4, 60:17, 61:17, 62:17, 64:3, 64:8, 65:22, 65:24, 66:9, 66:18, 66:23, 67:18, 68:2, 68:13, 68:19, 68:25, 69:5, 69:13, 71:13, 72:9, 72:12, 80:10, 94:22, 95:1, 95:5, 96:17, 101:15
**accepted** [7] - 10:19, 32:15, 35:6, 65:6, 95:18, 96:2, 108:11
**accepting** [1] - 14:24
**accepts** [3] - 36:8, 62:18, 62:20
**access** [2] - 25:21, 37:15
**accomplices** [1] - 18:21
**accordance** [1] - 117:10
**according** [4] - 12:17, 25:2, 44:17, 56:23
**accordingly** [3] - 50:17, 59:16, 59:18
**account** [4] - 95:4, 95:17, 100:2, 111:25
**accountability** [1] - 31:16
**accountable** [6] - 10:4, 31:19, 32:2, 33:3, 33:7, 34:8
**accountant** [2] - 22:9, 22:18
**accounted** [4] - 93:18, 93:21, 96:23, 96:25
**accounts** [1] - 23:2
**accumulate** [1] - 98:24
**accuracy** [1] - 17:15
**accurate** [1] - 121:15
**accurately** [1] - 83:25
**accused** [1] - 110:25
**accustomed** [1] - 85:17
**acknowledged** [4] - 22:23, 73:6, 73:7, 95:1
**acknowledges** [1] - 108:12
**act** [1] - 42:12
**Act** [1] - 117:3
**acted** [1] - 60:3
**Action** [1] - 1:3
**actions** [1] - 111:3
**active** [1] - 24:6
**activities** [2] - 22:3, 103:4

**activity** [15] - 10:13, 19:7, 20:16, 21:17, 28:14, 30:12, 31:8, 40:21, 48:15, 50:15, 59:11, 72:21, 73:6, 82:17, 110:3
**acts** [1] - 42:10
**actual** [5] - 34:21, 44:3, 70:15, 70:23, 71:5
**add** [2] - 14:17, 33:19
**added** [1] - 44:16
**addition** [19] - 11:4, 39:10, 39:21, 47:22, 52:10, 64:3, 64:9, 64:10, 82:5, 82:8, 82:13, 83:7, 83:12, 85:1, 85:21, 93:18, 94:21, 113:10, 117:9
**additional** [3] - 13:3, 60:1, 96:24
**address** [17] - 6:19, 11:15, 11:15, 15:8, 15:9, 17:24, 19:4, 26:17, 35:5, 57:15, 73:12, 102:22, 104:4, 104:7, 104:17, 113:20, 118:16
**addresses** [2] - 12:1, 115:23
**adjustment** [19] - 35:11, 36:24, 44:13, 48:18, 48:20, 50:11, 51:1, 51:13, 56:20, 69:13, 71:22, 75:1, 75:4, 75:9, 76:8, 78:13, 80:8, 93:2, 98:6
**adjustments** [1] - 7:18
**administration** [1] - 56:5
**admissibility** [1] - 17:13
**admissible** [2] - 70:18, 71:10
**admission** [2] - 31:25, 47:6
**admit** [4] - 30:7, 61:20, 62:5, 77:8
**admits** [5] - 21:16, 31:24, 32:19, 62:20, 114:1
**admitted** [14] - 9:7, 23:10, 28:4, 32:14, 37:12, 45:2, 50:14, 60:10, 61:21, 69:20, 69:25, 72:20, 73:9, 115:14
**admittedly** [1] - 55:4,

102:7
**admitting** [2] - 54:22, 69:17
**adopted** [1] - 83:2
**advance** [6] - 4:16, 4:21, 65:3, 68:3, 95:9, 101:14
**advanced** [5] - 60:10, 62:10, 63:23, 95:10, 109:21
**advancing** [1] - 64:1
**advice** [1] - 106:9
**advisory** [4] - 5:22, 80:14, 117:5
**afar** [1] - 60:19
**affected** [3] - 97:7, 97:22, 97:23
**affiliate** [1] - 23:16
**affirmatively** [4] - 26:21, 62:9, 65:18, 96:7
**afford** [2] - 59:3, 119:20
**afternoon** [3] - 35:4, 42:24, 48:1
**afterwards** [1] - 68:12
**age** [7] - 90:25, 91:4, 100:2, 109:4, 109:21, 110:1, 110:15
**agencies** [1] - 118:24
**agent** [6] - 40:5, 40:6, 40:7, 40:8, 70:19, 71:8
**Agent** [5] - 2:8, 2:9, 5:5, 70:20, 71:2
**agents** [3] - 3:14, 40:14, 41:6
**aggravated** [1] - 93:2
**aggravating** [8] - 51:13, 75:2, 75:4, 75:9, 75:14, 76:8, 78:14, 78:17
**ago** [1] - 55:9
**agree** [10] - 9:15, 9:16, 14:4, 36:12, 43:1, 52:25, 54:12, 55:20, 86:19, 86:25
**agreed** [3] - 7:14, 87:16, 96:5
**agreement** [4] - 4:5, 60:17, 62:19, 65:22, 95:18
**agrees** [7] - 13:19, 31:18, 36:25, 44:13, 48:19, 72:14, 78:22
**ahead** [3] - 3:23, 44:6, 44:8
**aid** [1] - 45:24
**aided** [2] - 2:15, 42:13

**air** [3] - 35:12, 36:21, 38:11
**aircraft** [9] - 10:6, 34:11, 34:14, 35:11, 36:21, 38:11, 38:14, 63:9, 79:23
**Airlines** [1] - 20:9
**airplane** [3] - 34:17, 34:18, 38:5
**airplanes** [1] - 20:9
**airport** [11] - 28:3, 39:12, 39:13, 41:12, 43:9, 45:1, 45:15, 45:23, 97:17, 97:18, 101:3
**Airport** [1] - 20:20
**alerted** [1] - 25:9
**Alexandria** [2] - 1:23, 26:4
**Alfaro** [3] - 47:19, 49:15, 49:22
**alleged** [2] - 17:8, 109:25
**allow** [3] - 97:17, 111:8, 111:13
**alluding** [1] - 93:15
**ally** [1] - 100:17
**Almaguer** [2] - 5:5, 18:16
**Almaguer-Ramirez** [2] - 5:5, 18:16
**almost** [2] - 63:1, 97:20
**alone** [4] - 28:13, 33:10, 43:12, 116:5
**ALSO** [1] - 2:7
**Alsworth** [2] - 3:13, 3:15
**ALSWORTH** [1] - 1:12
**altered** [1] - 56:15
**alternative** [1] - 53:9
**Altiplano** [2] - 108:17, 111:12
**altogether** [1] - 12:4
**Alvarez** [2] - 5:4, 18:14
**amazingly** [1] - 52:7
**amendment** [1] - 69:11
**America** [4] - 3:3, 3:12, 4:8, 20:21
**AMERICA** [1] - 1:3
**amount** [14] - 13:9, 15:17, 33:19, 33:22, 50:14, 72:24, 81:10, 81:13, 81:15, 85:15, 85:19, 88:6, 114:23, 118:11
**amounts** [5] - 13:9, 20:17, 29:5, 31:7,

3

32:12
**amply** [1] - 116:10
**analysis** [1] - 75:19
**ancillary** [1] - 96:9
**Angel** [1] - 19:11
**answer** [1] - 81:7
**anticipate** [1] - 112:1
**apart** [1] - 109:23
**apologize** [1] - 111:2
**appeal** [9] - 17:21, 119:1, 119:7, 119:13, 119:18, 119:20, 119:21, 119:22
**Appeals** [1] - 119:2
**appear** [2] - 83:20, 94:3
**Appearances** [1] - 1:25
**APPEARANCES** [2] - 1:9, 2:1
**appellate** [1] - 103:23
**applaud** [1] - 71:3
**applicability** [1] - 16:7
**applicable** [4] - 10:5, 15:18, 17:13, 50:22
**application** [10] - 51:2, 52:8, 56:1, 56:17, 56:19, 58:12, 79:22, 103:22, 119:10
**Application** [1] - 59:24
**applied** [8] - 15:7, 15:24, 38:12, 46:4, 50:18, 59:20, 72:11, 72:16
**applies** [10] - 11:13, 13:20, 15:5, 15:12, 16:11, 31:12, 33:11, 40:23, 52:9, 72:25
**apply** [28] - 5:22, 5:25, 7:19, 7:20, 9:11, 9:15, 9:25, 10:1, 11:14, 13:14, 16:9, 16:12, 36:24, 37:1, 44:14, 48:18, 48:19, 56:21, 56:22, 56:24, 73:16, 76:12, 80:2, 80:3, 93:25, 103:10, 112:8, 119:23
**appointed** [2] - 22:18, 119:23
**appreciate** [2] - 68:6, 72:23
**appreciated** [1] - 28:16
**appreciating** [1] - 28:11
**approach** [5] - 63:8,

63:11, 63:17, 101:16, 101:19
**appropriate** [11] - 15:17, 15:20, 42:9, 69:4, 82:15, 91:9, 99:10, 101:24, 102:14, 111:4, 118:24
**appropriately** [1] - 89:8
**argue** [4] - 37:17, 48:4, 48:6, 90:22
**argued** [1] - 14:21
**argues** [10] - 16:11, 22:19, 24:7, 26:3, 31:19, 37:20, 45:14, 48:22, 56:22, 72:15
**arguing** [2] - 13:21, 90:24
**argument** [18] - 11:16, 14:15, 16:13, 16:15, 32:17, 35:20, 57:6, 57:8, 78:10, 78:19, 78:25, 86:6, 87:4, 89:20, 91:3, 94:2, 102:21, 103:10
**arguments** [5] - 7:19, 18:1, 63:15, 94:23, 103:21
**Arizona** [1] - 65:16
**arm's** [2] - 100:23, 101:1
**arrangements** [1] - 23:4
**arrest** [3] - 115:15, 120:15, 120:23
**arrested** [4] - 23:13, 114:14, 120:17, 120:22
**arrive** [2] - 19:23, 19:24
**arrived** [2] - 25:6, 33:7
**arriving** [1] - 114:15
**articularly** [1] - 103:16
**articulated** [1] - 69:19
**Arturo** [2] - 21:8, 59:5
**aside** [3] - 7:25, 8:12, 66:17
**aspect** [1] - 9:14
**aspects** [1] - 96:1
**assault** [1] - 109:12
**assaulted** [1] - 109:14
**assessing** [1] - 66:17
**assessment** [3] - 48:5, 80:16, 117:10
**assistance** [1] - 119:14
**associate** [1] - 100:18
**associated** [4] - 46:11, 47:2, 100:14,

114:9
**associates** [3] - 24:2, 27:16, 43:22
**associating** [1] - 97:24
**association** [1] - 49:20
**assume** [1] - 54:8
**assumed** [1] - 33:5
**assuming** [1] - 17:2
**Atlanta** [2] - 7:7, 107:17
**attack** [1] - 18:6
**attempted** [8] - 10:10, 43:5, 43:24, 44:10, 53:16, 56:4, 56:25, 77:11
**attempting** [2] - 56:13, 56:14
**attended** [1] - 30:14
**attention** [6] - 78:8, 93:24, 95:20, 102:22, 116:2
**attorney** [3] - 26:11, 59:5, 110:23
**attorney's** [1] - 83:9
**attorneys** [2] - 8:20, 8:24
**attributable** [4] - 14:10, 81:19, 82:20, 87:21
**attribute** [1] - 42:3
**attributed** [2] - 11:1, 58:21
**audience** [2] - 6:16, 107:16
**AUSA** [1] - 3:16
**authorities** [1] - 115:19
**authority** [1] - 49:7
**authorization** [1] - 121:19
**authorized** [2] - 97:5, 118:4
**available** [4] - 50:23, 55:12, 113:13, 116:7
**average** [1] - 82:11
**avoid** [2] - 113:14, 115:20
**avoiding** [1] - 99:25
**awaiting** [1] - 109:3
**aware** [3] - 23:16, 103:6, 103:7
**AZZOUZ** [1] - 2:10
**Azzouz** [1] - 3:5

**B**

**b)** [1] - 74:1
**back-of-an-envelope** [1] - 82:8
**backyard** [2] - 98:18, 98:19
**bad** [4] - 85:14, 96:12, 99:14, 103:23
**bags** [3] - 20:8, 20:18, 41:12
**BAKER** [1] - 2:7
**Baker** [1] - 3:25
**baker** [1] - 4:2
**balance** [2] - 68:10, 71:21
**balances** [1] - 23:3
**ball** [1] - 66:1
**Barbie** [1] - 20:24
**barest** [1] - 69:17
**base** [16] - 10:5, 10:7, 10:11, 10:18, 10:20, 10:23, 13:19, 13:21, 15:1, 28:22, 31:15, 31:20, 33:11, 34:7, 80:5, 93:1
**based** [20] - 5:23, 14:11, 16:19, 19:25, 27:1, 29:22, 31:16, 32:3, 33:3, 33:10, 76:17, 81:10, 81:11, 84:2, 88:3, 88:9, 91:10, 114:18, 114:20, 115:3
**basic** [1] - 117:16
**basis** [13] - 32:20, 32:21, 34:24, 53:15, 63:11, 63:19, 64:22, 68:15, 79:10, 92:8, 92:18, 93:16, 106:7
**batting** [1] - 71:20
**beard** [1] - 53:18
**became** [2] - 23:10, 23:15
**BEFORE** [1] - 1:8
**begin** [1] - 79:18
**beginning** [1] - 19:7
**behalf** [6] - 3:11, 3:25, 38:25, 39:9, 104:10, 107:21
**behavior** [1] - 111:3
**belabor** [2] - 44:5, 52:24
**belated** [1] - 59:9
**believes** [3] - 21:18, 44:15, 72:25
**belonged** [3] - 12:17, 25:9, 89:6
**belonging** [1] - 33:4
**beloved** [1] - 107:15

**below** [5] - 90:5, 90:20, 92:22, 102:14, 121:19
**Beltran** [1] - 97:25
**Beltrán** [1] - 19:12
**bench** [2] - 104:14, 104:22
**benefit** [10] - 38:25, 41:14, 60:23, 67:3, 67:16, 71:21, 101:4, 101:15, 101:19, 101:20
**benefited** [1] - 21:13
**benefiting** [3] - 39:16, 101:1, 101:2
**benefits** [10] - 30:5, 30:7, 30:8, 65:25, 66:3, 66:12, 66:16, 68:1, 69:6
**Benito** [1] - 20:20
**BERYL** [1] - 1:8
**best** [2] - 11:23, 121:16
**better** [7] - 30:4, 42:21, 53:23, 69:17, 69:22, 71:2, 104:6
**between** [14] - 11:19, 13:16, 14:5, 29:9, 33:7, 33:13, 35:22, 36:11, 37:17, 37:21, 51:1, 55:25, 63:25, 87:2
**beyond** [3] - 33:9, 61:2, 62:13
**big** [6] - 21:10, 65:16, 82:24, 85:14, 105:24, 107:8
**bigger** [1] - 47:2
**Bikundi** [1] - 49:4
**billion** [1] - 88:18
**binder** [1] - 107:19
**binders** [6] - 54:21, 57:12, 81:19, 82:9, 82:10, 82:14
**binding** [1] - 54:10
**bit** [6] - 12:9, 26:23, 47:11, 58:10, 89:15, 98:11
**Blalock** [1] - 15:22
**board** [1] - 28:3
**body** [1] - 54:13
**bodyguards** [3] - 46:19, 48:25, 49:14
**boils** [1] - 13:22
**bold** [1] - 57:25
**Bolivia** [2] - 24:14, 25:3
**Boney** [1] - 16:3
**Booker** [1] - 17:5
**borrowing** [2] - 103:8,

103:15
**bosom** [1] - 112:22
**bottom** [5] - 46:22, 74:14, 102:4, 116:25, 117:1
**bottom-level** [1] - 102:4
**boy** [1] - 49:23
**bragging** [1] - 36:10
**break** [2] - 79:14, 79:16
**brevity** [1] - 44:6
**bribe** [5] - 10:10, 43:5, 43:24, 44:10, 45:3
**bribed** [9] - 10:10, 25:11, 43:4, 43:9, 43:24, 44:1, 44:10, 45:1, 45:2
**bribery** [8] - 38:16, 38:19, 42:19, 45:19, 46:1, 46:3, 63:9, 79:23
**bribes** [6] - 39:9, 39:11, 40:14, 42:1, 44:3, 44:19
**bribing** [5] - 23:4, 28:4, 38:24, 41:6, 43:21
**brief** [2] - 43:1, 69:10
**briefing** [7] - 13:18, 14:9, 14:18, 26:14, 26:16, 46:21, 81:9
**briefly** [5] - 6:19, 7:6, 14:20, 34:14, 111:20
**briefs** [1] - 112:11
**bring** [3] - 18:10, 39:6, 78:7
**bringing** [1] - 60:19
**broader** [1] - 112:23
**broken** [1] - 74:24
**brother** [7] - 19:9, 19:19, 20:1, 20:11, 21:4, 32:24, 107:15
**brother's** [1] - 19:6
**brought** [4] - 28:17, 28:18, 77:10, 93:24
**buckets** [3] - 91:22
**buddies** [1] - 100:18
**bulls** [2] - 30:17, 33:25
**bunch** [1] - 58:24
**burden** [5] - 15:13, 44:4, 61:16, 63:13, 79:21
**Bureau** [5] - 117:7, 118:21, 120:12, 120:25, 121:4
**business** [11] - 29:8, 38:23, 41:4, 41:7, 55:7, 85:7, 98:17, 100:16, 100:17,

103:3, 103:12
**businesses** [3] - 29:16, 29:19, 29:20
**butcher** [1] - 40:4
**buy** [2] - 38:8, 98:19

## C

**C)** [1] - 56:18
**c)(1)** [2] - 31:18, 80:6
**CA** [1] - 1:18
**cabined** [1] - 89:8
**Cachoro** [3] - 47:16, 49:15, 49:18
**cake** [2] - 101:13
**calculation** [3] - 8:13, 9:24, 99:5
**California** [6] - 3:16, 7:7, 107:17, 120:6, 120:9, 120:13
**camera** [2] - 52:7, 58:4
**candid** [1] - 52:6
**cannot** [1] - 68:13
**capacity** [1] - 79:5
**carefully** [2] - 17:10, 103:16
**Carlos** [2] - 23:13
**carried** [1] - 109:25
**carrier** [3] - 35:12, 36:22, 38:12
**carriers** [1] - 20:7
**carries** [1] - 15:13
**carry** [1] - 20:7
**carrying** [3] - 20:10, 20:18, 60:15
**cartel** [25] - 13:6, 20:14, 22:10, 22:15, 22:20, 22:21, 22:24, 23:3, 23:8, 23:11, 23:17, 23:22, 23:24, 24:23, 24:25, 33:17, 46:12, 48:24, 65:9, 97:14, 99:16, 100:18, 114:8
**cartel's** [2] - 22:25, 23:2
**cartel-related** [1] - 99:16
**cartels** [6] - 23:18, 23:19, 46:12, 67:20, 114:7, 114:10
**Case** [2] - 3:3, 16:1
**case** [70] - 4:18, 5:22, 5:25, 6:1, 6:6, 7:19, 7:21, 7:22, 8:21, 9:11, 9:12, 9:25, 15:21, 16:1, 16:2, 16:15, 16:16, 17:1, 17:2, 22:13, 26:8, 26:22, 27:12, 29:2,

35:15, 42:25, 43:13, 43:25, 49:12, 52:12, 59:9, 61:9, 62:23, 66:8, 66:21, 67:15, 70:19, 70:25, 71:1, 71:17, 71:22, 73:1, 75:3, 75:23, 85:1, 86:5, 86:11, 90:17, 91:15, 91:17, 92:5, 92:6, 92:17, 93:9, 93:17, 94:18, 97:8, 98:22, 99:11, 101:9, 102:15, 102:18, 102:24, 103:2, 112:8, 113:18, 116:10, 118:7, 120:18, 121:4
**cases** [6] - 14:8, 16:14, 18:9, 99:16, 99:19, 100:6
**cash** [8] - 20:18, 30:9, 39:13, 39:15, 39:19, 41:12, 84:3, 84:4
**casino** [1] - 29:16
**categorically** [1] - 91:18
**category** [2] - 85:20, 92:1
**Category** [2] - 9:18, 80:14
**caught** [1] - 52:6
**caused** [2] - 42:14, 98:2
**causes** [1] - 52:18
**causing** [1] - 98:2
**CCE** [4] - 77:13, 77:22, 78:2, 78:15
**cellmate** [1] - 109:13
**center** [1] - 116:21
**Center** [1] - 26:5
**cents** [1] - 85:17
**certain** [4] - 7:14, 80:1, 114:12, 119:8
**certainly** [12] - 21:12, 27:24, 29:5, 39:16, 41:25, 47:1, 58:21, 67:5, 91:2, 91:4, 102:2, 114:8
**CERTIFICATE** [1] - 121:14
**certificate** [1] - 121:18
**certify** [1] - 121:15
**cetera** [1] - 66:16
**chagrin** [1] - 86:23
**chain** [1] - 47:1
**challenge** [6] - 15:3, 17:22, 35:14, 65:2, 71:15, 119:16
**challenges** [3] - 62:25, 71:19, 108:23

**change** [2] - 118:16, 118:17
**changed** [1] - 75:19
**changes** [1] - 86:20
**changing** [1] - 36:15
**Chani** [3] - 47:15, 49:15, 49:18
**Chapo** [5] - 19:11, 23:23, 97:24, 100:19
**Chapter** [2] - 93:12, 103:9
**characteristic** [3] - 10:8, 38:3, 44:15
**characteristics** [4] - 5:24, 72:25, 113:13, 114:13
**characterization** [1] - 26:23
**charge** [6] - 22:15, 60:15, 66:24, 73:8, 77:10, 77:13
**charged** [16] - 21:14, 21:15, 21:23, 43:20, 51:19, 77:5, 77:21, 77:22, 78:2, 79:2, 79:6, 83:3, 86:10, 86:12, 87:6
**charges** [3] - 4:6, 21:21, 83:4
**charging** [1] - 31:12
**charitable** [1] - 86:13
**chartered** [1] - 37:12
**checkered** [1] - 27:24
**Chicago** [2] - 7:8, 107:17
**Chicklin** [1] - 49:23
**children** [2] - 108:7, 111:15
**Chile** [1] - 24:14
**chilling** [1] - 100:7
**Chivito** [1] - 25:4
**chose** [1] - 65:23
**Chupik** [2] - 3:13, 3:14
**CHUPIK** [1] - 2:9
**circles** [1] - 23:17
**Circuit** [12] - 15:16, 16:1, 16:2, 16:16, 16:21, 17:1, 49:4, 49:6, 49:11, 49:12, 119:2, 119:8
**Circuit's** [1] - 15:21
**circuits** [3] - 16:17, 16:21, 16:23
**circumstance** [2] - 92:18, 92:20
**circumstances** [6] - 16:17, 27:21, 110:2, 113:11, 113:21, 119:8
**citation** [2] - 45:20,

75:23
**cite** [4] - 15:16, 16:2, 49:4, 49:11
**cited** [1] - 45:16
**cites** [1] - 16:14
**citing** [1] - 45:12
**citizens** [1] - 66:13
**City** [3] - 20:20, 22:17, 30:20
**CJNG** [10] - 24:23, 25:4, 25:7, 25:8, 25:13, 25:17, 33:17, 33:18, 65:10, 114:8
**claim** [2] - 55:15, 68:1
**claims** [1] - 52:18
**clause** [1] - 74:25
**clean** [2] - 19:22, 41:16
**clear** [17] - 16:11, 16:19, 32:5, 32:21, 44:20, 46:11, 46:14, 68:22, 87:9, 89:7, 90:9, 93:10, 103:18, 107:25, 115:1, 121:1, 121:3
**clearer** [1] - 68:23
**clearly** [7] - 40:20, 72:8, 72:12, 72:13, 73:21, 78:10, 114:16
**Clerk** [2] - 118:14, 118:16
**client** [3] - 8:9, 86:18, 112:4
**close** [3] - 29:8, 29:9, 58:15
**closely** [3] - 56:9, 97:24, 100:14
**co** [1] - 42:10
**co-conspirator** [1] - 42:10
**cocaine** [97] - 4:7, 10:3, 12:10, 12:15, 12:16, 12:21, 12:23, 13:1, 13:7, 13:10, 13:12, 13:14, 14:2, 14:10, 14:22, 18:21, 19:20, 19:21, 20:12, 20:22, 22:16, 22:25, 24:14, 24:18, 25:2, 25:5, 25:6, 25:8, 25:13, 25:15, 28:2, 28:25, 29:3, 29:7, 30:18, 30:22, 31:14, 31:17, 31:20, 31:24, 32:10, 32:12, 32:13, 32:18, 32:25, 33:3, 33:6, 33:8, 33:15, 33:20, 33:22, 33:24, 34:3, 34:9, 34:22, 35:1, 35:18, 36:1,

37:6, 38:5, 40:14, 40:16, 47:14, 49:1, 50:5, 50:14, 59:1, 59:4, 63:20, 72:19, 72:20, 72:24, 81:14, 85:6, 85:13, 85:24, 85:25, 88:1, 88:6, 88:12, 88:21, 88:22, 89:9, 89:10, 89:12, 91:20, 92:4, 93:6, 93:9, 95:12, 96:16, 113:4, 113:24, 114:23, 115:3, 115:11

**coded** [1] - 34:21

**colleague** [1] - 51:16

**collect** [2] - 30:21, 86:14

**collection** [1] - 117:21

**collectively** [1] - 97:20

**colloquy** [1] - 73:3

**Colombia** [3] - 20:9, 39:13, 97:18

**Columbia** [2] - 65:14, 66:13

**COLUMBIA** [1] - 1:1

**combination** [2] - 80:13, 100:2

**combined** [2] - 7:22, 15:2

**coming** [2] - 6:23, 24:22

**commanded** [1] - 42:14

**commander** [6] - 39:12, 41:12, 45:15, 45:23, 97:16, 101:2

**commands** [1] - 84:21

**comment** [1] - 15:19

**commentary** [2] - 70:1, 71:13

**commercial** [3] - 35:12, 36:21, 38:11

**Commission** [2] - 76:25, 78:5

**commission** [5] - 40:15, 44:11, 79:4, 92:13, 103:17

**commit** [3] - 35:19, 55:16, 117:19

**Commitment** [2] - 118:20, 120:15

**committed** [3] - 20:24, 98:7, 117:7

**committing** [1] - 65:13

**common** [3] - 50:13, 97:20, 102:17

**communicate** [2] - 109:18, 109:19

**community** [3] -

69:24, 70:25, 114:17

**company** [4] - 24:5, 24:6, 24:12

**comparable** [1] - 116:5

**comparators** [1] - 116:1

**compared** [1] - 65:8

**compartment** [1] - 33:24

**compartments** [2] - 22:16, 30:17

**complete** [5] - 64:18, 104:18, 104:20, 104:24, 121:16

**completed** [2] - 37:25, 118:2

**completely** [3] - 30:5, 63:11, 68:4

**comply** [2] - 112:15, 117:23

**computation** [1] - 86:19

**computer** [1] - 2:15

**computer-aided** [1] - 2:15

**conceal** [1] - 84:5

**concept** [1] - 49:6

**concern** [1] - 43:2

**concerned** [5] - 27:13, 53:12, 58:6, 58:11, 103:5

**concerning** [1] - 17:6

**concerns** [1] - 17:6

**concert** [1] - 29:16

**concerted** [2] - 26:6, 27:6

**concession** [2] - 43:2, 86:17

**conclude** [2] - 36:5, 70:2

**concluded** [3] - 36:6, 43:22, 44:3

**concludes** [1] - 121:12

**conclusion** [2] - 42:20, 58:20

**condition** [1] - 117:24

**conditions** [5] - 108:15, 111:12, 117:13, 117:14, 117:18

**conduct** [54] - 16:18, 17:4, 18:20, 21:13, 28:8, 50:14, 54:24, 55:4, 56:8, 56:9, 56:11, 58:3, 58:7, 58:12, 60:1, 60:3, 62:22, 64:10, 64:11, 65:14, 68:11, 69:20,

72:17, 83:3, 86:12, 91:5, 93:18, 93:20, 94:3, 95:7, 95:17, 95:18, 96:1, 97:2, 97:9, 97:10, 98:2, 98:8, 98:12, 99:2, 99:3, 99:13, 101:5, 101:8, 101:11, 102:8, 113:7, 113:15, 114:22, 115:6, 115:16, 115:22, 117:16

**conferred** [2] - 81:1, 81:6

**confident** [1] - 60:21

**confinement** [1] - 108:15

**confirmed** [1] - 109:13

**confused** [1] - 34:21

**confusion** [1] - 78:8

**Congress** [1] - 112:13

**congressionally** [1] - 85:21

**conjunctive** [1] - 78:1

**connected** [1] - 74:22

**connection** [5] - 4:11, 9:1, 22:11, 59:7, 82:20

**connections** [1] - 29:9

**connote** [1] - 49:8

**consent** [1] - 87:2

**conservative** [9] - 33:2, 33:10, 87:12, 88:8, 88:16, 89:9, 89:23, 91:21, 91:22

**conservatively** [4] - 82:3, 93:7, 95:11, 96:14

**consider** [9] - 17:12, 94:19, 100:8, 101:6, 103:1, 112:12, 113:5, 113:11, 115:24

**consideration** [2] - 92:19, 117:4

**considerations** [2] - 68:8, 115:7

**considered** [2] - 99:3, 99:4, 121:18

**consisted** [1] - 13:6

**consistent** [1] - 115:18

**conspiracy** [9] - 4:7, 12:15, 28:2, 31:13, 35:19, 43:20, 66:15, 87:6, 113:22

**conspirator** [1] - 42:10

**constitutes** [2] - 52:13, 121:15

**Constitution** [1] - 118:15

**construe** [1] - 75:16

**construed** [1] - 53:5

**consult** [1] - 55:18

**contact** [2] - 109:8, 109:21

**contacted** [1] - 55:11

**contain** [1] - 33:6

**contained** [1] - 35:9

**container** [5] - 24:16, 24:19, 25:6, 25:12, 25:15

**containers** [2] - 24:22, 50:7

**containing** [1] - 19:20

**contends** [3] - 19:14, 29:11, 29:15

**contest** [1] - 62:22

**contested** [5] - 66:2, 68:17, 70:16, 72:17, 114:15

**contests** [1] - 60:2

**context** [8] - 38:22, 62:19, 63:22, 65:19, 67:1, 67:2, 67:17, 68:16

**continue** [1] - 68:18

**continued** [2] - 83:4, 111:22

**Continued** [2] - 1:25, 2:1

**continuing** [8] - 51:19, 75:10, 76:9, 76:14, 76:19, 77:8, 77:13, 77:16

**contrary** [1] - 35:14

**contrition** [1] - 64:17

**control** [3] - 24:23, 49:3, 49:7

**controlled** [6] - 35:13, 36:20, 36:22, 38:10, 38:14, 117:20

**conversation** [8] - 34:15, 34:23, 34:24, 35:22, 72:1, 93:22, 107:24

**conversations** [2] - 19:25, 108:2

**convicted** [2] - 77:9, 78:2

**conviction** [8] - 27:25, 28:1, 28:2, 56:7, 56:8, 80:17, 119:1, 119:16

**convictions** [2] - 28:19, 114:24

**convince** [3] - 31:3, 57:4, 58:17

**convincing** [2] -

16:12, 16:19

**cooperate** [2] - 66:6, 117:21

**cooperating** [10] - 17:7, 17:9, 17:23, 18:2, 18:12, 18:18, 19:1, 31:5, 66:5, 67:21

**cooperation** [5] - 20:25, 21:13, 21:19, 27:13, 45:19

**cooperators** [5] - 19:5, 47:5, 66:19, 66:25, 67:17

**coopted** [2] - 97:14, 97:16

**coordinated** [1] - 23:3

**Copa** [1] - 20:8

**core** [3] - 62:22, 96:9, 96:10

**Correa** [2] - 5:4, 18:14

**correct** [15] - 8:7, 9:19, 9:20, 9:22, 11:18, 14:6, 21:12, 36:2, 47:8, 67:9, 67:12, 81:17, 81:22, 88:13, 120:24

**correctly** [1] - 82:23

**correspondence** [1] - 112:11

**corresponding** [1] - 9:18

**corroborate** [3] - 31:9, 40:10, 47:21

**corroborated** [5] - 21:8, 33:12, 33:23, 49:19, 114:3

**corroboration** [1] - 48:7

**corruption** [1] - 99:21

**cost** [3] - 35:23, 119:21, 119:22

**counsel** [7] - 3:9, 3:12, 3:20, 6:4, 54:19, 55:17, 59:15, 64:23, 70:24, 119:14, 119:23

**counseled** [1] - 42:13

**count** [4] - 4:6, 9:25, 23:11, 80:17

**Count** [2] - 31:12, 117:8

**counterfeit** [1] - 56:15

**counterproductive** [2] - 61:5

**countervailing** [1] - 68:8

**counting** [1] - 34:5

**country** [3] - 97:12, 113:4, 114:22

**couple** [5] - 38:20,
40:3, 79:8, 93:23,
102:7
**couriers** [1] - 20:18
**course** [8] - 4:25,
52:3, 63:12, 65:5,
68:18, 68:21, 94:6,
102:9
**Court** [75] - 2:12, 2:13,
6:19, 15:25, 16:15,
16:22, 17:3, 18:8,
18:10, 26:10, 26:13,
27:9, 32:2, 40:18,
51:6, 51:13, 52:14,
55:17, 58:20, 59:17,
60:3, 60:6, 60:10,
60:18, 60:20, 61:16,
64:4, 64:11, 64:13,
64:15, 64:19, 64:20,
68:5, 77:6, 81:11,
82:23, 83:2, 84:21,
85:7, 90:15, 91:6,
91:8, 91:21, 92:9,
92:10, 92:12, 92:20,
93:16, 93:25, 94:19,
95:1, 95:11, 95:13,
96:19, 97:4, 100:21,
102:13, 102:16,
103:6, 104:7,
104:17, 107:21,
109:24, 114:19,
115:11, 115:24,
117:6, 118:7,
118:14, 118:17,
118:25, 119:1,
119:21, 121:22
**COURT** [165] - 1:1,
1:8, 3:17, 3:21, 4:2,
5:9, 5:12, 6:12, 6:14,
6:20, 7:1, 7:13, 8:4,
8:8, 8:12, 8:17, 8:23,
9:3, 9:21, 9:23, 11:7,
11:9, 11:15, 11:22,
12:7, 13:18, 13:24,
14:4, 14:7, 14:14,
14:17, 14:25, 35:2,
35:21, 36:12, 36:17,
40:12, 41:17, 41:22,
42:23, 43:16, 44:8,
47:3, 47:25, 48:12,
51:9, 51:21, 51:24,
52:22, 53:7, 54:2,
54:15, 54:21, 54:25,
55:20, 55:22, 55:25,
57:10, 60:11, 60:14,
60:24, 61:10, 61:20,
61:25, 62:12, 62:24,
63:3, 63:6, 65:8,
66:11, 67:4, 67:10,
67:13, 67:20, 68:6,

68:22, 69:9, 70:3,
70:7, 70:9, 71:23,
71:25, 72:7, 73:18,
73:24, 74:7, 75:8,
75:13, 76:4, 76:7,
76:17, 77:7, 77:19,
77:23, 78:3, 79:11,
79:15, 79:18, 80:22,
80:24, 81:12, 81:18,
81:24, 82:6, 82:15,
82:23, 83:8, 84:6,
84:9, 84:14, 84:18,
85:9, 86:1, 87:8,
87:20, 88:11, 88:16,
88:24, 89:13, 89:22,
89:25, 90:12, 90:24,
93:10, 95:23, 99:15,
99:19, 99:24, 100:6,
101:22, 102:19,
103:8, 104:1, 104:9,
104:20, 104:23,
105:1, 105:5, 105:7,
105:12, 105:16,
105:18, 106:11,
106:21, 106:25,
107:3, 107:11,
107:23, 108:20,
110:19, 111:18,
111:24, 112:3,
116:14, 116:16,
120:2, 120:4, 120:8,
120:11, 120:17,
120:20, 121:3,
121:6, 121:9, 121:11
**court** [16] - 15:23,
17:11, 43:22, 44:2,
45:2, 59:7, 59:12,
61:13, 66:12, 68:2,
68:16, 69:2, 69:24,
75:23, 96:7, 119:23
**court's** [2] - 17:17,
17:19
**Court's** [19] - 17:21,
64:5, 64:5, 64:8,
73:14, 73:15, 78:23,
79:10, 85:3, 91:4,
91:10, 93:20, 93:24,
94:16, 94:21, 96:18,
96:21, 97:1, 116:2
**court-appointed** [1] -
119:23
**courthouse** [1] -
63:21
**courtroom** [3] - 58:1,
58:4, 64:18
**COURTROOM** [1] -
3:2
**courts** [1] - 27:16
**cousin** [1] - 107:6
**covered** [1] - 56:11

**cows** [2] - 30:17,
33:25
**craft** [1] - 79:5
**crafted** [1] - 103:16
**create** [2] - 54:20, 86:5
**created** [2] - 55:3,
55:5
**credibility** [18] - 15:3,
17:18, 17:20, 17:24,
18:7, 19:2, 19:4,
22:5, 22:22, 26:5,
26:9, 26:17, 29:17,
29:24, 30:10, 48:5,
63:13
**credible** [5] - 14:12,
18:13, 22:12, 25:18,
33:21
**credibly** [1] - 37:10
**credit** [1] - 121:1
**crime** [2] - 86:9,
117:19
**crimes** [2] - 113:8,
115:7
**criminal** [35] - 5:23,
9:13, 9:17, 10:13,
18:20, 20:13, 20:16,
21:17, 27:24, 28:6,
30:12, 40:21, 48:15,
54:24, 59:5, 59:11,
75:10, 75:19, 76:10,
76:14, 76:20, 77:9,
77:13, 77:16, 83:2,
83:9, 86:12, 87:6,
98:8, 98:12, 99:2,
113:7, 114:24, 115:6
**Criminal** [5] - 1:3,
1:17, 3:3, 9:18,
80:14
**CRISP** [1] - 2:10
**Crisp** [1] - 3:5
**criteria** [8] - 50:10,
51:11, 74:13, 74:17,
74:18, 74:20, 74:21,
75:5
**critical** [2] - 19:2,
115:7
**criticism** [1] - 15:9
**CRM** [1] - 1:13
**cross** [5] - 28:7,
28:17, 45:17, 63:15,
87:13
**cross-examination** [3]
- 28:7, 28:17, 63:15
**cross-examined** [1] -
87:13
**culpability** [2] - 62:9,
73:9
**curious** [2] - 72:2,
72:3
**current** [1] - 47:19

**custody** [3] - 110:10,
110:12, 117:7
**custom** [1] - 40:8
**customs** [5] - 40:5,
40:7, 40:14, 41:6
**Customs** [2] - 117:25,
118:21
**cut** [2] - 14:7, 101:11

## D

**D.C** [17] - 1:6, 15:16,
15:21, 16:1, 16:2,
16:16, 16:21, 17:1,
49:4, 49:6, 49:11,
49:12, 108:14,
109:6, 118:15,
119:2, 119:8
**daily** [1] - 106:7
**damaging** [1] - 114:22
**Dangerous** [2] - 18:9,
70:14
**darkness** [1] - 66:4
**date** [3] - 120:15,
120:22, 120:24
**Dated** [1] - 121:20
**dates** [1] - 27:18
**daylight** [1] - 91:1
**days** [3] - 118:16,
119:18, 119:19
**DC** [2] - 1:14, 2:4
**DEA** [3] - 3:14, 5:4,
21:1
**deactivation** [1] - 21:1
**deal** [9] - 11:7, 11:9,
11:23, 11:24, 24:3,
24:11, 36:13, 90:12,
113:18
**dealer** [4] - 65:7,
65:13, 65:15, 65:17
**dealers** [1] - 50:5
**dealings** [2] - 22:8,
114:3
**deals** [4] - 23:23, 50:4,
114:12
**dealt** [2] - 29:4, 113:3
**debate** [2] - 14:4,
84:14
**debating** [1] - 70:4
**debt** [1] - 19:8
**decades** [4] - 21:16,
93:8, 102:10
**December** [1] - 17:1
**decide** [1] - 61:11
**decided** [3] - 24:13,
70:14, 108:22
**decision** [7] - 17:17,
70:15, 71:4, 85:3,
95:9
**declarant** [1] - 17:19

**declined** [1] - 16:24
**decrease** [9] - 10:20,
10:23, 72:10, 72:12,
72:15, 73:7, 74:14,
80:9, 80:11
**deemed** [1] - 14:12
**deeply** [2] - 20:1, 31:6
**defect** [1] - 119:4
**defend** [1] - 26:17
**defendant** [236] - 4:4,
7:14, 8:13, 9:17,
10:4, 10:6, 10:9,
10:13, 10:17, 10:19,
10:22, 13:1, 13:2,
13:20, 14:11, 16:9,
16:10, 16:14, 19:2,
19:10, 19:14, 20:3,
20:10, 21:5, 22:2,
22:4, 22:6, 22:8,
22:19, 23:9, 23:15,
23:16, 23:21, 23:22,
24:1, 24:3, 24:17,
24:19, 25:9, 25:16,
25:20, 25:21, 25:22,
25:25, 26:3, 26:4,
26:21, 26:22, 27:5,
27:12, 27:14, 27:22,
28:24, 29:11, 29:14,
29:15, 29:19, 29:25,
30:13, 30:15, 30:19,
30:23, 31:4, 31:10,
31:13, 31:19, 32:2,
32:24, 33:1, 33:2,
33:4, 33:6, 33:14,
34:8, 34:16, 34:25,
35:23, 35:25, 36:19,
36:25, 37:5, 37:15,
37:17, 37:22, 37:23,
38:4, 38:6, 38:8,
39:2, 39:7, 40:9,
41:9, 41:24, 42:1,
42:4, 42:6, 42:12,
43:4, 43:19, 43:25,
44:10, 44:13, 44:17,
45:5, 45:10, 46:2,
46:10, 46:15, 46:23,
47:6, 47:12, 47:14,
48:14, 48:18, 49:2,
49:14, 49:17, 49:21,
50:1, 50:9, 50:13,
50:19, 50:23, 51:11,
51:12, 52:2, 52:5,
56:4, 56:22, 56:24,
57:11, 57:19, 58:8,
58:9, 58:16, 58:18,
58:21, 59:8, 59:16,
59:25, 60:2, 60:8,
60:9, 60:12, 61:15,
61:22, 62:2, 62:8,
62:12, 62:18, 62:20,

63:8, 63:18, 64:14, 64:22, 64:25, 65:4, 66:23, 67:2, 68:1, 68:13, 68:15, 68:21, 70:24, 72:8, 72:12, 72:13, 73:4, 73:9, 74:12, 74:16, 74:19, 75:1, 75:3, 75:5, 75:8, 78:12, 78:16, 79:2, 79:5, 79:6, 79:25, 80:3, 83:5, 83:14, 83:17, 84:10, 84:23, 85:4, 86:6, 87:21, 87:25, 88:15, 89:6, 90:4, 90:19, 91:24, 93:7, 94:3, 94:5, 94:20, 95:5, 95:16, 95:21, 95:25, 96:5, 96:7, 96:11, 96:14, 96:20, 97:23, 98:1, 98:5, 98:7, 98:14, 99:1, 99:8, 99:9, 99:20, 99:25, 101:9, 101:11, 103:12, 104:11, 107:22, 110:7, 111:22, 112:21, 112:23, 113:8, 114:6, 115:13, 115:25, 116:3, 116:18

**DEFENDANT** [6] - 1:21, 2:2, 6:11, 8:22, 9:2, 110:21

**Defendant** [2] - 1:6, 43:23

**defendant's** [62] - 4:20, 9:7, 11:5, 13:12, 17:2, 17:6, 18:1, 21:6, 21:7, 21:9, 24:11, 25:1, 26:22, 27:1, 27:13, 28:14, 29:7, 29:10, 29:15, 31:16, 31:22, 37:8, 38:25, 39:20, 41:5, 45:8, 45:9, 45:17, 46:6, 46:23, 47:14, 48:25, 49:19, 49:23, 49:24, 50:3, 53:14, 56:8, 57:17, 59:5, 63:10, 64:10, 64:11, 64:16, 66:8, 68:11, 68:17, 69:1, 71:14, 72:18, 81:19, 88:5, 91:3, 91:5, 92:2, 95:8, 97:2, 97:9, 100:2, 112:20, 113:12

**defendants** [5] - 39:24, 92:3, 113:14, 115:21, 116:6

**defense** [21] - 4:23, 5:3, 5:6, 9:21, 15:3, 15:5, 24:7, 28:18, 41:3, 55:8, 55:17, 58:25, 59:13, 59:15, 62:25, 64:23, 70:23, 81:23, 98:22, 107:19, 112:12

**deference** [1] - 17:21

**defined** [2] - 29:1, 49:23

**definitions** [1] - 52:7

**degree** [1] - 92:21

**deliver** [1] - 102:21

**delivered** [1] - 13:1

**delivering** [1] - 47:16

**demeanor** [1] - 69:1

**demonstrate** [4] - 15:13, 41:4, 58:25, 62:6

**demonstrated** [4] - 63:5, 63:7, 65:4, 79:4

**demonstrates** [1] - 72:9

**demonstrating** [2] - 72:12, 115:17

**denial** [1] - 71:16

**denied** [3] - 26:13, 72:16, 96:8

**denies** [2] - 19:3, 60:2

**deny** [2] - 59:25, 61:17

**denying** [1] - 66:23

**depart** [1] - 92:9

**departure** [9] - 92:16, 92:18, 93:11, 93:14, 103:18, 104:2, 116:22, 116:24, 117:1

**departures** [1] - 103:11

**deportation** [3] - 116:21, 118:2, 118:22

**deported** [1] - 118:3

**DEPUTY** [1] - 3:2

**derived** [1] - 81:13

**described** [19] - 19:6, 19:21, 20:11, 20:23, 21:9, 22:8, 22:14, 24:20, 28:9, 29:4, 30:11, 30:12, 30:19, 30:20, 30:23, 31:1, 46:9, 47:19, 83:13

**description** [5] - 21:7, 40:7, 47:10, 47:18, 87:11

**descriptions** [1] - 23:7

**designated** [1] - 120:13

**designation** [1] - 120:5

**despite** [2] - 21:16, 66:11

**destroy** [1] - 26:8

**detail** [8] - 19:18, 21:6, 21:22, 22:14, 24:20, 30:5, 30:14, 30:23

**detailed** [1] - 24:10, 25:18

**details** [5] - 19:15, 20:25, 22:1, 29:12, 40:1

**Detention** [1] - 26:5

**detention** [1] - 116:21

**deter** [2] - 113:7, 115:6

**determination** [6] - 9:16, 11:10, 64:8, 80:19, 91:4, 91:10

**determinations** [2] - 8:1, 17:20

**determine** [4] - 5:17, 5:21, 15:22, 110:11

**determined** [2] - 23:1, 50:24

**determines** [2] - 60:3, 92:20

**determining** [3] - 92:19, 94:19, 112:7

**deterred** [1] - 115:12

**deterrence** [2] - 115:8, 115:13

**Diego** [1] - 1:18

**difference** [8] - 13:22, 63:5, 63:7, 63:25, 65:1, 65:17, 94:4, 101:6

**different** [37] - 5:16, 7:17, 13:8, 15:6, 16:9, 25:22, 38:20, 47:16, 49:24, 49:25, 53:13, 55:2, 62:17, 62:19, 63:19, 64:2, 65:12, 65:15, 66:9, 74:24, 76:16, 79:8, 84:1, 84:15, 85:19, 91:19, 92:6, 93:9, 94:10, 95:15, 96:5, 96:17, 100:9, 100:23, 100:25, 101:7, 101:9

**difficult** [6] - 30:25, 65:19, 85:12, 111:10, 111:13, 116:20

**digested** [1] - 57:9

**diminish** [1] - 53:11

**dining** [1] - 21:10

**direct** [6] - 28:18,

35:25, 93:21, 95:20, 100:12, 116:2

**directed** [2] - 25:14, 45:5, 117:21

**direction** [4] - 41:14, 42:1, 45:10, 96:21

**directly** [9] - 6:5, 7:4, 19:7, 23:5, 35:17, 39:14, 56:13, 99:21, 110:20

**dirty** [1] - 97:15

**disagree** [3] - 36:7, 48:5, 69:22

**disappearing** [1] - 79:15

**disassembled** [1] - 121:18

**disclosed** [1] - 70:23

**discounted** [2] - 28:15, 28:20

**discredit** [2] - 27:23, 32:6

**discrediting** [1] - 32:4

**discretion** [3] - 17:21, 70:15, 104:6

**discretionary** [1] - 117:13

**discuss** [1] - 87:4

**discussed** [3] - 8:10, 26:2, 30:15

**discussion** [4] - 26:1, 39:23, 85:2, 85:23

**disparities** [4] - 100:1, 102:2, 113:14, 115:21

**dispute** [15] - 10:3, 11:19, 12:9, 12:10, 15:2, 15:11, 31:11, 34:10, 38:15, 46:5, 51:1, 51:3, 55:25, 59:21, 84:14

**disputed** [1] - 6:1

**disputes** [6] - 7:20, 9:11, 10:1, 12:2, 15:21, 17:10

**disqualified** [4] - 75:21, 75:25, 77:3, 77:20

**disqualifier** [2] - 77:25, 78:11

**disqualifiers** [1] - 75:19

**disregard** [2] - 83:9, 115:17

**disrespect** [1] - 64:18

**disrupting** [1] - 97:11

**disruption** [2] - 97:3, 97:6

**dissatisfy** [1] - 76:2

**distinction** [1] -

101:21

**distinguish** [2] - 102:3, 102:4

**distribute** [3] - 4:7, 28:2, 31:13

**district** [4] - 15:23, 17:11, 17:17, 17:19

**DISTRICT** [3] - 1:1, 1:1, 1:8

**District** [7] - 3:16, 17:3, 43:13, 43:16, 65:14, 66:13, 118:14

**Division** [1] - 1:17

**DNA** [1] - 117:21

**docketed** [4] - 4:14, 4:19, 4:22, 4:24

**doctor** [1] - 86:22

**document** [1] - 56:15

**documents** [4] - 8:25, 52:11, 57:12

**DOJ** [2] - 1:13, 1:17

**DOJ's** [1] - 18:9

**DOJ-CRM** [1] - 1:13

**DOJ-USAO** [1] - 1:17

**dollar** [1] - 85:15

**dollars** [2] - 20:21, 85:17

**domed** [1] - 21:10

**done** [8] - 61:21, 65:4, 69:25, 71:18, 78:4, 96:6, 109:4, 110:9

**double** [1] - 101:20

**doubling** [1] - 89:17

**doubt** [2] - 61:2, 62:13

**down** [14] - 13:22, 36:16, 37:14, 38:15, 39:13, 44:7, 72:5, 87:15, 87:22, 91:10, 92:13, 94:13, 99:12, 102:3

**downplayed** [1] - 30:1

**downplaying** [1] - 30:6

**downward** [3] - 69:13, 71:22, 110:16

**drafting** [1] - 78:7

**dramatically** [2] - 16:18, 109:22

**draw** [1] - 32:2

**drives** [1] - 85:16

**drop** [1] - 108:22

**dropped** [2] - 57:5, 57:7

**drug** [47] - 13:4, 15:11, 19:6, 19:11, 20:2, 21:14, 22:1, 22:3, 22:8, 24:1, 28:1, 28:14, 30:16, 31:11, 32:23, 38:22, 43:20, 46:10, 47:2, 50:5,

60:6, 60:7, 60:9,
62:9, 63:8, 63:18,
65:7, 65:12, 65:14,
65:15, 65:17, 72:21,
73:5, 83:15, 83:18,
86:6, 91:18, 91:19,
96:10, 96:11, 96:16,
102:9, 103:3,
108:12, 109:24,
113:22, 114:3
**Drug** [1] - 70:14
**Drugs** [1] - 18:9
**drugs** [17] - 10:6,
19:10, 19:13, 23:2,
24:5, 37:13, 38:1,
38:7, 41:11, 85:4,
86:18, 91:23, 97:10,
98:11, 98:18, 98:20,
114:2
**dry** [1] - 54:7
**DTO** [1] - 46:6
**due** [4] - 16:3, 19:7,
21:18, 110:21
**dump** [2] - 58:24, 59:9
**dumped** [1] - 40:18
**dumping** [1] - 59:16
**during** [11] - 7:18,
7:21, 23:12, 24:24,
26:25, 28:14, 40:18,
52:3, 56:15, 71:1,
115:16
**dutifully** [1] - 70:21
**duty** [1] - 102:13

### E

**early** [1] - 22:15
**easy** [1] - 109:17
**eat** [1] - 101:13
**ECF** [1] - 4:24
**ECFs** [2] - 4:14, 4:23
**Edgar** [1] - 20:24
**effect** [1] - 103:4
**effective** [2] - 61:6,
99:9
**effects** [1] - 97:19
**effort** [3] - 26:6, 27:6,
55:16
**egregious** [2] - 99:21
**eight** [1] - 109:7
**either** [7] - 9:4, 53:11,
71:16, 85:7, 86:16,
114:11, 114:12
**El** [9] - 19:11, 23:5,
23:12, 23:23, 24:3,
33:14, 97:24, 100:19
**el** [1] - 12:25
**elbow** [1] - 94:7
**electronic** [1] - 82:17
**electronics** [4] - 55:5,

57:13, 82:18, 83:10
**elements** [3] - 62:5,
62:6, 62:21
**eligibility** [1] - 11:21
**eligible** [2] - 78:13,
79:25
**Elizabeth** [2] - 2:12,
121:21
**ELIZABETH** [1] -
121:15
**Elpidio** [4] - 5:4,
18:15, 22:7, 35:6
**Email** [5] - 1:15, 1:15,
1:19, 1:24, 2:5
**emails** [1] - 48:8
**emphasizes** [1] -
29:25
**employed** [1] - 33:16
**employee** [4] - 41:25,
42:3, 45:9, 49:10
**employer** [1] - 49:9
**encourages** [1] -
108:7
**encouraging** [2] -
60:25, 73:18
**end** [5] - 36:15, 57:1,
74:22, 88:21, 108:22
**Enforcement** [2] -
117:25, 118:21
**enforcement** [13] -
10:10, 38:16, 38:19,
38:24, 39:15, 39:19,
43:5, 43:21, 43:25,
44:2, 44:11, 44:19,
79:24
**engaged** [18] - 21:13,
46:10, 75:10, 76:9,
76:19, 77:8, 78:14,
78:15, 78:16, 83:15,
83:18, 86:7, 98:8,
100:10, 100:13,
102:7, 113:22, 115:9
**engaging** [3] - 77:16,
99:1, 103:13
**English** [2] - 105:8,
105:11
**enhanced** [1] - 96:8
**enhancement** [33] -
15:14, 35:9, 35:10,
35:17, 36:10, 36:19,
37:3, 37:7, 42:11,
43:4, 43:23, 45:20,
46:1, 51:17, 52:1,
52:8, 56:2, 56:21,
56:22, 56:23, 58:7,
58:13, 58:22, 59:18,
64:7, 64:24, 77:4,
77:21, 94:2, 94:17,
98:4, 98:9, 98:13
**enhancements** [6] -

17:8, 63:9, 63:10,
71:19, 79:6, 93:23
**Enrico** [1] - 47:17
**Enriquito** [2] - 49:15,
49:18
**ensure** [1] - 112:14
**entered** [6] - 4:5,
60:12, 60:14, 81:3,
118:9, 119:16
**enterprise** [8] - 51:20,
75:10, 76:10, 76:15,
76:20, 77:9, 77:13,
77:16
**entire** [1] - 106:2
**entirely** [1] - 53:13
**entitled** [2] - 10:22,
21:18
**entry** [2] - 21:2,
119:18
**envelope** [1] - 82:8
**ephedrine** [4] - 13:7,
24:14, 24:19, 33:15
**equipment** [2] - 82:18,
83:10, 84:1
**equivalent** [1] - 110:8
**err** [1] - 17:3
**errand** [1] - 49:23
**errors** [2] - 108:13
**escape** [1] - 28:9
**escaping** [1] - 28:11
**especially** [1] - 106:6
**essentially** [4] - 40:6,
83:16, 83:21, 84:3
**establish** [3] - 38:9,
71:15, 117:16
**established** [6] - 16:3,
37:18, 44:21, 48:23,
90:15, 119:12
**estimate** [5] - 33:2,
33:10, 88:9, 89:9,
91:23
**estimated** [1] - 82:4
**et** [1] - 66:16
**evaluated** [1] - 17:10
**evaluating** [1] - 100:3
**event** [8] - 26:19,
28:12, 28:20, 29:6,
53:11, 71:3, 115:5,
116:2
**events** [3] - 19:18,
24:10, 53:13
**eventual** [2] - 21:3,
85:23
**eventually** [1] - 110:12
**everlasting** [1] - 86:22
**everywhere** [1] -
54:14
**evidence** [52] - 5:1,
7:17, 9:8, 12:23,
13:8, 15:7, 15:14,

15:20, 15:24, 16:5,
16:11, 16:19, 17:4,
17:13, 21:23, 21:24,
31:22, 31:25, 34:14,
35:25, 37:2, 37:5,
37:17, 38:6, 40:13,
41:17, 42:15, 42:16,
42:19, 42:21, 44:22,
48:7, 48:8, 48:11,
48:22, 50:12, 63:24,
64:1, 65:2, 68:23,
73:2, 76:18, 79:21,
81:10, 82:16, 83:13,
83:16, 83:20, 87:13,
90:11, 91:23, 99:24
**evidentiary** [17] - 4:17,
4:21, 5:1, 8:5, 9:8,
26:15, 32:9, 32:18,
40:19, 45:13, 69:2,
73:2, 112:9, 112:10,
114:4, 115:4, 115:16
**exactly** [7] - 14:13,
36:17, 62:23, 67:21,
69:15, 81:24, 98:13
**examination** [3] -
28:7, 28:17, 63:15
**examined** [1] - 87:13
**example** [9] - 27:8,
29:17, 37:12, 41:6,
47:9, 47:11, 64:12,
75:20, 84:4
**examples** [1] - 56:11
**except** [2] - 49:22,
103:8
**exceptional** [1] -
92:17
**excerpts** [1] - 45:17
**excess** [1] - 92:21
**exchange** [1] - 45:19
**excluding** [1] - 91:22
**exclusively** [1] - 40:25
**excuse** [2] - 48:8,
74:10
**excused** [1] - 121:11
**execute** [1] - 118:24
**exercise** [1] - 49:3
**exhibits** [2] - 4:24,
112:9
**expanding** [1] - 29:7
**expectations** [1] -
117:16
**expert** [1] - 54:13
**explain** [3] - 5:14, 6:7,
112:5
**explained** [1] - 30:25
**explaining** [1] - 17:2
**explains** [1] - 25:21
**explicit** [1] - 38:2
**export** [4] - 35:13,
36:22, 37:6, 38:5

**exported** [2] - 36:20,
38:10
**expressly** [1] - 50:21
**extended** [1] - 105:24
**extensive** [8] - 10:15,
18:20, 23:6, 31:7,
48:16, 50:10, 50:16,
112:9
**extent** [1] - 24:7,
45:22, 54:23, 55:15,
66:15, 86:2, 86:7,
97:5, 119:17, 119:24
**extradited** [3] -
108:15, 109:1, 109:6
**extradition** [5] -
108:21, 108:25,
109:3, 109:4, 114:15
**extraordinary** [2] -
17:3, 18:22
**extreme** [2] - 16:17,
26:23

### F

**F.3d** [5] - 15:15, 16:1,
16:22, 17:16, 49:4
**F.4th** [1] - 49:10
**face** [4] - 52:20, 54:3,
57:20, 94:8
**faced** [1] - 21:21
**facial** [2] - 53:19,
53:21
**facilitate** [4] - 40:15,
42:7, 44:11, 118:22
**facilitated** [1] - 113:23
**facility** [2] - 120:8,
120:13
**fact** [17] - 9:6, 13:15,
16:8, 30:3, 38:9,
46:24, 52:15, 67:17,
68:4, 71:14, 87:1,
87:16, 91:16, 94:3,
103:12, 103:14,
116:24
**fact-finding** [2] - 16:8,
87:1
**factor** [4] - 113:17,
113:20, 115:23,
115:24
**factors** [2] - 5:24,
112:13
**facts** [12] - 7:15, 8:5,
9:7, 13:12, 13:17,
16:4, 32:15, 62:5,
76:18, 114:1, 114:3
**factual** [10] - 5:18,
7:25, 8:1, 8:14, 9:5,
15:21, 17:10, 48:7,
63:11, 63:19
**fail** [1] - 74:20

**failed** [2] - 28:7, 76:6
**fails** [1] - 16:13
**fair** [4] - 15:13, 55:19, 71:18, 77:6
**fairing** [1] - 27:16
**fairly** [1] - 66:14
**falling** [1] - 54:21
**falls** [1] - 85:20
**false** [15] - 28:4, 28:5, 54:23, 55:9, 56:14, 57:12, 64:2, 65:3, 68:3, 68:16, 71:16, 95:10, 96:8, 101:14, 111:5
**falsely** [5] - 53:10, 59:25, 60:2, 72:16, 111:22
**familiar** [1] - 25:25
**families** [1] - 18:24
**family** [30] - 6:16, 6:18, 7:9, 7:11, 21:3, 22:4, 29:9, 29:10, 30:13, 57:23, 105:24, 106:2, 106:9, 106:17, 106:18, 107:24, 107:25, 108:3, 108:4, 108:7, 110:5, 111:13, 111:15, 112:20, 112:22, 112:24, 114:17
**family's** [1] - 20:12
**far** [5] - 32:14, 99:5, 102:17, 108:14, 112:23
**farm** [1] - 110:5
**fast** [1] - 41:8
**fat** [1] - 82:24
**fate** [1] - 24:21
**father** [9] - 19:6, 19:9, 19:19, 21:4, 29:4, 32:24, 106:6, 107:15, 114:21
**fault** [1] - 109:14
**FCRR** [3] - 2:12, 121:15, 121:21
**fear** [1] - 57:22
**federal** [1] - 117:19
**feeds** [1] - 85:2
**feigness** [1] - 54:14
**FEITEL** [37] - 2:3, 35:4, 36:2, 36:15, 42:24, 43:18, 51:16, 51:22, 52:16, 52:23, 53:9, 54:6, 54:17, 54:22, 55:2, 55:21, 55:23, 69:10, 70:6, 70:8, 70:11, 71:24, 72:6, 73:23, 74:5, 75:15, 76:6, 76:13,

76:21, 77:18, 77:20, 77:24, 86:2, 102:20, 103:19, 104:5, 111:23
**feitel** [1] - 55:22
**Feitel** [19] - 3:20, 12:22, 14:21, 14:22, 35:3, 36:17, 48:2, 54:16, 57:20, 60:21, 69:9, 71:9, 75:13, 78:10, 86:1, 87:13, 87:22, 103:18, 103:25
**Feitel's** [1] - 78:25
**felt** [1] - 54:9
**few** [2] - 105:21, 111:14
**field** [5] - 21:10, 28:10, 59:3, 98:18, 98:19
**fifth** [2] - 51:3, 55:25
**fight** [3] - 20:11, 84:19, 110:24
**fighting** [1] - 61:4, 84:25, 108:20
**figure** [1] - 84:21
**file** [1] - 119:22
**filed** [1] - 119:18
**filing** [1] - 119:19
**filled** [1] - 30:18
**final** [5] - 84:15, 89:1, 89:11, 89:17, 89:18
**finalized** [1] - 81:5
**finalizing** [1] - 84:10
**finally** [1] - 71:12
**financial** [2] - 118:13, 118:17
**findings** [4] - 9:6, 81:2, 81:11, 102:16
**fine** [4] - 63:17, 80:15, 103:20, 118:7
**finger** [3] - 57:1, 57:17, 94:15
**finished** [1] - 119:8
**firmly** [1] - 34:6
**first** [22] - 3:9, 5:16, 7:21, 15:4, 15:8, 31:11, 43:7, 52:4, 52:18, 54:17, 54:19, 62:2, 70:13, 74:25, 81:7, 102:24, 104:11, 109:7, 110:23, 111:19, 113:18, 114:14
**five** [16] - 10:14, 10:16, 25:22, 34:2, 46:14, 46:18, 46:22, 47:4, 47:5, 48:15, 48:25, 49:14, 50:8, 50:15, 69:18, 80:7
**fleeing** [1] - 28:10

**flood** [1] - 68:16
**floor** [1] - 33:24
**flooring** [3] - 24:4, 24:12, 24:15
**FLORES** [4] - 1:5, 105:19, 106:15, 106:22
**Flores** [43] - 3:4, 3:19, 4:4, 5:12, 7:12, 8:18, 12:14, 14:24, 34:25, 36:5, 37:18, 38:24, 39:14, 45:14, 48:9, 48:23, 52:19, 53:1, 53:15, 53:17, 53:23, 54:18, 55:18, 57:13, 69:15, 71:21, 86:10, 100:9, 100:14, 100:16, 100:5, 105:6, 105:7, 105:20, 107:7, 107:14, 108:10, 109:23, 110:17, 110:19, 117:6, 120:12
**Flores's** [10] - 6:16, 13:4, 39:11, 47:22, 55:3, 71:10, 73:19, 100:15, 105:4, 107:5
**FLORES-HERNANDEZ** [1] - 1:5
**Flores-Hernandez** [8] - 3:4, 3:19, 4:4, 5:12, 8:18, 52:19, 117:6, 120:12
**Flores-Hernandez's** [1] - 105:20
**flurry** [1] - 67:14
**fly** [2] - 34:19, 35:24
**focus** [2] - 68:10, 93:15
**focused** [1] - 88:22
**follow** [2] - 77:1, 117:25
**following** [4] - 51:11, 74:13, 117:13, 117:23
**follows** [1] - 80:4
**food** [1] - 47:1
**FOR** [4] - 1:1, 1:11, 1:21, 2:2
**foregoing** [1] - 121:15
**foreign** [1] - 116:19
**forfeiture** [21] - 15:16, 39:22, 80:25, 81:1, 81:4, 81:10, 81:12, 81:15, 82:20, 84:10, 84:11, 84:15, 84:16, 86:20, 89:1, 89:2, 89:11, 89:14, 89:18,

118:8, 118:12
**forgot** [1] - 6:15
**forgotten** [2] - 43:11, 43:12
**form** [1] - 57:12
**former** [2] - 22:9, 43:19
**forms** [1] - 92:18
**formula** [1] - 70:17
**forth** [2] - 21:24, 52:14
**forward** [8] - 3:7, 24:13, 41:8, 68:20, 105:6, 106:19, 110:20, 112:5
**fought** [1] - 69:21
**four** [14] - 5:2, 5:16, 10:12, 10:15, 26:9, 34:2, 46:5, 46:15, 48:16, 50:8, 50:17, 75:22, 80:6, 108:24
**four-point** [1] - 10:15
**framed** [1] - 76:1
**frank** [1] - 61:13
**fraud** [2] - 21:15, 59:8
**fraudulent** [1] - 54:23
**friend** [2] - 58:15, 59:5
**friends** [2] - 96:12, 107:16
**frivolous** [3] - 62:24, 63:6, 71:16
**frivolously** [1] - 60:2, 62:21, 72:17
**Front** [1] - 1:18
**fronted** [1] - 66:20
**frowned** [1] - 58:9
**fuel** [2] - 30:18, 34:3
**full** [8] - 57:12, 68:1, 72:24, 95:16, 95:17, 112:11, 118:18, 121:16
**fuller** [1] - 78:21
**fully** [3] - 8:20, 22:23, 30:5
**fulsome** [1] - 14:18
**function** [4] - 97:4, 97:6, 97:23, 98:3
**functional** [1] - 110:8
**functions** [1] - 97:11
**fundamental** [1] - 119:4
**furthermore** [1] - 34:22
**future** [2] - 18:8, 113:8

---

## G

**gain** [1] - 65:24
**game** [1] - 66:1
**games** [1] - 34:20
**garner** [1] - 62:16

**gathers** [1] - 108:5
**gender** [1] - 53:20
**general** [10] - 18:1, 24:9, 29:12, 29:21, 41:2, 47:24, 58:8, 82:14, 97:21, 115:8
**generalities** [2] - 19:15, 29:13
**generally** [4] - 15:9, 16:11, 23:15, 27:15, 31:5, 85:11, 92:8, 109:24, 115:22
**gesture** [8] - 52:5, 54:2, 57:22, 57:24, 57:25, 58:2, 94:9, 94:10
**gestures** [1] - 54:11
**gesturing** [1] - 52:19
**gig** [1] - 98:10
**given** [20] - 17:21, 17:22, 40:21, 42:11, 42:18, 50:13, 66:14, 68:25, 69:4, 73:8, 73:14, 74:18, 75:5, 89:7, 90:25, 95:17, 109:4, 110:2, 116:3, 116:24
**glue** [1] - 107:25
**God** [1] - 106:4
**goods** [1] - 115:4
**government** [110] - 3:9, 5:3, 5:7, 5:17, 6:4, 7:16, 7:23, 7:24, 10:25, 12:11, 13:19, 14:21, 15:13, 18:5, 18:6, 18:12, 21:22, 21:25, 27:14, 30:1, 30:4, 30:6, 30:7, 30:8, 31:18, 32:6, 32:21, 34:12, 37:4, 37:16, 37:20, 38:13, 38:17, 43:7, 44:15, 44:17, 44:20, 44:25, 45:1, 45:2, 45:7, 45:13, 45:16, 45:18, 46:7, 48:22, 49:13, 50:11, 51:5, 52:18, 55:8, 55:9, 55:14, 56:19, 56:23, 57:3, 60:24, 61:16, 62:13, 63:12, 64:1, 65:1, 66:19, 67:6, 67:21, 69:14, 69:16, 69:19, 69:23, 70:9, 70:19, 72:1, 72:15, 72:18, 72:23, 73:4, 73:16, 74:9, 77:11, 78:20, 78:22, 79:20, 80:20, 84:18, 84:23, 86:3, 86:4, 86:7, 86:13,

90:6, 90:7, 97:19,
97:21, 97:22, 98:2,
98:25, 101:14,
102:23, 102:25,
103:21, 110:24,
111:19, 114:4,
114:10, 115:11,
115:25, 119:20,
119:25, 120:20,
121:7
**government's** [21] -
4:15, 15:10, 17:6,
17:23, 26:12, 26:14,
26:15, 32:5, 36:3,
37:2, 43:1, 44:4,
45:20, 46:2, 63:14,
68:6, 72:22, 73:24,
80:12, 89:16, 89:19
**governmental** [4] -
97:3, 97:6, 97:11,
103:4
**governor** [1] - 47:19
**gram** [1] - 29:5
**grandchildren** [2] -
108:8, 111:16
**grandfather** [2] -
105:23, 114:21
**grandson** [2] - 105:4,
105:20
**grant** [4] - 73:9, 73:24,
80:11, 116:23
**granted** [1] - 69:7
**great** [3] - 18:23,
19:17, 111:9
**greater** [3] - 13:9,
60:9, 112:15
**grew** [1] - 31:1
**gross** [1] - 19:16
**ground** [1] - 65:23
**group** [2] - 39:5,
104:14
**growing** [1] - 29:7
**Guadalajara** [2] -
23:20, 30:20
**guards** [1] - 109:19
**Guatemala** [1] - 22:17
**guess** [6] - 23:18,
30:19, 34:2, 58:15,
58:25, 115:15
**guideline** [47] - 7:25,
8:13, 10:5, 10:8,
10:16, 10:18, 10:21,
10:24, 11:10, 13:16,
15:19, 31:12, 31:17,
31:21, 34:7, 36:18,
44:9, 48:13, 50:18,
56:2, 56:17, 59:19,
59:24, 71:14, 72:7,
80:18, 90:17, 91:7,
91:8, 91:17, 92:15,

92:19, 93:17, 93:23,
94:2, 94:17, 94:20,
95:2, 96:19, 96:22,
96:23, 97:5, 99:4,
99:14, 101:20,
116:13, 119:12
**guidelines** [47] - 5:22,
5:25, 7:19, 7:20,
9:11, 9:15, 9:24,
10:1, 13:14, 15:15,
17:11, 42:21, 48:21,
50:25, 69:3, 69:11,
73:7, 73:13, 79:3,
80:3, 90:5, 90:16,
91:11, 91:16, 92:7,
92:8, 92:9, 92:12,
93:15, 93:19, 93:21,
95:4, 96:3, 96:24,
96:25, 100:3,
102:16, 102:25,
103:22, 112:7,
113:10, 115:23,
116:6, 116:8, 117:5,
119:11
**guilty** [25] - 4:5, 60:12,
60:14, 61:15, 61:23,
62:3, 62:4, 65:19,
65:21, 66:24, 68:11,
68:14, 68:20, 83:5,
95:9, 95:13, 108:11,
110:22, 111:1,
113:15, 114:25,
115:22, 119:3, 119:5
**guy** [5] - 47:12, 61:19,
85:23, 102:6, 114:19

## H

**hair** [2] - 53:19, 53:21
**half** [8] - 12:25, 20:2,
32:25, 87:20, 87:23,
87:24, 89:5, 111:9
**hall** [1] - 29:16
**hand** [4] - 94:8, 94:12,
94:13
**handing** [3] - 39:15,
39:19, 41:12
**handle** [1] - 105:16
**hands** [2] - 41:11,
41:15
**happy** [1] - 106:2
**hard** [5] - 61:4, 61:20,
85:5, 85:8, 106:16
**head** [5] - 53:3, 58:9,
64:23, 97:18, 106:18
**health** [2] - 99:10,
109:19
**hear** [18] - 6:3, 6:4,
6:5, 7:4, 7:18, 11:24,
12:11, 34:12, 38:17,

46:7, 51:5, 72:3,
74:9, 86:1, 90:1,
105:2, 111:19
**heard** [16] - 5:1, 6:5,
12:13, 12:16, 12:22,
13:3, 27:3, 38:21,
38:23, 39:1, 39:10,
51:23, 54:13, 112:8,
112:20, 112:21
**hearing** [41] - 4:17,
4:21, 4:24, 5:2, 5:15,
6:9, 7:18, 7:21, 8:6,
9:4, 9:9, 16:8, 18:3,
18:13, 22:12, 26:8,
26:15, 27:7, 27:10,
32:4, 32:9, 32:18,
40:19, 45:13, 61:2,
64:20, 66:19, 68:17,
69:2, 73:2, 90:1,
94:6, 95:21, 104:3,
111:3, 112:9,
112:10, 114:4,
115:4, 115:16
**hearings** [3] - 12:13,
70:16, 70:19
**hearsay** [4] - 17:17,
70:18, 71:7, 71:9
**heart** [3] - 105:22,
105:24, 107:8
**heartland** [4] - 90:17,
90:20, 91:15, 91:17
**Hector** [1] - 19:12
**height** [1] - 108:16
**held** [5] - 4:18, 91:21,
108:17, 108:25,
114:15
**help** [8] - 24:3, 29:7,
30:21, 36:6, 45:25,
58:25, 103:9, 106:16
**helped** [5] - 19:7,
19:19, 19:22, 20:6,
114:11
**helpful** [2] - 18:8,
92:25
**hereby** [2] - 117:7,
121:15
**heretofore** [1] - 103:1
**HERNANDEZ** [1] - 1:5
**Hernandez** [8] - 3:4,
3:19, 4:4, 5:12, 8:18,
52:19, 117:6, 120:12
**Hernandez's** [1] -
105:20
**hidden** [2] - 30:17,
33:24
**hiding** [1] - 33:23
**hierarchical** [1] - 49:8
**hierarchically** [1] -
49:9
**high** [3] - 41:14, 50:5,

111:11
**high-level** [1] - 50:5
**high-security** [1] -
111:11
**higher** [1] - 16:12
**highest** [1] - 102:9
**highlights** [1] - 12:19
**highly** [2] - 25:17,
55:1
**himself** [6] - 19:8,
20:2, 20:6, 40:11,
43:24, 110:4
**hired** [1] - 45:14
**Hispanic** [1] - 109:11
**history** [10] - 5:23,
9:13, 9:17, 27:24,
28:6, 42:18, 75:20,
102:24, 113:12,
114:13
**History** [2] - 9:18,
80:14
**Hoffman** [2] - 55:6,
55:12
**hold** [1] - 66:22
**home** [9] - 21:6, 21:7,
21:9, 85:16, 106:20,
107:9, 108:14,
110:4, 112:21
**Honduras** [3] - 22:17,
37:14, 43:20
**honest** [1] - 106:3
**honestly** [3] - 106:4,
106:10, 107:20
**Honor** [102] - 3:2, 3:4,
3:10, 3:18, 3:24, 5:8,
5:11, 6:13, 7:6, 8:3,
8:7, 8:11, 8:16, 9:20,
9:22, 11:4, 11:18,
11:21, 12:6, 12:12,
12:13, 13:11, 14:6,
14:13, 14:16, 14:20,
34:13, 35:4, 35:6,
36:2, 36:8, 38:18,
39:25, 42:24, 42:25,
43:6, 46:8, 46:9,
48:1, 48:3, 52:16,
52:20, 53:14, 53:25,
54:17, 55:19, 55:24,
59:23, 70:21, 71:6,
71:8, 71:12, 71:21,
75:15, 75:23, 76:13,
76:22, 76:25, 79:13,
80:21, 80:23, 81:17,
81:22, 82:22, 83:19,
84:12, 84:17, 86:2,
87:1, 90:8, 99:18,
102:20, 103:1,
104:13, 104:19,
104:21, 104:25,
105:14, 105:15,

105:17, 106:22,
107:13, 107:14,
108:10, 110:14,
110:21, 111:2,
111:7, 111:17,
116:13, 116:12,
116:15, 120:1,
120:3, 120:10,
120:14, 120:19,
121:5, 121:8, 121:10
**Honor's** [3] - 36:16,
43:2, 83:20
**HONORABLE** [1] - 1:8
**hope** [3] - 61:10,
106:11, 106:12
**Hornok** [1] - 3:11
**HORNOK** [81] - 1:12,
3:10, 5:8, 8:3, 8:7,
9:20, 11:3, 11:8,
11:11, 12:5, 12:12,
13:23, 34:13, 38:18,
40:24, 42:8, 46:8,
47:8, 51:6, 51:10,
51:25, 57:7, 59:23,
60:13, 60:23, 61:8,
61:12, 61:22, 62:2,
62:15, 63:2, 63:4,
63:7, 65:11, 66:25,
67:8, 67:12, 67:16,
67:24, 68:9, 69:8,
73:12, 74:12, 75:12,
78:22, 80:21, 81:6,
81:17, 81:22, 82:1,
82:7, 82:22, 82:25,
83:12, 84:8, 84:21,
85:10, 87:9, 87:22,
88:13, 88:17, 89:12,
89:19, 89:24, 90:8,
90:14, 91:2, 93:13,
95:24, 99:18, 99:23,
100:5, 100:8,
101:23, 111:20,
112:2, 116:12,
116:15, 120:1,
120:22, 121:8
**horrible** [1] - 108:15
**hours** [2] - 93:23,
118:6
**house** [5] - 59:3,
98:20, 98:25, 111:8,
111:14
**HOWELL** [1] - 1:8
**huge** [3] - 31:7, 63:1,
115:9
**human** [2] - 20:7,
20:17
**hundreds** [1] - 50:5
**husband** [1] - 107:15
**hustle** [1] - 98:10

## I

**ICE** [1] - 116:21
**ID** [1] - 15:17
**idea** [5] - 40:10, 48:9, 64:25, 84:3, 85:11
**identifiable** [1] - 113:19
**identification** [1] - 28:4
**identified** [12] - 13:13, 27:19, 41:1, 42:8, 46:21, 47:23, 48:10, 49:17, 59:10, 61:8, 83:19
**identify** [6] - 3:8, 27:7, 39:24, 39:25, 40:2, 50:7
**identifying** [1] - 64:21
**identity** [1] - 70:23
**ignores** [1] - 18:6
**illegal** [9] - 21:2, 27:25, 50:10, 55:4, 59:1, 59:4, 82:16, 110:3, 115:4
**illegality** [1] - 28:11
**imagine** [1] - 85:7
**imagined** [1] - 53:2
**immediately** [3] - 33:18, 117:24, 118:13
**immigration** [2] - 110:10, 110:12
**Immigration** [2] - 117:25, 118:21
**impede** [1] - 56:5
**impeded** [1] - 56:4
**imperfect** [2] - 94:1, 95:6
**implicated** [1] - 30:13
**implicit** [1] - 49:7
**import** [9] - 10:6, 26:25, 33:14, 35:13, 36:7, 36:22, 37:6, 38:4, 38:14
**importance** [1] - 97:6
**important** [2] - 61:9, 97:11
**importation** [7] - 4:8, 28:3, 31:14, 34:22, 35:18, 40:16, 113:24
**imported** [2] - 36:20, 38:10
**importing** [1] - 113:3
**impose** [5] - 6:8, 112:6, 112:14
**imposed** [9] - 99:16, 100:4, 113:1, 115:6, 117:16, 119:9, 119:10, 119:17,

119:24
**imposition** [1] - 118:7
**impossible** [1] - 110:11
**imprecise** [1] - 30:9
**impression** [1] - 34:23
**imprisonment** [3] - 80:15, 90:6, 116:8
**incarceration** [3] - 90:4, 90:5, 116:10
**incident** [2] - 30:24, 33:13
**include** [4] - 18:13, 47:3, 112:25, 117:18
**included** [8] - 5:2, 46:14, 47:5, 47:12, 47:15, 83:5, 88:11, 88:14
**includes** [1] - 56:11
**including** [15] - 5:3, 18:22, 19:11, 19:18, 20:17, 21:5, 24:10, 24:18, 27:25, 29:16, 37:3, 44:18, 48:25, 103:3, 119:8
**income** [1] - 59:2
**incomplete** [2] - 54:25, 55:10
**inconsistent** [1] - 60:4
**incorporated** [1] - 7:15
**incorrect** [1] - 119:10
**increase** [18] - 10:7, 10:11, 10:15, 10:18, 15:23, 16:18, 38:12, 40:23, 44:12, 45:11, 46:3, 48:16, 56:10, 79:22, 79:23, 79:24, 80:1, 97:4
**increased** [1] - 80:6
**incredible** [2] - 21:17, 31:8
**incredibly** [3] - 65:12, 99:14, 100:21
**incriminating** [1] - 31:6
**indeed** [1] - 109:14
**independent** [1] - 23:23
**independently** [3] - 23:21, 46:13, 48:23
**indicia** [1] - 17:14
**indictment** [2] - 4:6, 83:3
**indirectly** [1] - 56:13
**individual** [8] - 18:19, 19:5, 39:1, 47:23, 93:3, 98:14, 106:23, 109:1
**individuals** [15] - 27:3,

39:5, 47:24, 49:13, 64:25, 66:5, 66:6, 66:7, 93:5, 100:13, 100:14, 100:15, 100:16, 101:7, 104:16
**induced** [1] - 42:14
**ineffective** [1] - 119:14
**ineligible** [4] - 50:19, 74:21, 75:14, 78:17
**inference** [1] - 42:18
**influence** [1] - 24:24
**influencing** [1] - 56:13
**information** [17] - 17:12, 17:14, 25:5, 26:6, 26:7, 26:21, 26:24, 27:6, 27:8, 27:14, 27:17, 31:9, 47:20, 47:21, 68:16, 92:25, 94:18
**informed** [1] - 7:8
**initial** [2] - 35:13, 88:2
**inmate** [1] - 109:14
**inmates** [2] - 109:11, 109:13
**inside** [1] - 19:22
**insignificant** [1] - 97:25
**instance** [2] - 43:7, 46:18
**instances** [3] - 38:20, 39:14, 79:3
**instant** [1] - 56:7
**instead** [1] - 101:10
**instructions** [1] - 118:1
**instructive** [1] - 92:11
**insufficient** [6] - 27:23, 37:9, 38:9, 54:25, 58:22, 59:17
**insufficiently** [1] - 93:19
**intend** [2] - 7:18, 11:15
**intended** [2] - 53:24, 77:25
**intent** [2] - 26:7, 53:13
**interactions** [1] - 22:2
**interest** [1] - 68:18
**interested** [3] - 26:20, 27:12, 27:15
**interesting** [1] - 78:19
**intermediaries** [1] - 44:18
**international** [5] - 21:17, 63:1, 103:13, 113:22, 116:3
**interpretation** [2] - 77:2, 78:9

**interpreted** [2] - 31:2, 58:16
**INTERPRETER** [1] - 105:17
**Interpreter** [2] - 2:10, 2:10
**Interpreters** [1] - 3:5
**interpreters** [2] - 41:20, 105:16
**interpretive** [1] - 75:18
**interrupt** [1] - 51:16, 99:15
**intimidate** [1] - 53:16, 56:25
**intimidating** [1] - 56:12
**invested** [2] - 32:9, 96:13
**investigation** [13] - 4:12, 5:19, 7:16, 8:10, 8:25, 14:3, 36:25, 48:17, 56:6, 56:16, 56:21, 118:20, 118:23
**investigative** [1] - 61:7
**investors** [1] - 23:1
**invoke** [1] - 104:2
**involuntary** [1] - 119:3
**involved** [24] - 10:14, 19:12, 20:1, 21:16, 22:4, 22:25, 29:2, 38:24, 41:4, 46:23, 48:15, 50:15, 55:4, 72:24, 76:14, 77:12, 81:14, 82:17, 92:22, 99:20, 106:12, 106:13
**involvement** [3] - 22:1, 24:11, 50:3
**irrelevant** [2] - 45:19, 77:14
**isolate** [1] - 110:4
**issue** [21] - 11:21, 11:25, 16:23, 35:5, 36:11, 51:7, 52:18, 53:20, 55:3, 58:23, 61:9, 61:10, 61:12, 61:14, 62:23, 72:18, 74:2, 74:4, 82:23, 92:4
**issues** [7] - 11:24, 40:25, 48:2, 66:16, 74:3, 109:19, 109:22
**items** [1] - 59:10

## J

**Jack** [6] - 5:5, 18:16, 21:8, 28:23, 83:13,

114:5
**Jail** [2] - 108:14, 109:7
**jail** [9] - 21:18, 26:3, 26:20, 27:9, 108:4, 108:18, 109:8, 109:20, 109:21
**jails** [1] - 108:13
**Jalisco** [1] - 47:20
**JAMES** [1] - 2:9
**James** [1] - 3:13
**January** [4] - 1:5, 25:23, 26:1, 37:21
**Jesus** [3] - 105:3, 105:5, 105:7
**jet** [1] - 104:5
**Johnson** [1] - 49:10
**joined** [1] - 74:24
**JONATHAN** [1] - 1:12
**Jonathan** [1] - 3:11
**jonathan.hornok@ usdoj.gov** [1] - 1:15
**Jorge** [3] - 5:6, 21:8, 59:5
**Juan** [2] - 23:13
**Juarez** [1] - 20:20
**judge** [5] - 43:18, 58:2, 63:21, 95:12, 115:8
**JUDGE** [1] - 1:8
**Judge** [2] - 35:15, 75:23
**Judgement** [1] - 120:15
**judgment** [7] - 17:18, 81:13, 81:15, 84:10, 117:6, 118:10, 119:19
**Judgment** [1] - 118:20
**judicial** [2] - 56:16, 61:7
**July** [1] - 120:16
**jump** [4] - 15:16, 16:2, 49:4, 49:11
**June** [1] - 23:14
**jurisdiction** [1] - 35:15
**jurors** [1] - 66:14
**jury** [1] - 60:18
**justice** [8] - 10:17, 51:4, 52:2, 52:19, 55:17, 56:2, 56:5, 64:5
**justifiable** [1] - 61:18
**justification** [1] - 58:6

## K

**KARIMA** [1] - 2:10
**Karima** [1] - 3:5
**keep** [2] - 41:15, 101:13

**keeps** [2] - 64:14, 107:25
**kept** [2] - 23:1, 109:11
**Kevin** [1] - 5:5
**kidnapped** [1] - 25:4
**kidnapping** [2] - 20:16, 20:23
**kilogram** [5] - 29:2, 34:6, 87:12, 88:19, 88:21
**kilograms** [60] - 4:7, 12:14, 12:16, 12:21, 13:10, 13:14, 13:15, 14:10, 19:20, 20:3, 20:4, 24:18, 25:2, 25:8, 29:5, 31:13, 31:17, 31:20, 31:24, 32:3, 32:10, 32:12, 32:13, 32:16, 32:17, 32:18, 32:20, 32:25, 33:3, 33:4, 33:6, 33:8, 33:15, 33:20, 33:21, 33:24, 34:9, 37:13, 50:5, 63:20, 63:25, 72:19, 81:14, 85:6, 85:13, 87:11, 89:9, 89:10, 89:12, 91:19, 91:24, 91:25, 92:6, 93:6, 95:12, 95:14, 96:16
**kilos** [6] - 12:23, 13:7, 69:18, 87:23, 89:4
**kind** [48] - 34:23, 38:21, 40:1, 40:9, 41:2, 41:15, 46:24, 47:10, 47:23, 52:11, 53:22, 58:11, 59:11, 60:17, 61:23, 61:24, 62:16, 63:24, 64:21, 79:7, 82:8, 82:11, 84:2, 85:5, 85:8, 85:10, 85:12, 85:14, 85:20, 86:5, 87:3, 88:8, 92:23, 93:2, 93:3, 94:1, 96:10, 96:11, 96:13, 96:17, 98:10, 98:14, 99:6, 100:10, 100:13, 100:23, 101:10, 101:12
**kinds** [1] - 83:25
**knife** [1] - 53:2
**knowing** [3] - 19:1, 19:3, 60:21
**knowledge** [5] - 25:1, 41:13, 42:6, 44:3, 97:21
**known** [3] - 20:24, 66:5, 66:21
**knows** [2] - 42:4, 78:5

**Kotelly** [1] - 35:15
**Kyle** [2] - 3:13
**KYLE** [2] - 1:16, 2:8
**kyle.martin@usdoj.gov** [1] - 1:19

**L**

**lack** [4] - 29:17, 109:15, 110:15, 115:17
**lacks** [1] - 109:16
**lady** [1] - 110:23
**language** [10] - 34:21, 38:3, 42:11, 42:13, 54:14, 66:15, 78:25, 79:5, 79:7, 109:16
**Language** [2] - 2:10, 2:10
**Laredo** [1] - 84:4
**large** [4] - 59:2, 69:6, 70:24, 113:22
**largely** [1] - 18:19
**larger** [2] - 65:16, 88:19
**Las** [1] - 7:8
**last** [7] - 6:7, 47:18, 58:23, 93:22, 99:6, 108:3, 111:14
**late** [2] - 58:24, 83:14
**latenight** [1] - 43:15
**laugh** [2] - 106:8, 111:4
**laughing** [1] - 64:14
**launder** [2] - 29:21, 39:20
**laundered** [2] - 88:14, 89:20
**launderer** [3] - 39:18, 44:18, 45:14
**launderers** [1] - 39:11
**laundering** [12] - 20:14, 20:15, 20:17, 21:15, 45:25, 83:21, 83:23, 84:2, 86:9, 86:10, 115:1
**law** [18] - 10:10, 15:17, 35:15, 38:16, 38:19, 38:24, 39:15, 39:19, 43:5, 43:21, 43:24, 44:1, 44:11, 44:19, 79:23, 113:6, 115:18, 119:9
**lawyer** [2] - 27:20, 32:11
**laying** [1] - 64:21
**leader** [13] - 10:13, 13:6, 22:9, 22:24, 23:10, 24:25, 46:6, 46:24, 47:7, 48:14,

50:23, 80:7, 97:13
**leaders** [1] - 114:9
**leadership** [3] - 48:18, 51:19, 77:21
**leap** [1] - 83:8
**least** [12] - 12:14, 22:9, 23:20, 33:3, 46:15, 46:22, 60:8, 87:4, 89:17, 95:7, 96:16, 114:9
**leave** [3] - 43:12, 70:12, 84:7
**lectern** [1] - 3:8
**led** [1] - 25:12
**ledger** [2] - 82:10, 82:11
**ledgers** [5] - 86:4, 86:11, 86:20, 87:5, 87:10
**left** [3] - 20:12, 94:13, 111:15
**legal** [7] - 15:4, 15:7, 15:12, 15:18, 35:5, 35:8, 63:15
**legally** [2] - 63:16, 118:4
**legitimate** [2] - 24:6, 115:2
**lend** [1] - 22:5
**length** [3] - 89:8, 100:24, 101:1
**lengthy** [4] - 6:2, 50:4, 66:14, 116:9
**less** [4] - 30:2, 32:14, 96:11, 102:5
**letter** [1] - 104:15
**letters** [13] - 6:20, 6:21, 6:22, 6:25, 7:2, 7:3, 7:5, 104:17, 107:20, 107:21, 107:23
**Level** [2] - 13:14, 14:1
**level** [56] - 9:24, 10:5, 10:7, 10:11, 10:18, 10:21, 10:22, 10:23, 13:20, 13:21, 13:22, 15:2, 28:22, 31:15, 31:21, 33:11, 34:7, 35:11, 36:19, 37:1, 37:3, 38:12, 40:23, 44:14, 45:11, 46:1, 46:3, 46:25, 50:5, 56:10, 58:7, 67:3, 67:9, 69:12, 71:22, 72:10, 72:11, 72:15, 73:7, 73:10, 74:15, 75:7, 79:22, 79:23, 79:24, 80:1, 80:5, 80:9, 80:11, 80:13, 93:1, 98:4, 98:13,

102:2, 102:4
**levels** [14] - 14:5, 44:12, 48:16, 50:17, 56:10, 59:19, 66:17, 67:5, 67:7, 70:4, 72:10, 73:25, 80:7, 102:9
**Lewisburg** [1] - 109:9
**Leyva** [3] - 15:15, 17:15, 97:25
**Licenciado** [17] - 39:2, 41:17, 41:18, 41:21, 41:22, 41:23, 42:5, 44:18, 44:24, 44:25, 45:3, 45:4, 45:6, 45:8, 45:9, 47:11, 47:16, 49:15, 49:18
**Licensiado's** [1] - 45:5
**life** [8] - 61:19, 90:6, 91:14, 99:9, 99:16, 101:17, 106:9, 110:8
**light** [2] - 17:4, 118:8
**likeable** [2] - 114:19, 114:20
**likewise** [4] - 52:13, 73:16, 92:2, 98:4
**limitation** [1] - 62:10
**limited** [2] - 61:6, 62:9
**line** [2] - 32:2, 46:22
**lips** [1] - 53:24
**list** [1] - 11:3
**listed** [1] - 47:18
**listens** [1] - 106:8
**lists** [1] - 40:8
**litany** [1] - 13:8
**litigation** [1] - 26:12
**livelihood** [2] - 99:8, 98:12, 99:1
**living** [2] - 98:11, 98:12
**load** [9] - 12:25, 13:4, 13:6, 25:17, 32:25, 87:23, 88:12, 89:6
**loads** [12] - 12:24, 13:5, 25:3, 32:10, 39:13, 63:24, 87:11, 87:16, 87:17, 87:20, 89:4, 96:13
**Lobo** [7] - 23:6, 23:12, 24:3, 33:14, 43:14, 43:19, 43:25
**local** [1] - 117:19
**location** [1] - 25:12
**look** [13] - 7:3, 24:6, 41:8, 58:5, 61:24, 68:19, 85:11, 85:14, 92:25, 94:2, 99:12, 103:23, 106:19
**looked** [5] - 4:11,

4:25, 82:9, 94:6, 103:24
**looking** [2] - 27:17, 43:10, 64:18, 74:14, 88:4
**lookout** [1] - 25:10
**Lopez** [1] - 28:25
**lords** [1] - 19:11
**lose** [1] - 68:13
**lost** [1] - 74:2
**Loth** [2] - 2:12, 121:21
**LOTH** [1] - 121:15
**love** [2] - 7:11, 106:10
**loved** [1] - 111:16
**loving** [1] - 105:23
**low** [1] - 88:21
**low-end** [1] - 88:21
**lower** [1] - 96:4
**luck** [1] - 96:14
**lying** [1] - 19:1

**M**

**ma'am** [2] - 43:18, 71:24
**machine** [1] - 2:14
**magnitude** [2] - 60:9, 65:16
**main** [1] - 102:21
**maintain** [1] - 32:7
**maintained** [1] - 23:2
**maintaining** [1] - 91:13
**majority** [1] - 109:11
**man** [5] - 47:18, 106:9, 106:17, 107:14, 111:13
**management** [2] - 49:7, 116:4
**manager** [2] - 49:2, 50:24
**mandate** [1] - 85:21
**mandatory** [4] - 50:22, 60:15, 117:13, 117:18
**manner** [2] - 60:4, 121:19
**manual** [1] - 5:25
**MANUELA** [1] - 2:10
**Manuela** [1] - 3:5
**many-year** [1] - 31:7
**Manzanillo** [3] - 13:5, 24:22, 25:10
**March** [3] - 4:6, 83:4, 121:20
**marijuana** [1] - 22:25
**Mario** [2] - 5:4, 18:13
**Martin** [2] - 3:13, 3:15
**MARTIN** [1] - 1:16
**material** [3] - 5:7,

5:10, 28:17
**materials** [1] - 4:10
**math** [3] - 32:12, 82:9, 89:16
**mathematician** [2] - 32:11, 86:22
**matter** [11] - 3:6, 35:5, 35:14, 43:3, 53:13, 60:11, 73:12, 86:14, 92:14, 104:4, 115:11
**matters** [2] - 30:24, 103:5
**max** [1] - 108:19
**maximum** [2] - 108:17, 119:11
**mayhem** [1] - 99:22
**mean** [19] - 21:20, 26:18, 29:18, 29:21, 40:15, 40:17, 54:2, 54:19, 57:2, 60:12, 70:18, 77:16, 82:16, 85:6, 86:21, 97:21, 98:21, 99:13, 100:6
**meaning** [1] - 41:24
**means** [5] - 40:25, 50:6, 75:16, 78:1, 86:17
**meant** [2] - 55:10, 75:24
**medical** [1] - 109:22
**meet** [6] - 38:2, 50:10, 51:11, 62:6, 74:16, 94:17
**meeting** [5] - 21:4, 25:23, 30:19, 44:1, 83:13
**meetings** [1] - 30:14
**meets** [1] - 74:13
**Melanie** [1] - 3:13
**MELANIE** [1] - 1:12
**melanie.alsworth2@ usdoj.gov** [1] - 1:15
**member** [2] - 23:16, 114:6
**members** [7] - 6:16, 6:18, 7:9, 22:4, 30:13, 105:25, 112:20
**memo** [2] - 32:8, 32:19
**memoranda** [1] - 4:17
**memorandum** [4] - 4:16, 4:21, 4:22, 36:4
**mention** [4] - 6:15, 18:7, 26:16, 44:13
**mentioned** [4] - 14:22, 43:10, 51:6, 57:3
**mentioning** [1] - 29:18
**merchandise** [3] -

25:7, 59:2, 59:4
**mere** [1] - 32:11
**merely** [1] - 14:23
**message** [2] - 31:2, 58:18
**messages** [1] - 48:9
**met** [3] - 25:21, 27:21, 28:24
**method** [1] - 34:3
**methods** [1] - 30:16
**Mexican** [4] - 24:23, 33:16, 54:13, 59:7, 59:12, 83:9, 97:14, 98:24
**Mexico** [26] - 7:7, 20:20, 22:17, 30:20, 47:20, 57:14, 84:5, 97:12, 97:18, 97:19, 97:21, 98:2, 98:23, 107:17, 108:17, 108:19, 109:3, 110:4, 110:13, 111:8, 111:11, 111:12, 114:14, 114:25, 115:19, 120:23
**mid** [1] - 83:14
**middle** [1] - 65:23
**might** [3] - 82:3, 85:11, 97:1
**Miguel** [1] - 19:11
**Milenio** [11] - 13:6, 22:10, 22:14, 22:24, 23:10, 23:18, 24:25, 65:9, 97:14, 114:8, 114:9
**million** [37] - 20:7, 20:8, 20:9, 30:22, 80:16, 81:13, 81:16, 81:21, 82:1, 82:4, 82:11, 82:12, 84:11, 84:20, 85:18, 85:19, 85:24, 85:25, 86:3, 86:15, 86:16, 86:20, 86:24, 86:25, 87:9, 87:10, 87:19, 88:3, 88:14, 89:11, 89:13, 89:20, 98:24, 118:11
**millions** [2] - 20:21
**mind** [4] - 26:23, 36:16, 38:2, 50:2
**minimization** [1] - 22:21
**minimum** [4] - 24:24, 28:10, 50:22, 60:15
**minute** [1] - 79:16
**mischaracterization** [1] - 19:16
**miss** [2] - 106:5, 107:10

**missed** [2] - 10:2, 67:14
**missing** [3] - 10:25, 108:5, 108:6
**misspoken** [1] - 116:13
**mistake** [1] - 108:10
**mitigated** [1] - 101:5
**mitigates** [1] - 67:18
**mitigating** [1] - 98:22
**model** [1] - 34:17
**Mohammed** [1] - 16:25
**Mojarro** [5] - 5:4, 18:15, 22:7, 35:7, 37:7
**moment** [3] - 55:5, 68:20, 112:19
**money** [27] - 20:12, 20:14, 20:15, 20:17, 21:15, 29:21, 39:11, 39:18, 39:20, 44:18, 45:14, 45:18, 45:25, 47:16, 83:21, 83:22, 84:1, 84:2, 85:18, 85:19, 86:9, 86:10, 97:16, 97:17, 114:25, 115:2, 118:10
**month** [2] - 30:18, 34:1
**months** [17] - 23:11, 90:21, 91:7, 99:7, 101:24, 102:5, 102:10, 102:11, 102:14, 109:7, 109:10, 110:16, 116:23, 117:2, 117:8, 117:11
**months'** [4] - 80:15, 90:3, 90:4, 116:8
**MORI** [1] - 2:8
**Mori** [2] - 3:13, 3:14
**morning** [17] - 3:9, 3:10, 3:18, 3:21, 3:22, 3:24, 4:2, 4:3, 4:12, 5:15, 6:10, 52:22, 71:18, 74:10, 95:21, 95:23, 95:24
**morning's** [1] - 64:20
**most** [9] - 9:10, 28:6, 28:9, 38:6, 39:25, 52:25, 53:3, 65:25, 95:25
**mother's** [1] - 86:22
**motion** [10] - 26:12, 53:1, 53:2, 67:6, 67:8, 67:9, 70:10, 73:25, 80:12, 88:2
**motions** [1] - 60:22

**motivation** [1] - 68:15
**mouth** [2] - 53:24, 54:7
**move** [3] - 24:13, 54:16, 57:25
**moved** [3] - 14:24, 20:21, 25:12
**movement** [1] - 57:17
**moving** [1] - 73:16
**MR** [120] - 3:10, 5:8, 8:3, 8:7, 9:20, 11:3, 11:8, 11:11, 12:5, 12:12, 13:23, 34:13, 35:4, 36:2, 36:15, 38:18, 40:24, 42:8, 42:24, 43:18, 46:8, 47:8, 51:6, 51:10, 51:16, 51:22, 51:25, 52:16, 52:23, 53:9, 54:6, 54:17, 54:22, 55:2, 55:21, 55:23, 57:7, 59:23, 60:13, 60:23, 61:8, 61:12, 61:22, 62:2, 62:15, 63:2, 63:4, 63:7, 65:11, 66:25, 67:8, 67:12, 67:16, 67:24, 68:9, 69:8, 69:10, 70:6, 70:8, 70:11, 71:24, 72:6, 73:12, 73:23, 74:5, 74:12, 75:12, 75:15, 76:6, 76:13, 76:21, 77:18, 77:20, 77:24, 78:22, 80:21, 81:6, 81:17, 81:22, 82:1, 82:7, 82:22, 82:25, 83:12, 84:8, 84:21, 85:10, 86:2, 87:9, 87:22, 88:13, 88:17, 89:12, 89:19, 89:24, 90:8, 90:14, 91:2, 93:13, 95:24, 99:18, 99:23, 100:5, 100:8, 101:23, 102:20, 103:19, 104:5, 105:19, 106:15, 106:22, 107:4, 111:20, 111:23, 112:2, 116:12, 116:15, 120:1, 120:22, 121:8
**MS** [40] - 3:18, 5:11, 6:13, 6:15, 6:22, 7:6, 8:11, 8:16, 9:22, 11:18, 12:6, 14:1, 14:6, 14:13, 14:15, 14:20, 41:20, 48:1, 79:13, 80:23, 84:12, 84:17, 104:13,

104:21, 104:25, 105:3, 105:9, 105:14, 106:23, 107:2, 107:13, 107:24, 108:22, 120:3, 120:6, 120:10, 120:14, 120:19, 121:5, 121:10
**mule** [1] - 97:16
**multiple** [1] - 50:4
**murder** [1] - 99:22
**Murillo** [5] - 5:6, 21:8, 21:11, 59:6, 114:5
**must** [13] - 16:19, 49:3, 75:5, 100:5, 100:8, 101:6, 117:18, 117:19, 117:20, 117:24, 118:3, 118:5, 119:18
**mustache** [1] - 54:3

## N

**nailed** [2] - 87:15, 87:22
**name** [10] - 3:11, 41:19, 44:25, 47:18, 49:22, 50:8, 55:8, 105:3, 105:19, 120:8
**named** [6] - 25:4, 39:1, 49:17, 50:1, 55:6, 106:23
**names** [8] - 46:20, 47:15, 49:13, 49:24, 104:18, 104:20, 104:24
**narco** [3] - 37:9, 63:1, 103:13
**Narcotics** [2] - 18:9, 70:14
**narcotics** [11] - 18:21, 20:13, 31:7, 50:3, 50:9, 66:24, 82:20, 83:11, 106:13, 115:9, 116:3
**narrative** [6] - 64:2, 65:3, 68:3, 95:10, 96:8, 101:15
**national** [1] - 116:19
**nature** [6] - 40:21, 50:13, 97:5, 103:20, 113:11, 113:21
**Nava** [1] - 23:5
**Navy** [7] - 25:9, 25:11, 25:14, 33:16, 97:14
**NDDS** [1] - 3:15
**NE** [1] - 1:13
**nearest** [1] - 118:5
**necessarily** [4] - 11:9,

14

17:18, 21:25, 71:15
**necessary** [5] - 16:4,
44:21, 102:15,
112:15, 118:24
**necessity** [1] - 69:14
**neck** [1] - 53:1
**need** [14] - 7:4, 35:22,
35:25, 72:3, 84:4,
84:19, 102:3, 102:4,
112:25, 113:5,
113:13, 113:16,
115:5, 115:20
**needed** [1] - 25:20
**needle** [2] - 65:18,
101:12
**needs** [6] - 42:11,
42:15, 42:20, 43:2,
73:6, 115:12
**nefarious** [2] - 40:21,
59:11
**negative** [3] - 58:9,
76:2, 76:21
**negotiate** [1] - 60:17
**nephew** [3] - 107:5,
107:6, 107:15
**nephews** [1] - 108:9
**nervous** [1] - 105:9
**never** [17] - 19:3,
21:15, 21:20, 21:23,
29:20, 45:3, 45:8,
54:12, 58:19, 77:10,
85:6, 106:15,
107:20, 107:21,
107:23, 109:25
**new** [1] - 69:11
**New** [2] - 43:14, 43:17
**news** [1] - 27:4
**nickname** [1] - 25:3
**nieces** [1] - 108:9
**night** [1] - 108:3
**nine** [1] - 109:7
**non** [1] - 69:12
**nonconservative** [1] -
88:18
**none** [3] - 18:2, 49:19,
95:3
**Note** [2] - 56:17, 59:24
**note** [7] - 32:8, 56:17,
60:6, 70:1, 71:12,
71:13, 120:14
**notebooks** [1] -
112:11
**noted** [5] - 16:23,
17:8, 80:19, 107:13,
119:25
**notes** [4] - 52:8, 88:4,
88:9, 121:16
**nothing** [4] - 40:1,
58:18, 69:18, 111:1
**notice** [3] - 104:3,

119:17, 119:19
**noticed** [2] - 64:15,
69:1
**notify** [1] - 118:16
**notion** [1] - 49:7
**notorious** [1] - 19:11
**notwithstanding** [1] -
16:6
**Novick** [3] - 5:5,
70:20, 71:2
**nowhere** [2] - 18:25,
59:10
**nub** [1] - 82:23
**null** [1] - 121:18
**number** [23] - 7:17,
12:10, 15:11, 21:5,
29:13, 34:10, 34:17,
38:15, 40:2, 46:5,
51:12, 59:21, 78:4,
84:22, 85:2, 85:22,
86:21, 88:5, 88:10,
88:14, 88:18,
102:15, 115:14
**numbers** [4] - 66:15,
85:14, 89:6, 93:5
**numerous** [1] - 49:21
**NW** [2] - 2:4, 118:15

## O

**oath** [2] - 63:21, 95:12
**object** [3] - 86:3, 86:7,
111:23
**objected** [2] - 14:1,
71:8
**objection** [8] - 9:4,
27:1, 31:23, 37:3,
46:2, 73:21, 84:9,
120:20
**objections** [5] - 5:18,
5:20, 7:24, 8:12,
8:14, 11:1, 80:18,
119:24
**obligation** [1] - 118:18
**obligations** [1] -
118:13
**obstruct** [2] - 55:10,
56:5
**obstructed** [3] -
10:17, 52:2, 56:4
**obstruction** [17] -
51:4, 51:25, 52:8,
52:13, 52:19, 55:16,
56:1, 56:20, 58:7,
58:12, 58:22, 59:18,
59:19, 64:5, 64:7,
68:23, 79:24
**obstructive** [3] - 56:7,
94:4, 95:7
**obtain** [2] - 26:6, 27:6

**obtained** [2] - 26:19,
42:12
**obtaining** [2] - 39:17
**obviously** [1] - 79:9
**occurred** [5] - 50:4,
52:3, 58:5, 83:3,
97:1
**occurs** [2] - 38:21
**OF** [3] - 1:1, 1:3, 1:7
**offender** [2] - 10:23,
74:8
**offenders** [3] - 74:6,
74:8, 80:2
**offense** [68] - 5:24,
9:24, 10:5, 10:7,
10:8, 10:11, 10:18,
10:21, 10:23, 13:20,
13:21, 13:22, 14:5,
15:2, 28:22, 31:15,
31:20, 33:11, 34:7,
35:19, 37:1, 38:3,
40:16, 44:12, 44:14,
44:15, 46:3, 50:17,
50:24, 51:20, 56:7,
56:8, 56:9, 56:10,
58:7, 59:18, 62:5,
62:7, 62:21, 62:22,
69:17, 69:20, 70:4,
72:9, 72:10, 72:13,
72:15, 72:25, 73:25,
74:14, 79:7, 80:5,
80:6, 80:13, 81:14,
82:21, 86:11, 92:21,
92:23, 93:1, 98:7,
113:2, 113:7,
113:12, 113:16,
113:22, 114:21,
115:1
**offered** [2] - 41:3, 86:3
**offering** [1] - 42:22
**offers** [2] - 27:5, 32:1
**office** [12] - 3:15, 4:13,
72:11, 90:3, 90:10,
92:24, 116:22,
117:14, 117:22,
118:6, 118:19,
118:23
**Office** [1] - 4:1
**office's** [2] - 9:16,
72:14
**OFFICER** [1] - 3:24
**officer** [8] - 10:10,
38:16, 38:20, 39:19,
43:5, 44:2, 44:11,
79:24
**Officer** [1] - 3:25
**officers** [4] - 38:25,
39:15, 43:21, 44:19
**Official** [1] - 2:13
**official** [5] - 44:25,

45:1, 45:2, 56:16,
121:22
**officials** [4] - 25:9,
25:11, 43:25, 45:2
**often** [1] - 92:25
**oil** [5] - 12:21, 19:20,
39:5, 39:6, 47:9
**old** [4] - 102:6, 110:9,
111:7, 114:14
**older** [1] - 108:9
**once** [3] - 30:18, 34:1,
110:9
**one** [57] - 4:6, 5:3,
9:14, 11:1, 12:2,
12:3, 12:5, 12:7,
12:10, 13:4, 15:11,
16:21, 19:22, 19:23,
22:13, 23:22, 24:10,
24:16, 24:17, 25:23,
26:11, 35:20, 39:7,
39:14, 39:16, 39:18,
41:10, 41:11, 43:9,
48:3, 49:23, 54:19,
56:3, 63:17, 67:22,
67:24, 67:25, 74:3,
76:24, 78:24, 80:11,
80:17, 84:13, 89:4,
92:15, 92:24, 96:15,
101:25, 102:1,
106:11, 106:12,
106:18, 109:1,
115:24
**one-count** [1] - 4:6
**one-level** [1] - 80:11
**ones** [3] - 30:11,
55:17, 111:16
**operating** [2] - 23:19,
46:12
**operation** [9] - 20:2,
20:13, 20:14, 20:15,
32:23, 37:11, 46:14,
50:10, 116:4
**operations** [2] - 37:18,
115:10
**opportunity** [1] -
110:19
**opposed** [4] - 7:4,
42:2, 61:2, 69:4
**option** [1] - 62:3
**Options** [1] - 117:15
**order** [22] - 39:12,
39:20, 62:4, 72:23,
80:25, 81:1, 81:3,
84:11, 84:15, 84:16,
88:25, 89:1, 89:11,
89:14, 89:18,
109:10, 115:18,
118:8, 118:12,
118:20, 118:24,
120:15

**ordered** [3] - 117:9,
118:2, 118:10
**orders** [3] - 13:5, 60:8,
65:16
**ordinarily** [1] - 92:22
**organization** [5] -
41:10, 41:15, 46:23,
49:1, 97:25
**organized** [2] - 24:15,
24:21
**organizer** [5] - 10:13,
46:24, 48:14, 50:23,
80:7
**organizing** [1] - 25:3
**original** [1] - 81:12
**originally** [1] - 89:14
**Oscar** [6] - 23:5,
28:25, 105:3, 105:5,
105:7, 105:19
**otherwise** [8] - 10:14,
20:24, 48:16, 50:10,
50:16, 56:12, 66:20,
103:10
**ourselves** [2] - 11:12,
112:17
**outcome** [1] - 85:23
**outset** [3] - 17:22,
45:16
**outside** [3] - 86:12,
91:1, 118:3
**outsized** [1] - 22:24
**overall** [1] - 30:10
**overarching** [2] - 15:3,
17:22
**overlap** [1] - 13:16
**overruled** [3] - 31:23,
37:4, 46:2
**overseeing** [1] - 22:25
**own** [20] - 18:19,
18:21, 20:13, 20:15,
20:16, 21:6, 21:24,
22:1, 22:3, 28:8,
28:24, 30:12, 30:13,
31:6, 37:11, 45:25,
46:6, 47:6, 50:14
**owned** [2] - 18:19,
29:19
**owner** [1] - 55:7
**ownership** [1] - 84:5
**owning** [1] - 23:7

## P

**p.m** [1] - 121:12
**Pablo** [2] - 106:23,
106:25
**package** [1] - 19:19
**packed** [2] - 20:8,
20:18
**page** [1] - 15:17

**pages** [4] - 45:12, 45:16, 45:21, 57:12
**paid** [5] - 20:19, 44:4, 45:4, 45:18, 118:18
**painstaking** [2] - 19:17, 30:14
**painted** [1] - 98:15
**pandemic** [1] - 108:16
**papers** [2] - 57:3, 63:22
**paperwork** [2] - 37:25, 67:14
**parables** [1] - 103:20
**paragraph** [3] - 74:22, 78:11, 83:1
**part** [17] - 16:22, 18:5, 32:14, 36:23, 41:7, 50:22, 55:3, 57:6, 57:8, 59:13, 82:2, 90:1, 98:7, 99:2, 102:21, 104:6, 111:9
**Part** [1] - 117:14
**partially** [1] - 90:24
**participants** [5] - 10:14, 48:15, 49:25, 50:16, 80:8
**participating** [1] - 40:10
**particular** [14] - 36:10, 36:13, 53:15, 58:10, 60:6, 66:8, 75:3, 85:1, 87:5, 90:17, 92:5, 97:8, 99:11, 102:18
**particularly** [6] - 29:23, 32:22, 39:22, 50:2, 57:22, 58:19
**parties** [3] - 3:7, 9:14, 9:15, 9:25, 10:3, 11:2, 11:20, 11:25, 12:3, 51:2, 56:1, 60:16, 80:25, 81:6, 87:2, 90:1
**partner** [6] - 39:2, 41:23, 42:2, 42:6, 42:7, 45:8
**partnered** [1] - 33:14
**partnering** [1] - 39:6
**partners** [4] - 12:20, 39:7, 39:8, 42:2
**partnership** [3] - 39:3, 39:9, 47:10
**parts** [2] - 51:18, 74:24
**party** [2] - 39:8, 121:19
**pass** [1] - 21:18
**passed** [1] - 89:8
**passports** [1] - 28:5
**path** [1] - 101:11

**pattern** [1] - 98:7
**pay** [6] - 44:19, 45:6, 45:15, 84:23, 117:9, 118:10
**payable** [1] - 118:13
**paying** [7] - 39:4, 39:8, 39:12, 41:25, 45:23, 102:22, 108:13
**payments** [4] - 23:3, 30:1, 30:9, 45:5
**pending** [2] - 14:8, 116:21
**Pennsylvania** [1] - 2:4
**people** [34] - 6:15, 6:17, 18:20, 28:4, 29:2, 36:11, 44:1, 46:15, 46:17, 46:18, 46:20, 46:22, 47:4, 47:13, 47:15, 48:9, 48:24, 49:16, 52:25, 53:3, 53:19, 61:20, 65:9, 73:19, 93:1, 98:1, 102:3, 102:4, 107:7, 111:5, 115:9
**per** [7] - 33:4, 33:24, 82:11, 87:12, 87:23, 88:19, 89:4
**percentage** [1] - 23:23
**perception** [1] - 53:12
**perfectly** [1] - 63:17
**perhaps** [4] - 21:23, 59:10, 65:8, 73:19
**period** [15] - 6:2, 19:24, 22:9, 23:12, 23:20, 24:24, 25:22, 28:14, 34:1, 50:4, 83:5, 83:17, 96:15, 113:25, 116:9
**permission** [1] - 119:21
**permit** [1] - 17:11
**permitted** [1] - 119:17
**person** [20] - 25:3, 27:19, 34:22, 35:23, 39:3, 42:4, 44:23, 45:6, 46:25, 55:6, 98:19, 98:21, 105:23, 106:3, 107:7, 108:6, 113:2
**personal** [3] - 18:24, 43:3, 109:8
**personally** [6] - 12:17, 19:21, 24:25, 42:12, 43:24, 100:10
**personnel** [2] - 20:20, 23:4
**persons** [2] - 26:7, 49:20
**persuade** [1] - 16:13

**persuasive** [2] - 37:20, 59:12
**pertinent** [2] - 36:23, 50:21
**phone** [4] - 25:24, 27:1, 27:19, 37:16
**photocopied** [1] - 121:18
**physical** [2] - 48:8, 58:7
**pick** [1] - 48:2
**picked** [1] - 94:13
**picture** [1] - 98:15
**pictures** [2] - 85:9, 85:10
**pieces** [2] - 13:8, 78:24
**pillar** [2] - 106:1
**Pinedo** [25] - 5:4, 18:14, 19:5, 19:17, 20:1, 20:6, 21:9, 21:12, 22:1, 28:21, 32:22, 34:4, 41:18, 44:23, 45:17, 45:22, 45:24, 49:16, 50:1, 56:25, 57:2, 57:16, 89:3, 114:4
**Pinedo's** [5] - 19:14, 19:16, 21:7, 33:10, 33:21
**plain** [2] - 35:16, 75:6
**plan** [1] - 71:23
**plane** [12] - 25:20, 34:17, 35:17, 35:24, 36:1, 37:4, 37:6, 37:9, 37:12, 37:24, 38:2, 38:8
**planes** [9] - 26:1, 35:1, 35:23, 36:5, 36:6, 37:11, 37:15, 37:18, 38:7
**planning** [1] - 116:24
**plausible** [1] - 57:22
**play** [1] - 53:23
**playing** [3] - 53:21, 54:3, 98:17
**plays** [1] - 69:3
**plea** [20] - 4:5, 7:15, 9:8, 32:1, 32:15, 60:12, 60:14, 60:17, 62:19, 65:21, 68:11, 68:24, 76:19, 95:18, 99:13, 101:8, 114:2, 119:3, 119:5
**plead** [3] - 62:4, 65:21
**pleaded** [5] - 61:15, 61:23, 68:11, 83:5, 95:13
**pleading** [6] - 62:3, 65:19, 66:24, 68:14,

69:19, 95:9
**pleadings** [2] - 11:6, 103:2
**pleads** [1] - 68:20
**pleasure** [1] - 55:23
**pled** [3] - 108:11, 110:22, 111:1
**plethora** [1] - 27:11
**plus** [3] - 4:22, 46:15, 49:14
**point** [32] - 10:7, 10:11, 10:15, 10:17, 10:20, 10:23, 11:13, 13:11, 39:21, 44:5, 52:24, 60:5, 64:10, 67:5, 70:21, 73:14, 73:17, 74:5, 74:7, 74:8, 74:21, 78:18, 80:2, 80:12, 83:1, 85:16, 90:9, 90:16, 94:5, 96:21, 101:25, 102:1
**pointed** [4] - 53:3, 64:15, 72:2, 116:18
**pointer** [1] - 57:1
**points** [3] - 11:19, 73:16, 75:22
**policy** [2] - 60:11, 113:10
**Port** [1] - 24:22
**port** [3] - 13:5, 25:6, 97:15
**portion** [1] - 87:19
**portions** [2] - 5:18, 9:5
**ports** [1] - 39:4
**position** [10] - 32:7, 60:25, 63:23, 68:7, 72:18, 91:13, 94:25, 95:14, 100:20, 103:21
**possess** [1] - 117:20
**possible** [3] - 11:4, 88:20, 102:13
**possibly** [1] - 96:4
**post** [5] - 26:15, 68:11, 68:24, 99:13, 101:8
**post-evidentiary** [1] - 26:15
**post-plea** [3] - 68:11, 99:13, 101:8
**potential** [1] - 27:13
**potentially** [1] - 49:25
**precedent** [1] - 58:11
**precisely** [5] - 34:6, 42:8, 58:5, 88:4, 88:7
**prefer** [1] - 11:25, 12:5, 105:15
**preference** [1] - 12:3

**preferred** [1] - 25:16
**preliminary** [7] - 81:3, 84:11, 84:12, 84:16, 88:25, 89:14, 118:12
**preparatory** [1] - 90:9
**prepared** [3] - 12:1, 30:4, 110:17
**preparing** [1] - 61:13
**preponderance** [13] - 15:14, 15:20, 15:24, 16:5, 16:7, 16:10, 16:24, 17:4, 37:5, 44:22, 50:12, 61:1, 79:21
**presence** [1] - 27:25
**PRESENT** [1] - 2:7
**present** [7] - 44:1, 57:6, 65:18, 77:11, 79:8, 79:9, 92:20
**presentation** [5] - 12:1, 12:2, 52:10, 59:14, 81:19
**presented** [16] - 7:17, 8:5, 9:8, 18:12, 27:9, 42:16, 52:12, 58:19, 59:13, 63:16, 65:2, 68:4, 71:7, 81:10, 112:10
**presentence** [15] - 4:12, 5:19, 7:16, 8:2, 8:10, 8:24, 9:5, 14:2, 31:15, 36:25, 48:17, 56:20, 117:15, 118:19, 118:23
**presenting** [1] - 73:1
**presents** [1] - 64:1
**preservation** [1] - 61:6
**preserve** [1] - 35:14
**presided** [1] - 4:25
**President** [1] - 43:20
**pretended** [1] - 53:2
**pretrial** [1] - 60:22
**pretty** [2] - 23:6, 114:18
**previously** [2] - 27:4, 107:19
**pricing** [1] - 23:1
**primarily** [2] - 30:16, 34:14
**principal** [1] - 32:1
**priors** [1] - 24:4
**prison** [9] - 28:10, 28:12, 61:19, 91:1, 96:12, 101:18, 108:18, 111:9, 111:11
**Prisons** [4] - 117:7, 120:12, 120:25, 121:4
**privy** [1] - 21:22

**probable** [1] - 17:15
**Probation** [2] - 2:7, 4:1
**PROBATION** [1] - 3:24
**probation** [14] - 3:25, 4:13, 9:16, 72:11, 72:14, 90:3, 90:10, 92:24, 116:22, 117:14, 117:22, 118:6, 118:19, 118:22
**probation's** [1] - 48:19
**probative** [1] - 29:23
**problem** [3] - 40:12, 61:22, 108:6
**problems** [1] - 43:7
**procedural** [1] - 104:3
**proceed** [5] - 5:15, 5:16, 6:10
**proceeding** [2] - 56:16, 121:12
**proceedings** [5] - 65:5, 118:2, 118:22, 119:4, 121:16
**Proceedings** [1] - 2:14
**proceeds** [4] - 20:7, 20:10, 30:22, 86:9
**process** [4] - 16:4, 62:16, 67:22, 67:25
**procured** [1] - 42:14
**produce** [1] - 56:14
**produced** [4] - 2:15, 54:18, 57:11, 86:5
**produces** [1] - 80:14
**producing** [1] - 56:14
**promise** [1] - 43:1
**promote** [2] - 113:5, 113:9
**prompted** [1] - 26:12
**prong** [2] - 53:15, 54:1
**prongs** [1] - 52:1
**pronounce** [1] - 41:19
**proof** [6] - 43:23, 44:4, 66:19, 76:11, 77:11, 79:21
**properly** [3] - 15:23, 82:19, 97:23
**prosecuted** [2] - 65:15, 114:25
**prosecution** [1] - 56:6
**prosecutorial** [1] - 61:6
**prosecutors** [1] - 66:12
**protect** [2] - 113:8, 115:6
**protected** [2] - 23:21, 48:24
**protecting** [1] -

100:15
**protection** [1] - 114:12
**prove** [5] - 17:7, 59:11, 61:1, 62:13, 83:22
**proved** [2] - 16:5, 50:12
**proven** [1] - 37:4
**provide** [5] - 31:25, 75:23, 102:14, 113:6, 113:16
**provided** [7] - 17:14, 20:25, 40:9, 47:20, 55:8, 112:12, 116:1
**providing** [1] - 28:13
**proving** [1] - 17:4, 79:21
**provision** [5] - 56:3, 74:19, 75:6, 97:2, 104:2
**provisional** [1] - 120:23
**provisions** [3] - 92:15, 103:9, 117:4
**prudent** [1] - 52:17
**PSR** [8] - 8:15, 13:19, 31:18, 36:24, 44:12, 44:13, 48:17, 83:1
**public** [3] - 47:20, 113:8, 115:6
**publicly** [1] - 66:5
**pull** [1] - 7:1
**punishment** [1] - 113:6
**purchase** [3] - 20:22, 37:24, 83:25
**purchased** [1] - 34:18
**purchasing** [2] - 37:24, 57:13
**purposes** [4] - 112:16, 112:18, 112:22, 112:25
**pursuant** [6] - 10:12, 10:21, 117:3, 119:6, 119:15, 120:23
**pursue** [1] - 32:17
**push** [1] - 101:14
**put** [9] - 21:24, 59:13, 61:16, 62:12, 65:1, 66:16, 73:1, 85:15, 103:16
**putting** [5] - 7:25, 41:10, 52:14, 63:12, 66:18

**puzzling** [1] - 121:4

## Q

**qua** [1] - 69:12
**qualified** [1] - 75:6
**qualifies** [1] - 50:9
**qualify** [2] - 74:20, 76:6
**qualifying** [3] - 74:5, 74:7, 80:2
**quantities** [10] - 29:1, 29:2, 29:3, 29:4, 34:6, 113:3, 113:24, 115:10
**quantity** [16] - 10:3, 12:10, 12:11, 14:2, 14:22, 15:11, 31:12, 60:6, 60:7, 60:9, 62:9, 63:9, 63:19, 91:23, 92:4, 93:9
**questionable** [3] - 55:1, 59:9
**questions** [1] - 6:9
**quibble** [1] - 22:22
**quickly** [3] - 7:10, 79:16, 105:1
**Quigley** [1] - 49:12
**quite** [10] - 24:10, 25:18, 25:25, 33:21, 57:24, 60:20, 85:12, 88:9, 105:1, 115:19
**quote** [6] - 12:20, 36:19, 43:23, 48:14, 56:3, 72:8
**quoting** [1] - 49:11

## R

**rage** [1] - 70:18
**rails** [2] - 61:23, 62:1
**raise** [1] - 62:25
**raising** [1] - 11:1
**Ramirez** [40] - 5:4, 5:5, 18:15, 18:16, 22:7, 22:10, 22:23, 23:25, 24:20, 24:24, 25:2, 25:7, 25:11, 25:13, 25:16, 25:19, 25:24, 26:6, 26:9, 26:20, 27:2, 27:8, 27:11, 27:15, 27:20, 27:24, 28:7, 33:13, 33:16, 35:7, 36:6, 37:7, 37:8, 37:10, 37:13, 37:17, 37:22, 88:12, 114:5
**Ramirez's** [7] - 24:8, 26:3, 26:11, 27:23, 28:16, 28:20, 33:20

**ran** [3] - 20:14, 23:17, 46:14
**range** [25] - 5:23, 13:12, 13:16, 69:4, 80:15, 80:16, 88:19, 90:14, 90:18, 91:7, 91:8, 91:17, 92:19, 93:17, 94:20, 95:2, 96:19, 99:14, 101:20, 115:23, 116:8, 116:25, 117:2, 119:12
**ranging** [1] - 89:4
**rate** [1] - 87:12
**rather** [1] - 32:11
**RAUL** [1] - 1:5
**Raul** [7] - 3:3, 3:19, 4:4, 14:24, 105:4, 105:20, 117:6
**re** [1] - 16:1
**reached** [1] - 25:19
**reactivation** [1] - 21:3
**read** [6] - 8:9, 36:3, 57:9, 70:1, 78:10, 114:18
**reading** [3] - 35:16, 39:22, 110:18
**ready** [2] - 79:18, 81:4
**really** [23] - 36:14, 46:12, 53:22, 54:6, 66:2, 79:14, 82:16, 84:19, 85:12, 86:16, 92:3, 92:5, 99:12, 100:7, 101:8, 106:5, 106:19, 107:4, 107:7, 107:8, 107:9, 107:10
**reason** [7] - 11:12, 27:5, 31:9, 34:24, 59:2, 84:25, 110:2
**reasonable** [6] - 42:17, 52:25, 61:2, 62:13, 78:11, 116:10
**reasonably** [1] - 53:5
**reasons** [6] - 27:11, 73:2, 91:12, 91:15, 94:23, 101:23
**receipt** [1] - 40:6
**receipts** [32] - 39:23, 39:24, 40:2, 40:7, 40:13, 40:14, 40:18, 40:22, 41:1, 41:2, 52:12, 54:16, 54:17, 55:2, 55:3, 55:6, 57:13, 58:24, 59:6, 59:7, 59:10, 59:12, 59:14, 59:17, 81:20, 81:24, 82:6, 82:7, 83:6, 83:17, 83:19, 83:24

**receive** [7] - 30:8, 47:14, 51:12, 75:1, 75:3, 75:9, 78:13
**received** [12] - 4:20, 14:19, 26:4, 30:1, 30:2, 30:3, 30:6, 58:14, 76:8, 94:25, 101:18, 119:14
**receives** [2] - 93:4, 98:5
**receiving** [1] - 31:1
**recent** [1] - 28:1
**recently** [1] - 109:1
**recess** [1] - 79:17
**recidivism** [1] - 110:1
**recognize** [1] - 16:17
**recognizes** [1] - 16:10
**recollection** [3] - 27:17, 27:20, 99:20
**recommendation** [11] - 4:13, 13:19, 31:18, 37:1, 44:14, 48:19, 72:14, 90:10, 91:9, 120:4, 120:11
**recommendations** [1] - 90:2
**recommended** [3] - 90:3, 90:4, 117:14
**recommends** [3] - 31:15, 116:9, 116:23
**record** [15] - 3:4, 3:8, 18:25, 36:14, 44:20, 47:21, 56:15, 78:21, 78:22, 80:19, 93:10, 103:18, 103:24, 119:25, 121:2
**recorded** [4] - 25:23, 34:15, 37:16, 37:21
**records** [2] - 113:15, 115:21
**recount** [1] - 30:14
**recounted** [1] - 19:17
**recounting** [1] - 24:9
**recover** [1] - 84:24
**reduced** [1] - 74:1
**reduction** [7] - 11:12, 11:14, 67:3, 73:10, 73:17, 74:21, 75:7
**reenter** [2] - 118:4, 118:5
**reference** [3] - 11:5, 92:7, 102:25
**referenced** [2] - 51:14, 103:2
**reflect** [3] - 54:23, 97:5, 113:1
**reflected** [4] - 82:6, 82:7, 82:13, 96:18
**reflects** [1] - 95:2
**Reform** [1] - 117:3

**refresh** [1] - 27:17
**refreshed** [1] - 27:21
**regard** [2] - 17:12, 57:16
**regarding** [9] - 16:7, 18:18, 39:23, 113:21, 114:13, 115:8, 115:13, 115:20, 116:7
**regardless** [1] - 84:22
**registered** [1] - 28:3
**regular** [1] - 108:18
**regularly** [4] - 35:12, 36:21, 38:11, 38:22
**rehabilitation** [1] - 113:9
**reiterate** [1] - 107:6
**reiterated** [1] - 95:14
**reject** [2] - 78:9, 87:3
**related** [6] - 30:24, 45:7, 56:8, 56:9, 87:5, 99:16
**relatedly** [1] - 17:19
**relationship** [2] - 49:9, 100:24
**relay** [1] - 70:21
**release** [3] - 117:11, 118:19, 118:23
**released** [2] - 23:14, 116:20
**relevant** [13] - 16:18, 17:12, 56:9, 60:1, 60:2, 62:22, 64:7, 72:17, 75:18, 91:4, 94:18, 97:1, 112:13
**reliability** [1] - 17:15
**reliance** [2] - 17:7, 73:15
**relief** [4] - 50:19, 50:22, 51:2, 80:1
**relies** [1] - 37:16
**rely** [4] - 17:17, 40:22, 40:24, 53:14
**relying** [2] - 17:3, 32:4
**remain** [2] - 112:22, 118:3
**remember** [2] - 43:6, 71:1
**remind** [2] - 27:4, 112:17
**repeat** [1] - 111:25
**repeatedly** [1] - 28:9
**replete** [1] - 19:15
**report** [17] - 4:12, 5:19, 7:16, 8:2, 8:10, 8:25, 9:5, 14:3, 31:15, 36:25, 48:17, 56:21, 117:15, 117:24, 118:5, 118:20, 118:23

**reported** [2] - 2:14, 23:5
**Reporter** [3] - 2:12, 2:13, 121:22
**reporting** [1] - 118:1
**represent** [1] - 93:5
**representation** [1] - 59:8
**represented** [2] - 83:25, 91:17
**request** [3] - 50:19, 89:17, 119:21
**requesting** [1] - 103:17
**requests** [1] - 38:13
**require** [4] - 16:24, 79:1, 79:5, 87:1
**requirement** [2] - 35:8, 36:9
**requirements** [3] - 76:15, 76:23, 118:1
**requires** [5] - 35:17, 43:23, 51:10, 67:5, 70:9
**reserve** [3] - 51:17, 51:20, 51:22
**resolve** [5] - 5:19, 7:20, 15:10, 15:21, 60:20
**resolves** [3] - 51:1, 51:7, 51:14
**resolving** [2] - 17:10, 64:21
**resources** [1] - 61:7
**respect** [41] - 22:7, 28:23, 31:11, 31:23, 38:19, 39:4, 40:1, 51:8, 51:25, 52:4, 54:1, 56:6, 58:23, 62:8, 63:8, 63:10, 63:18, 64:5, 64:24, 73:13, 73:14, 81:8, 85:3, 88:5, 89:19, 90:14, 90:15, 91:5, 91:10, 91:15, 94:16, 94:22, 96:22, 100:9, 102:1, 109:15, 110:21, 113:6, 113:17, 116:13
**respond** [2] - 78:20, 103:7, 111:20
**response** [2] - 26:15, 64:16
**responsibility** [45] - 10:20, 28:8, 32:16, 59:14, 59:22, 59:24, 60:4, 60:18, 61:17, 62:17, 62:18, 62:20, 64:4, 64:8, 65:6, 65:23, 65:24, 66:10,

66:18, 66:23, 68:2, 68:14, 68:19, 68:25, 69:5, 69:13, 69:25, 71:11, 71:13, 72:9, 72:13, 73:5, 78:6, 80:10, 94:22, 95:6, 95:17, 95:22, 95:25, 96:8, 96:18, 101:10, 101:16, 108:11, 116:4
**responsible** [16] - 12:14, 13:13, 18:23, 32:13, 39:3, 39:8, 42:10, 60:8, 63:20, 63:23, 85:5, 86:18, 91:24, 96:1, 101:4, 101:5
**rest** [2] - 48:11, 61:19
**restitution** [3] - 113:16, 113:17, 113:19
**result** [2] - 31:20, 119:10
**resulted** [1] - 97:3
**results** [2] - 65:25, 80:12
**retain** [1] - 65:24
**retaliation** [1] - 66:7
**return** [2] - 110:4, 118:6
**returning** [1] - 89:25
**reveal** [1] - 27:6
**revealed** [3] - 26:20, 28:6, 67:23
**revealing** [1] - 26:5
**reveals** [1] - 37:22
**revelations** [1] - 22:3
**review** [10] - 4:10, 13:18, 15:6, 15:7, 26:10, 27:2, 31:22, 37:2, 43:15, 82:14
**reviewed** [3] - 4:15, 37:19, 112:9
**reviewing** [1] - 7:5
**revising** [1] - 91:9
**revision** [1] - 81:9
**rf@rfeitellaw.com** [1] - 2:5
**Rhee** [25] - 3:19, 5:10, 6:14, 8:9, 11:17, 13:25, 14:9, 41:19, 41:22, 44:24, 47:25, 53:17, 55:13, 60:21, 69:9, 80:22, 102:20, 103:25, 104:7, 104:9, 105:7, 107:12, 112:4, 120:2, 121:9
**RHEE** [41] - 1:21, 3:18, 5:11, 6:13, 6:15,

6:22, 7:6, 8:11, 8:16, 9:22, 11:18, 12:6, 14:1, 14:6, 14:13, 14:15, 14:20, 41:20, 48:1, 79:13, 80:23, 84:12, 84:17, 104:13, 104:21, 104:25, 105:3, 105:9, 105:14, 106:23, 107:2, 107:13, 107:24, 108:22, 120:3, 120:6, 120:10, 120:14, 120:19, 121:5, 121:10
**risen** [1] - 41:9
**risk** [1] - 18:24
**Robert** [1] - 3:20
**ROBERT** [1] - 2:3
**role** [26] - 10:15, 22:14, 22:18, 22:20, 22:21, 22:24, 23:7, 46:6, 48:18, 48:20, 50:11, 51:1, 51:13, 64:24, 69:3, 75:2, 75:4, 75:9, 75:14, 76:8, 78:14, 78:17, 80:8, 92:2, 93:2, 116:3
**roof** [1] - 21:10
**room** [1] - 21:10
**rough** [1] - 96:13
**round** [2] - 26:12, 78:4
**RPR** [3] - 2:12, 121:15, 121:21
**Rule** [1] - 104:1
**rule** [1] - 71:9
**rules** [2] - 17:13, 77:1
**ruling** [7] - 64:5, 73:15, 78:23, 79:10, 94:16, 94:22
**rulings** [2] - 64:22, 93:20
**run** [3] - 24:13, 115:14, 115:19
**running** [1] - 65:9
**runs** [4] - 24:4, 24:12, 24:20

### S

**safety** [10] - 11:5, 11:16, 11:20, 50:19, 51:2, 51:6, 57:23, 75:20, 79:25
**SAINT** [1] - 121:15
**Saint** [2] - 2:12, 121:21
**SAINT-LOTH** [1] - 121:15

**Saint-Loth** [2] - 2:12, 121:21
**sale** [1] - 20:12
**San** [1] - 1:18
**Sanchez** [3] - 28:25, 57:4, 58:16
**SANDI** [1] - 1:21
**sandirheelaw@ gmail.com** [1] - 1:24
**sandy** [1] - 3:19
**Santiaguito** [1] - 47:17
**Santos** [2] - 21:8, 59:6
**sat** [1] - 92:13
**satisfied** [4] - 8:20, 16:4, 76:15, 76:23
**satisfies** [1] - 35:8, 36:9
**satisfy** [4] - 44:4, 75:5, 76:1, 76:2
**saved** [3] - 69:23, 69:24
**saves** [1] - 104:1
**saving** [1] - 69:14
**saw** [2] - 19:24, 45:3
**scale** [4] - 18:22, 21:17, 28:13, 31:8
**scared** [3] - 53:7, 53:10, 58:10
**scenario** [1] - 47:9
**scheduled** [3] - 35:12, 36:21, 38:11
**Schofield** [1] - 43:18
**scope** [1] - 86:12
**score** [1] - 9:17
**scrutinized** [1] - 17:9
**Sealed** [1] - 16:1
**seaports** [1] - 23:5
**seat** [1] - 64:17
**seated** [3] - 6:12, 9:3, 55:22
**second** [9] - 5:21, 7:21, 25:8, 25:10, 74:3, 81:8, 84:6, 99:15, 106:6
**secret** [2] - 22:16, 103:14
**section** [1] - 59:25
**Section** [29] - 10:9, 10:16, 10:19, 10:21, 10:24, 15:19, 18:9, 34:7, 36:18, 44:9, 48:13, 48:20, 50:20, 56:2, 59:19, 70:14, 72:7, 77:10, 78:12, 80:5, 80:8, 80:10, 92:15, 96:22, 112:13, 117:4, 117:10, 119:6, 119:15

**Sections** [1] - 4:9
**security** [5] - 20:19, 23:4, 28:10, 108:18, 111:11
**see** [22] - 15:15, 15:17, 15:18, 15:21, 15:24, 15:25, 16:2, 16:19, 16:22, 16:25, 17:15, 49:3, 49:10, 54:6, 56:16, 57:23, 77:23, 86:24, 89:15, 93:1, 104:23, 107:14
**seek** [1] - 81:15
**seem** [1] - 111:4
**seemingly** [1] - 28:11
**sees** [1] - 91:1
**seize** [3] - 25:14, 33:17
**seized** [2] - 13:5, 33:18
**sell** [3] - 34:16, 98:10, 98:18
**selling** [2] - 28:25, 98:20
**send** [1] - 33:25
**sense** [8] - 49:9, 50:13, 85:13, 85:18, 89:15, 97:20, 101:18, 102:17
**sent** [3] - 24:5, 30:17, 116:21
**sentence** [42] - 6:7, 6:8, 16:19, 69:4, 85:3, 91:9, 92:12, 93:3, 95:19, 96:2, 96:4, 96:19, 96:20, 97:2, 97:4, 99:9, 99:10, 100:1, 100:3, 101:24, 102:5, 102:14, 110:7, 110:8, 110:16, 112:5, 112:6, 112:14, 113:1, 113:7, 113:14, 115:5, 115:20, 115:22, 116:9, 116:25, 117:1, 118:25, 119:7, 119:9, 119:13, 119:16
**sentenced** [5] - 90:21, 94:20, 95:3, 101:17, 116:6
**sentences** [3] - 99:17, 113:13, 116:7
**Sentencing** [2] - 117:3, 117:15
**sentencing** [59] - 3:23, 4:4, 4:11, 4:13, 4:15, 4:17, 4:20, 5:14,

5:15, 5:23, 6:6, 6:18, 9:1, 9:6, 9:9, 16:5, 16:8, 16:25, 17:11, 17:20, 18:3, 22:12, 26:8, 27:7, 27:10, 32:8, 32:19, 50:25, 52:3, 55:13, 56:6, 58:2, 61:2, 63:13, 66:1, 66:19, 67:18, 68:17, 69:11, 70:16, 70:18, 71:6, 80:15, 90:2, 92:13, 95:20, 102:2, 103:17, 104:8, 111:3, 112:7, 112:16, 112:18, 112:23, 112:25, 115:8, 117:5, 119:11, 119:14
**SENTENCING** [1] - 1:7
**separate** [3] - 76:23, 77:25, 89:20
**separately** [1] - 11:24
**separation** [1] - 109:10
**September** [4] - 4:18, 9:9, 45:12, 81:4
**serious** [1] - 96:1
**seriously** [1] - 115:12
**seriousness** [2] - 73:8, 113:1
**serve** [1] - 66:14
**services** [2] - 39:17
**set** [5] - 8:1, 8:14, 74:19, 89:13, 112:13
**sets** [1] - 59:24
**setting** [2] - 8:12, 58:11
**settled** [2] - 15:18, 16:6
**seven** [3] - 9:25, 10:22, 11:19
**several** [2] - 5:2, 109:10
**severe** [1] - 119:11
**shaking** [1] - 64:22
**shall** [6] - 117:12, 117:23, 118:16, 118:19, 118:23, 121:18
**shared** [1] - 27:8
**shares** [1] - 107:8
**SHERRY** [1] - 2:7
**Sherry** [1] - 3:25
**shielded** [1] - 66:20
**shipment** [7] - 24:18, 25:1, 25:8, 25:10, 25:14, 33:19, 36:1
**shipments** [8] - 24:5, 24:15, 24:21, 25:5,

40:14, 42:7, 89:5
**shipped** [2] - 50:6, 114:23
**shipping** [3] - 24:14, 50:6, 115:10
**shook** [1] - 58:9
**short** [3] - 19:15, 29:12, 79:14
**shorthand** [1] - 2:14
**shot** [1] - 37:14
**shoulders** [1] - 59:15
**show** [2] - 7:11, 107:17
**showed** [1] - 47:13
**shows** [1] - 27:2
**sic** [1] - 116:8
**side** [5] - 9:4, 12:21, 98:10, 98:17
**signatory** [1] - 121:19
**significant** [4] - 96:3, 97:3, 114:7, 118:8
**significantly** [1] - 29:25
**silent** [2] - 63:11, 103:22
**similar** [5] - 96:22, 113:15, 115:21, 115:22
**similarly** [2] - 21:10, 34:3
**simple** [1] - 106:3
**simply** [4] - 18:6, 37:19, 45:10, 111:5
**Sinaloa** [11] - 20:14, 23:17, 23:18, 23:22, 23:24, 46:12, 48:24, 65:9, 100:18, 114:7, 114:10
**sine** [1] - 69:12
**single** [1] - 64:14
**Sinuhe** [19] - 5:5, 18:16, 18:17, 21:8, 21:11, 28:23, 29:3, 29:13, 29:25, 30:4, 31:3, 33:23, 47:4, 49:21, 57:4, 58:14, 58:17, 83:13, 114:5
**Sinuhe's** [3] - 28:24, 29:9, 29:11
**sip** [1] - 74:11
**sit** [4] - 36:16, 44:7, 61:25, 72:5
**sitting** [3] - 64:13, 94:7, 95:8
**situation** [2] - 73:19, 99:10
**six** [6] - 10:19, 46:19, 47:13, 59:21, 111:9, 116:23
**skills** [1] - 109:16

**slaughter** [1] - 44:24
**small** [4] - 28:25, 29:1, 29:3, 65:6
**small-time** [1] - 65:6
**smaller** [2] - 65:10, 65:11
**Smith** [3] - 116:22, 116:23, 117:1
**smuggle** [2] - 38:7, 41:5
**smuggled** [2] - 57:14, 59:4
**smuggler** [1] - 115:4
**smuggling** [9] - 12:20, 19:12, 41:4, 41:7, 55:4, 59:1, 82:17, 82:18, 98:23
**sober** [1] - 112:19
**SOC** [4] - 10:8, 10:12, 37:2, 44:21
**soccer** [2] - 21:9, 29:17, 34:20, 59:3, 98:17, 98:18, 98:19
**social** [2] - 23:17
**sole** [1] - 71:10
**soliciting** [1] - 26:24
**someone** [5] - 24:17, 41:21, 54:13, 103:24, 108:5
**sometimes** [2] - 18:23, 111:3
**somewhat** [5] - 23:21, 58:2, 58:9, 88:3, 114:16
**son** [3] - 43:19, 47:22, 57:5
**soon** [2] - 52:5, 106:5
**sorry** [5] - 6:13, 44:24, 79:13, 101:25, 116:16
**sort** [10] - 7:22, 15:2, 28:18, 29:21, 43:9, 49:8, 62:25, 68:8, 103:19, 110:3
**sought** [1] - 26:21
**soul** [1] - 44:6
**sound** [1] - 85:14
**sounds** [2] - 11:3, 41:24
**source** [1] - 21:1
**South** [1] - 20:21
**Southern** [6] - 3:16, 43:13, 43:16, 120:6, 120:9, 120:13
**Spanish** [6] - 2:10, 2:10, 40:4, 40:5, 105:15, 105:18
**spared** [2] - 60:18, 60:20
**speaking** [3] - 27:3,

102:23, 106:2
**special** [2] - 80:16, 117:9, 117:23
**Special** [3] - 2:8, 2:9, 5:5
**specific** [13] - 5:24, 10:8, 31:25, 34:17, 38:3, 42:1, 44:14, 46:16, 46:20, 47:23, 72:25, 115:13, 116:1
**specifically** [21] - 12:16, 31:10, 38:23, 39:1, 42:18, 47:15, 49:13, 49:16, 49:18, 51:10, 52:1, 52:4, 60:5, 62:2, 64:2, 65:3, 68:3, 72:17, 79:3, 88:5, 88:23
**spend** [4] - 54:15, 61:19, 110:12, 111:14
**split** [1] - 16:23
**spy** [1] - 97:15
**squarely** [1] - 59:15
**St** [1] - 1:22
**stand** [11] - 5:13, 8:18, 28:13, 43:11, 52:6, 57:18, 61:18, 70:20, 95:8, 103:22, 109:23
**standard** [15] - 15:5, 15:6, 15:8, 15:12, 15:18, 15:20, 15:24, 16:7, 16:8, 16:9, 16:11, 16:12, 16:24, 42:9
**standing** [4] - 101:17, 103:25, 113:2, 114:19
**stands** [1] - 116:5
**start** [5] - 3:8, 9:13, 12:8, 12:10, 90:7
**started** [2] - 20:13, 64:17
**starting** [5] - 4:12, 7:23, 19:5, 21:1, 22:15
**state** [1] - 117:19
**statement** [10] - 13:12, 32:15, 47:21, 76:18, 82:13, 83:20, 88:23, 105:13, 110:17, 114:1
**statements** [6] - 7:25, 8:1, 8:14, 29:22, 111:21, 113:11
**STATES** [4] - 1:1, 1:3, 1:8, 1:11
**States** [22] - 3:3, 3:12, 4:8, 7:10, 13:2, 21:2, 34:1, 40:17, 43:14,

84:3, 88:1, 88:7, 88:22, 108:23, 108:24, 110:24, 113:25, 114:16, 118:3, 118:4, 118:5, 118:11
**stating** [2] - 16:3, 16:22
**status** - 116:19
**statute** [7] - 50:20, 50:21, 75:25, 84:21, 102:12, 119:17
**statutory** [3] - 76:15, 78:9, 119:7
**stay** [2] - 68:18, 68:21
**steal** [3] - 25:8, 25:13, 33:18
**stenographic** [1] - 121:16
**step** [10] - 5:16, 5:21, 6:3, 6:7, 9:10, 62:8, 85:22, 105:6, 110:20, 112:4
**stepfather** [8] - 28:24, 29:6, 30:15, 30:21, 31:2, 31:3, 57:4, 58:15
**steps** [2] - 5:16, 7:21
**stick** [2] - 54:4, 94:11
**sticking** [1] - 56:25
**still** [6] - 55:12, 57:7, 65:6, 101:1, 101:3
**stipulated** [1] - 13:17
**stolen** [2] - 25:7, 25:17
**stop** [1] - 84:6
**strategy** [1] - 95:9
**Street** [2] - 1:13, 1:18
**stressed** [1] - 111:4
**strict** [1] - 77:1
**strictly** [1] - 75:16
**strike** [1] - 26:13
**striking** [1] - 28:9
**stroking** [1] - 94:8
**strong** [1] - 17:21
**strongly** [1] - 40:20
**structure** [1] - 79:7
**stuck** [1] - 94:14
**study** [1] - 106:16
**stuff** [1] - 26:24
**subject** [2] - 63:14, 66:7
**submitted** [15] - 4:16, 4:17, 4:21, 4:22, 4:23, 5:1, 6:20, 6:21, 6:24, 8:25, 26:10, 32:8, 55:18, 107:19, 107:21
**subparagraph** [3] - 75:16, 76:24, 78:2

**subparts** [1] - 74:14
**subsections** [1] - 79:9
**substance** [6] - 35:13, 36:20, 36:23, 38:10, 38:14, 117:20
**substantial** [1] - 60:15
**substantially** [2] - 92:21, 92:22
**subtle** [1] - 58:2
**successfully** [3] - 24:13, 32:6, 59:7
**sufficient** [7] - 17:14, 45:11, 58:13, 62:6, 63:16, 76:19, 86:25, 92:1, 94:17, 112:15
**sufficiently** [2] - 44:20, 89:7
**suggest** [4] - 34:21, 40:9, 40:21, 86:8
**suggested** [3] - 34:19, 45:8, 69:16
**suggesting** [1] - 15:6
**suggestion** [1] - 18:25
**suggests** [2] - 33:2, 38:6
**suitcases** [1] - 20:18
**Suite** [1] - 1:22
**sum** [1] - 79:19
**summarized** [1] - 12:22
**summarizing** [1] - 14:23
**super** [1] - 108:19
**superior** [1] - 49:10
**supervised** [4] - 49:14, 49:25, 50:8, 117:11
**supervision** [3] - 49:8, 117:12, 117:17
**supervisor** [2] - 49:2, 50:24
**supplement** [1] - 8:4
**supplemental** [5] - 4:16, 4:22, 4:24, 32:19, 112:10
**supplemented** [1] - 9:7
**support** [20] - 7:11, 7:15, 7:17, 16:14, 17:15, 28:22, 32:1, 32:15, 34:6, 44:21, 45:11, 46:1, 72:23, 79:10, 79:22, 92:8, 107:18, 108:7, 114:17
**supported** [3] - 28:21, 64:7, 102:16
**supporting** [4] - 100:17, 100:19, 100:20, 114:1

**supports** [3] - 14:10, 58:20, 99:14
**supposed** [1] - 83:8
**supposedly** [1] - 36:5
**Supreme** [2] - 15:25, 16:15
**surprise** [2] - 21:20, 30:3
**surprised** [1] - 89:15
**surprising** [1] - 50:2
**surprisingly** [1] - 26:14
**surrounded** [1] - 110:5
**sustained** [1] - 79:20
**sword** [1] - 54:21
**swore** [1] - 63:21
**sworn** [1] - 3:5
**sympathetic** [1] - 72:22
**system** [3] - 66:12, 69:6, 100:21

## T

**table** [3] - 3:12, 3:20, 94:8
**tack** [2] - 66:8, 73:20
**tactical** [1] - 71:4
**tank** [2] - 12:22, 20:3
**tanker** [5] - 32:23, 33:4, 33:5, 39:5, 47:9
**tankers** [2] - 33:1, 39:6
**tanks** [9] - 19:20, 19:22, 19:23, 19:24, 30:18, 33:5, 33:7, 34:3
**tape** [1] - 58:4
**task** [1] - 73:1
**teaches** [2] - 106:12, 106:13
**team** [1] - 29:17
**ten** [4] - 74:13, 74:18, 74:24, 79:16
**ten-minute** [1] - 79:16
**tend** [1] - 31:9
**term** [2] - 117:8, 117:11
**terminology** [1] - 22:23
**terms** [3] - 30:8, 99:25, 115:17
**terrible** [2] - 102:8, 108:13
**test** [6] - 24:4, 24:11, 24:12, 24:20, 63:13, 65:2
**testified** [25] - 18:3,

19:9, 19:25, 20:6, 20:16, 21:4, 22:11, 23:25, 25:16, 25:19, 28:23, 29:20, 32:22, 33:23, 37:7, 37:10, 37:14, 44:23, 45:22, 49:16, 49:21, 57:17, 58:14, 59:6, 88:20
**testify** [6] - 30:4, 30:25, 31:3, 57:5, 58:17, 105:10
**testifying** [6] - 30:2, 53:8, 53:10, 57:19, 58:1, 105:12
**testimony** [58] - 5:2, 12:13, 12:15, 12:18, 12:19, 13:3, 14:9, 14:11, 14:23, 17:8, 18:2, 19:14, 19:16, 23:19, 24:8, 25:18, 26:25, 27:23, 28:12, 28:13, 28:16, 28:20, 28:21, 29:12, 29:14, 29:15, 32:4, 33:10, 33:12, 33:20, 33:22, 34:5, 35:6, 36:8, 37:8, 38:21, 39:5, 39:10, 41:23, 42:20, 45:24, 46:16, 46:18, 62:25, 63:16, 71:7, 81:23, 82:2, 83:10, 87:25, 88:7, 89:21, 97:9, 97:13, 97:16, 98:15, 112:8, 115:3
**testing** [1] - 63:25
**Texas** [2] - 65:15, 84:4
**text** [6] - 31:2, 48:8, 58:14, 58:16, 58:18, 75:6
**THE** [174] - 1:1, 1:8, 1:11, 1:21, 2:2, 3:2, 3:17, 3:21, 4:2, 5:9, 5:12, 6:11, 6:12, 6:14, 6:20, 7:1, 7:13, 8:4, 8:8, 8:12, 8:17, 8:22, 8:23, 9:2, 9:3, 9:21, 9:23, 11:7, 11:9, 11:15, 11:22, 12:7, 13:18, 13:24, 14:4, 14:7, 14:14, 14:17, 14:25, 35:2, 35:21, 36:12, 36:17, 40:12, 41:17, 41:22, 42:23, 43:16, 44:8, 47:3, 47:25, 48:12, 51:9, 51:21, 51:24, 52:22, 53:7, 54:2, 54:15, 54:21, 54:25, 55:20, 55:22, 55:25, 57:10, 60:11, 60:14,

60:24, 61:10, 61:20, 61:25, 62:12, 62:24, 63:3, 63:6, 65:8, 66:11, 67:4, 67:10, 67:13, 67:20, 68:6, 68:22, 69:9, 70:3, 70:7, 70:9, 71:23, 71:25, 72:7, 73:18, 73:24, 74:7, 75:8, 75:13, 76:4, 76:7, 76:17, 77:7, 77:19, 77:23, 78:3, 79:11, 79:15, 79:18, 80:22, 80:24, 81:12, 81:18, 81:24, 82:6, 82:15, 82:24, 83:8, 84:6, 84:9, 84:14, 84:18, 85:9, 86:1, 87:8, 87:20, 88:11, 88:16, 88:24, 89:13, 89:22, 89:25, 90:12, 90:24, 93:10, 95:23, 99:15, 99:19, 99:24, 100:6, 101:22, 102:19, 103:8, 104:1, 104:9, 104:20, 104:23, 105:1, 105:5, 105:7, 105:12, 105:16, 105:17, 105:18, 106:11, 106:21, 106:25, 107:3, 107:11, 107:23, 108:20, 110:19, 110:21, 111:18, 111:24, 112:3, 116:14, 116:16, 120:2, 120:4, 120:8, 120:11, 120:17, 120:20, 121:3, 121:6, 121:9, 121:11
**themselves** [3] - 18:24, 31:6, 86:13
**theory** [3] - 38:1, 41:3, 53:9
**therefore** [5] - 10:4, 75:4, 76:11, 80:3, 99:3
**thinking** [2] - 37:23, 71:1
**thinks** [1] - 65:6
**third** [8] - 6:3, 26:6, 67:5, 67:9, 73:14, 73:17, 80:12, 89:25
**this..** [1] - 78:21
**thousand** [2] - 12:21, 87:24
**thread** [2] - 65:19, 101:12
**threat** [3] - 53:4, 53:5, 57:18

**threaten** [1] - 53:25
**threatened** [1] - 56:24
**threatening** [7] - 52:4, 56:12, 57:16, 57:24, 57:25, 94:9, 94:10
**threats** [2] - 54:12, 68:23
**three** [16] - 6:18, 10:9, 18:18, 31:5, 32:10, 32:21, 38:15, 46:9, 63:24, 67:3, 67:11, 73:25, 75:22, 96:13, 109:17, 112:8
**three-day** [1] - 112:8
**three-level** [1] - 67:3
**throughout** [1] - 94:5
**thrust** [2] - 18:1, 98:8
**tied** [1] - 98:1
**Tio** [1] - 12:25
**tip** [2] - 54:4, 94:14
**tips** [2] - 40:8, 41:7
**title** [1] - 22:23
**today** [2] - 9:1, 121:7
**together** [1] - 108:1
**tongue** [8] - 54:4, 56:25, 57:2, 57:18, 94:12, 94:14
**tonnage** [3] - 113:3, 113:24, 115:10
**tons** [1] - 60:19
**took** [11] - 45:9, 52:6, 57:2, 63:8, 88:8, 94:25, 95:21, 95:25, 98:25, 104:14, 104:22
**top** [7] - 46:25, 91:7, 93:16, 99:14, 100:3, 102:2, 116:13
**top-level** [2] - 46:25, 102:2
**top-of-the-guidelines** [1] - 100:3
**torture** [1] - 99:22
**total** [4] - 9:24, 12:24, 80:13, 81:20
**totalling** [1] - 20:4
**totally** [2] - 28:15, 28:20
**touch** [2] - 57:20, 94:12
**touched** [1] - 94:14
**touching** [2] - 54:4, 57:1
**tough** [2] - 61:10, 61:12
**towards** [1] - 57:25
**track** [2] - 23:1, 74:2
**trade** [1] - 84:2
**trade-based** [1] - 84:2

**traffic** [1] - 97:10
**trafficked** [7] - 19:10, 72:19, 85:4, 93:6, 93:7, 96:14, 114:2
**trafficker** [5] - 91:18, 91:19, 96:10, 96:12, 96:16
**traffickers** [3] - 47:2, 63:1, 109:24
**trafficking** [38] - 18:21, 19:6, 20:2, 21:15, 22:2, 22:3, 22:8, 24:2, 28:1, 28:14, 30:16, 31:7, 32:23, 35:1, 37:9, 37:11, 38:22, 40:16, 46:10, 49:1, 50:3, 50:9, 65:14, 72:21, 73:5, 82:21, 83:11, 83:15, 83:18, 85:5, 86:6, 102:9, 103:3, 103:14, 106:14, 108:12, 115:3, 115:10
**traffics** [2] - 85:24, 91:19
**trailers** [2] - 30:17, 33:25
**transcript** [8] - 2:15, 37:19, 45:13, 45:16, 45:20, 121:16, 121:18, 121:18
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 2:15
**transcripts** [3] - 26:9, 27:22, 60:19
**transfer** [1] - 37:24
**transferred** [4] - 38:1, 109:9, 109:12, 110:13
**transferring** [1] - 22:16
**translations** [1] - 60:18
**transport** [3] - 20:6, 36:1, 37:13
**transported** [1] - 110:10
**traumatic** [1] - 20:23
**traveled** [2] - 7:7, 107:16
**traveling** [1] - 28:5
**treating** [1] - 58:6
**trepidation** [1] - 54:9
**trial** [15] - 17:14, 60:18, 61:3, 61:17, 62:14, 65:25, 66:4, 66:14, 66:22, 67:1, 67:2, 69:14, 69:23,

69:24
**tried** [5] - 57:4, 65:23, 101:11, 101:12, 103:7
**trigger** [1] - 79:6
**triggered** [1] - 79:1
**triggering** [1] - 58:12
**trip** [1] - 30:20
**trouble** [1] - 28:7
**troubling** [1] - 115:17
**truckload** [1] - 89:4
**trucks** [3] - 19:13, 22:16, 50:7
**true** [8] - 35:7, 36:8, 60:3, 60:7, 64:23, 65:12, 121:15, 121:16
**truly** [2] - 69:10, 95:6
**truth** [1] - 63:22
**try** [3] - 26:16, 55:14, 69:10
**trying** [6] - 31:3, 43:8, 58:17, 62:16, 86:8
**turn** [5] - 34:10, 39:18, 51:3, 52:17, 57:15
**turned** [1] - 64:17
**turning** [2] - 9:23, 15:10
**TVs** [1] - 83:25
**two** [68] - 10:6, 10:7, 10:11, 10:17, 10:20, 10:22, 11:13, 12:24, 13:22, 14:5, 16:14, 19:23, 19:24, 20:5, 23:19, 24:15, 30:16, 34:10, 35:11, 36:19, 37:1, 37:3, 38:12, 40:23, 44:12, 44:14, 45:11, 46:1, 46:3, 51:18, 52:1, 56:7, 56:10, 58:7, 59:18, 60:8, 66:17, 67:4, 67:7, 67:10, 69:12, 70:4, 70:13, 71:22, 72:10, 72:11, 72:15, 73:7, 73:10, 73:15, 74:15, 74:21, 74:24, 75:7, 79:22, 79:23, 79:24, 80:1, 80:9, 89:5, 96:15, 98:4, 98:13, 104:16, 104:24, 104:25
**two-level** [22] - 10:22, 35:11, 36:19, 37:1, 37:3, 38:12, 40:23, 45:11, 46:1, 69:12, 71:22, 72:11, 73:7, 73:10, 75:7, 79:22, 79:23, 79:24, 80:1, 80:9, 98:4, 98:13

**two-offense** [5] - 13:22, 44:14, 46:3, 58:7, 72:15
**two-point** [6] - 10:7, 10:11, 10:17, 10:20, 11:13, 74:21
**two-year** [2] - 19:24, 96:15
**type** [1] - 113:18
**types** [2] - 113:13, 116:7
**typical** [1] - 93:3
**typically** [1] - 94:7

**U**

**U.S** [26] - 2:7, 3:25, 15:15, 15:22, 15:25, 16:3, 16:15, 16:16, 16:20, 16:25, 17:5, 27:16, 28:1, 28:3, 28:10, 30:18, 31:14, 49:3, 49:10, 49:12, 50:6, 117:24, 118:14, 119:1
**U.S.C** [10] - 4:9, 50:20, 76:16, 77:6, 77:10, 112:13, 117:4, 117:10, 119:6, 119:15
**ultimate** [2] - 24:21, 85:3
**unable** [3] - 49:22, 86:18, 119:20
**uncle** [1] - 107:15
**unclear** [1] - 47:11
**under** [50] - 5:25, 9:24, 10:5, 10:8, 10:16, 10:18, 10:24, 12:17, 13:20, 17:13, 29:4, 30:3, 31:17, 31:21, 32:3, 34:7, 38:13, 40:23, 42:21, 46:3, 48:20, 50:17, 50:20, 50:25, 51:13, 52:7, 56:2, 59:19, 62:19, 70:5, 73:6, 74:1, 75:1, 75:9, 77:9, 78:11, 80:5, 80:8, 80:10, 80:11, 93:11, 93:20, 95:4, 95:12, 98:5, 98:6, 102:12, 116:6, 119:8
**underlies** [1] - 17:25
**underlying** [1] - 76:18
**undermine** [2] - 26:5, 30:10
**undermined** [1] - 68:4
**undermines** [1] - 22:21

**underplays** [1] - 22:20
**understood** [6] - 34:25, 38:1, 38:7, 45:7, 57:17, 95:7
**unique** [1] - 92:3
**UNITED** [4] - 1:1, 1:3, 1:8, 1:11
**United** [22] - 3:3, 3:12, 4:8, 7:10, 13:2, 21:2, 34:1, 40:17, 43:14, 84:3, 88:1, 88:7, 88:22, 108:23, 108:24, 110:24, 113:25, 114:16, 118:3, 118:4, 118:5, 118:11
**universal** [1] - 54:11
**unlawful** [1] - 119:3
**unlawfully** [6] - 36:19, 38:4, 38:10, 38:14, 56:12, 117:20
**unless** [4] - 11:25, 36:13, 78:20, 118:4
**unsuccessful** [1] - 71:15
**unverify** [1] - 55:14
**unwarranted** [4] - 100:1, 102:1, 113:14, 115:20
**up** [23] - 18:19, 23:7, 26:24, 31:1, 33:8, 34:5, 36:15, 41:15, 43:12, 47:1, 47:13, 52:17, 61:18, 63:24, 64:13, 64:24, 70:20, 74:24, 79:19, 94:13, 101:17, 102:4, 105:2
**uphold** [1] - 102:13
**upward** [9] - 35:11, 56:20, 81:9, 92:9, 93:11, 93:14, 103:11, 103:17
**urges** [2] - 16:9, 56:19
**USAO** [1] - 1:17

**V**

**V-A-Z-Q-U-E-Z** [1] - 107:2
**VA** [1] - 1:23
**vacuum** [2] - 20:8, 20:18
**vacuum-packed** [2] - 20:8, 20:18
**vague** [1] - 58:24
**Valdez** [1] - 20:24
**Valencia** [1] - 23:5
**value** [3] - 85:4, 88:20, 88:21
**valve** [8] - 11:5, 11:16,

11:20, 50:19, 51:2,
51:6, 75:20, 80:1
**variance** [3] - 90:5,
93:14, 110:16
**variation** [1] - 84:1
**various** [3] - 4:23,
50:6, 114:11
**VAS** [1] - 107:1
**vast** [2] - 20:17, 113:3
**VAZ** [1] - 107:1
**Vazquez** [4] - 106:24,
106:25, 107:1, 107:3
**VAZQUEZ** [1] - 107:4
**Vegas** [1] - 7:8
**Venezuela** [1] - 37:13
**verify** [1] - 55:14
**versus** [5] - 3:3, 43:14,
85:24, 88:6, 102:8
**victim** [2] - 109:12,
109:18
**victims** [2] - 113:16,
113:19
**video** [1] - 94:6
**videos** [2] - 108:3,
108:4
**view** [7] - 15:1, 43:11,
46:13, 68:7, 72:22,
87:12, 88:16
**viewed** [1] - 23:20
**viewing** [1] - 103:15
**views** [1] - 72:4
**Villarreal** [1] - 20:25
**violation** [3] - 4:9,
79:2, 119:9
**violence** [9] - 18:22,
75:22, 99:21,
100:11, 100:13,
100:24, 100:25,
109:25, 110:15
**violent** [3] - 100:21,
102:8, 114:7
**visa** [1] - 30:8
**visas** [1] - 7:9
**visits** [1] - 109:8
**void** [1] - 121:18
**vs** [1] - 1:4

---

## W

**wait** [3] - 76:4
**waiting** [2] - 14:8,
109:3
**waived** [1] - 119:5
**waives** [1] - 118:7
**walks** [1] - 95:16
**walls** [1] - 91:1
**Walton** [1] - 75:24
**waltzing** [1] - 97:17
**wants** [7] - 78:20,
86:4, 104:19, 110:4,

112:21, 112:23,
112:24
**warehouse** [2] -
30:22, 30:23
**warning** [1] - 54:4
**warrant** [4] - 58:22,
59:17, 120:18,
120:23
**warranted** [3] - 15:15,
15:23, 92:17
**warranting** [6] - 10:7,
10:11, 10:15, 10:17,
10:20, 113:19
**Washington** [5] - 1:6,
1:14, 1:22, 2:4,
118:15
**waste** [2] - 45:21, 57:8
**watch** [1] - 57:2
**watching** [1] - 52:21
**water** [1] - 74:11
**Watts** [3] - 15:25,
16:15, 16:20
**ways** [5] - 52:1, 94:1,
114:11, 115:2, 116:5
**weapon** [1] - 53:2
**weapons** [1] - 109:25
**week** [6] - 12:24,
45:15, 45:23, 61:13,
97:17, 101:3
**weeks** [2] - 19:23,
89:5
**well-settled** [1] - 16:6
**Westlaw** [2] - 16:25,
43:15
**white** [1] - 53:18
**whole** [6] - 72:20,
73:5, 85:18, 91:12,
91:14, 106:9
**wholesale** [1] - 88:20
**willfully** [2] - 42:14,
56:4
**willing** [1] - 106:4
**win** [2] - 44:6, 71:19
**wish** [1] - 6:5
**wit** [1] - 44:6
**Witness** [2] - 70:22
**witness** [30] - 5:3, 5:6,
17:19, 37:6, 43:8,
43:11, 47:19, 52:5,
52:6, 53:3, 53:6,
53:16, 53:25, 54:9,
56:13, 56:24, 57:16,
57:21, 58:1, 58:10,
64:12, 70:20, 70:23,
81:23, 82:2, 87:13,
87:15, 87:16, 95:8
**witness's** [2] - 14:23,
82:13
**witnessed** [1] - 64:12
**witnesses** [31] - 15:4,

15:10, 17:7, 17:9,
17:23, 17:25, 18:3,
18:12, 18:13, 18:18,
19:1, 26:18, 31:6,
32:5, 32:6, 32:22,
42:17, 46:9, 48:6,
48:10, 49:19, 50:7,
60:19, 63:14, 66:15,
68:24, 70:16, 71:4,
71:6, 114:4
**witnesses'** [1] - 18:7
**Wolf** [1] - 55:6
**wonderful** [1] - 107:7
**wondering** [1] - 6:17
**wood** [3] - 24:4, 24:12,
24:15
**word** [2] - 40:5, 75:21
**words** [4] - 72:20,
103:9, 103:16,
105:21
**worker** [2] - 42:3, 45:9
**workers** [4] - 49:22,
49:24, 50:8
**world** [1] - 11:13
**worse** [1] - 91:16
**worsen** [1] - 109:22
**worth** [4] - 84:25,
85:24, 85:25, 102:7
**writ** [2] - 69:6, 70:24
**writes** [1] - 76:25
**written** [3] - 23:2,
40:3, 104:16
**wrote** [1] - 104:15

---

## Y

**year** [4] - 19:24, 23:12,
31:7, 96:15
**years** [16] - 12:24,
20:5, 34:2, 41:8,
96:15, 108:24,
108:25, 109:2,
109:17, 110:9,
111:7, 111:9,
111:14, 113:25,
114:14, 115:14
**years'** [1] - 102:7
**York** [2] - 43:14, 43:17
**youngest** [1] - 108:8
**yourself** [1] - 43:3
**yourselves** [1] - 3:8

---

## Z

**zero** [7] - 9:17, 10:23,
74:5, 74:7, 74:8,
78:17, 80:2
**zero-point** [5] - 10:23,
74:5, 74:7, 74:8,
80:2